UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Hon. Freda L. Wolfson |
| v. | : | |
| | : | Criminal No. 13-560 (S-1) |
| CHRISTOPHER CASTELLUZZO | : | |
| and | : | |
| LUKE ATWELL | : | |

**BRIEF OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS
<u>AND IN SUPPORT OF THE GOVERNMENT'S MOTION</u>**

PAUL J. FISHMAN
UNITED STATES ATTORNEY
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:

THOMAS S. KEARNEY
Special Assistant United States Attorney

COURTNEY A. HOWARD
Assistant United States Attorney

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................   1

STATEMENT OF FACTS....................................................................   2

LEGAL ARGUMENT.........................................................................   17

    I. The Motion To Dismiss The Superseding Indictment
       Should be Denied......................................................... 17

    II. A Bill of Particulars Is Not Warranted....................................... 21

    III. The Defense Request to Sever the Trials Should be
       Denied.................................................................... 28

    IV. The Defense Motions to Suppress the Evidence are Without
       Merit and Should be Denied in their Entirety............................ 32

       A. Agents Properly Conducted a Consent Search of the Residence
          in Bayonne and the Range Rover....................................... 32

       B. The Good Faith Exception and Inevitable Discovery Doctrines
          Apply to the Search of Castelluzzo's Cellular Phone..............34

          1. Agents Acted in Good Faith When They Searched
             Castelluzzo's Phone Incident to His Arrest.................... 34

          2. The Text Messages on Castelluzzo's Phone Inevitably
             Would Have Been Discovered Through An Independent,
             Lawful Search Warrant................................................. 39

       C. The Motion to Suppress Evidence Obtained Pursuant to
          Search Warrants is Meritless and Should be Denied ............40

          1. Probable Cause for the Search Warrants....................... 41

          2. Particularity of the Search Warrants............................ 44

          3. Execution of the Search Warrants................................. 47

          4. A Suppression Hearing is not Warranted....................... 50

    V. Evidence Regarding the Email Communications Predating
       the Charged Conspiracy is Admissible ................................... 53

       A. Intrinsic Evidence ........................................................... 54

       B. Rule 404(b) ..................................................................... 55

       C.  Rule 403 ........................................................................57

CONCLUSION......................................................................  61

## **PRELIMINARY STATEMENT**

The United States of America respectfully submits this memorandum of law in opposition to the defense motions to sever and to suppress evidence.  The joint defense brief was submitted by defendants Christopher Castelluzzo ("Castelluzzo") and Luke Atwell ("Atwell") on January 6, 2015.  The United States respectfully reserves the right to supplement its responses by oral argument.  For the reasons set forth herein, the Court should deny the defense motions in their entirety.

The United States of America respectfully moves, as set forth in Point V of this brief, for the Court to admit the email communications between Castelluzzo and Atwell dating back to September 2010.

**STATEMENT OF FACTS**

Defendants Castelluzzo and Atwell are charged in a one-count Superseding Indictment (the "Superseding Indictment").[1]  Crim. No. 13-560. The defendants are charged with one count of knowingly and intentionally conspiring with each other, and others, to distribute and to possess with intent to distribute, controlled substances.  Those controlled substances included 3,4 Methylenedioxymethcathinone Hydrochloride ("methylone"), cocaine, 3,4 Methylenedioxymethamphetamine ("MDMA"), and marijuana.

The charges against the defendants stem from a conspiracy spanning approximately 29 months.  Three distinct investigations resulted in the accumulation of evidence that the Government intends to use at trial.  First, the Drug Enforcement Administration ("DEA") conducted an investigation in March 2013 resulting in the seizure of over 6 kilograms of methylone at a drug re-packaging mill in East Orange, New Jersey.  Second, the Department of Homeland Security, Homeland Security Investigations ("HSI"), seized approximately 2.9 kilograms of methylone that Atwell picked up at the Manville, New Jersey Post Office and placed in the car he occupied with Castelluzzo.  Third, following the arrest of both defendants outside the Manville Post Office, Agents searched various electronic devices of the defendants and

---

[1] The original Indictment in this case was returned in August 2013 against Castelluzzo and Atwell charging them with conspiracy to import methylone into the United States and for the substantive crime of importing methylone into the United States in April 2013.

2

uncovered email communications establishing a drug conspiracy between the defendants and others dating back to 2010.

### March 7, 2013 – East Orange

On March 7, 2013, the DEA was conducting an investigation into possible drug trafficking activities out of an apartment located in East Orange. Agents had received a tip related to a chemical odor emanating from apartment L at 68 Elmwood Avenue, East Orange, New Jersey, as well as the activities of a male connected to the apartment who had been operating a black Nissan. Agents established surveillance around 68 Elmwood Avenue, East Orange—a four-story apartment building.

At approximately 5:00 p.m. on March 7, 2013, a black Nissan Altima registered to Castelluzzo, but operated by Rafael Santiago-Soto ("Soto"), parked in front of 68 Elmwood Avenue.  Soto exited the vehicle, retrieved a cardboard box from the trunk, and entered the building.  Several law enforcement agents entered the common area of the building and met with Soto as he approached apartment L on the second floor of the complex.  Law enforcement observed that the cardboard box carried by Soto was open and contained packing envelopes and other shipping materials.  The agents confirmed a strong chemical odor emanating from apartment L.  After Soto was advised of the drug investigation, he provided written consent for the officers to search apartment L. (Exhibit A.)

As the officers entered apartment L, the chemical odor became even stronger, and they observed more parcel packing materials and several boxes

3

containing suspected controlled substances.   Two other individuals, Jose Careno-Benigno ("Benigno") and Rossy Gil-Espinosa ("Espinosa"), were found sorting and packaging controlled substances in a back room of the apartment. Espinosa was wearing rubber gloves while handling the controlled substances. As Soto walked with Task Force Officer ("TFO") Jeff Van Peenen through the apartment, he warned the officer "not to touch the chemicals," to "wear gloves," and to "not breathe in" the chemicals.

Officers recovered a large quantity of synthetic marijuana, a suspected controlled substance, later identified as methylone, as well as packaging, labels, and various other items involved in packaging and distributing controlled substances.   Several white padded boxes containing suspected controlled substances were also found in the apartment.   The labels attached to these white padded boxes contained phrases such as "Granny," "Hypnosis," "Smooth Operator," "Skunk Squirt," "Epidemic Phase 1," "Epidemic Phase 2," "Epidemic Phase 3," and "Epidemic Phase 4."   Several of the shipping boxes were addressed to Castelluzzo at an address in Newark.   A photograph of Castelluzzo from the Department of Corrections was also recovered inside apartment L.

While the officers conducted an inventory of the evidence found in the apartment, Atwell arrived at apartment L.   He claimed that he was there to deliver a pair of gloves to Soto.   Atwell was detained temporarily and

subsequently released.  Soto, Benigno, and Espinosa were all arrested at the scene and charged by complaint with conspiracy to distribute MDMA.[2]

During the inventory of apartment L, agents recovered financial records related to Castelluzzo.  These items included checks and deposit tickets for a Chase account, a copy of a $13,000 bank check issued by TD Bank referencing Castelluzzo, and a copy of a $3,999.29 bank check issued by TD Bank six days prior to the search referencing Aroma Caps.

Documents listing Castelluzzo as the registered agent for Aroma Caps were also recovered during the search of 68 Elmwood Avenue.  Thirteen cashier's checks totaling $130,000 for the two month period from January 2013 through March of 2013, issued by JP Morgan Chase, were also recovered. The remitter on each of the checks was either Rafael Santiago or Rafael Imports, and they were made payable to Aroma Caps (11 times) or to Castelluzzo (2 times).  Two checks totaling $23,000 and made payable to Castelluzzo were recovered inside apartment L.  Both of the checks were dated March 5, 2013, two days before the DEA entry at the apartment.

Later that day, several agents went to 28 Evergreen Street, Bayonne, New Jersey in an attempt to locate Castelluzzo.  They were met by Naivene Mahgoub, who identified herself as the mother of Castelluzzo's children and a

---

[2] At the time, the field test resulted in a positive reading for MDMA.  The laboratory results indicate that the substance packaged at the East Orange drug mill was, in fact, methylone.  Soto and Espinosa were indicted on April 1, 2014 with conspiracy to distribute and possess with intent to distribute methylone.  On April 29, 2014, Benigno was added in a superseding indictment containing the same charges. On February 2, 2015, Soto entered a guilty plea before the Honorable Esther Salas, United States District Judge for the District of New Jersey.

resident of 28 Evergreen Street.  Ms. Mahgoub, whose name also appeared on some of the checks recovered from the East Orange drug mill, was cooperative with the agents and verbally consented to a search of the residence, a 2009 Range Rover parked in the driveway of the residence, and a Nissan Altima parked in the garage of the residence.  A consent form permitting the officers to search the residence was presented by the officers and signed by Ms. Mahgoub.  (Exhibit B.) During the search of the residence, officers recovered three cellular phones and packaging materials—including but not limited to rubber bands, money wrappers, a notebook, and plastic cylindrical tubes.  The search of the Range Rover yielded several labels that matched labels seized from the drug mill at 68 Elmwood Avenue, East Orange, New Jersey.  Ms. Mahgoub was asked to advise Castelluzzo to call the agents when he returned to the residence, but no contact was ever voluntarily made.

### April 16, 2013 – Manville

On April 10, 2013, Custom and Border Protection ("CBP") officers at the San Francisco air mail facility intercepted a package from China destined for Atwell's business, LA Courier Services, located at 64 N. Weiss Street, Manville, New Jersey.  The Package was screened using infrared technology and was suspected of containing a controlled substance.  Tests of the contents of the Package revealed that it contained slightly less than three (3) kilograms of methylone, a Schedule I controlled substance.  HSI received the Package in Newark, New Jersey and prepared it for an attempted controlled delivery by

removing the methylone and replacing it with sham meant to simulate the size and appearance of the controlled substance.

An undercover postal inspector, posing as a mail carrier, brought the Package to Atwell's business, LA Courier Services, on April 15, 2013 at approximately 10:25 a.m.  Atwell was not present at LA Courier Services at the time of the attempted delivery.  The undercover agent left a re-delivery slip for the Package with the office manager of the building complex.

Later in the afternoon of April 15, 2013, Castelluzzo engaged in a series of text messages with an individual identified in Castelluzzo's cell phone only as "Ghost."  (Exhibit C.)  On April 15, 2013 at 2:46 p.m., Castelluzzo received the message "Hit me when u wake up."   At 5:36 p.m., Castelluzzo responded to "Ghost" asking, "So wat u up to today."  "Ghost" responded one minute later with, "Got 2 collect 2600 and pay u back other than that I ain't doing shit."  At 5:40 p.m., Castelluzzo responded, "U aint drop it in the account yet" to which Ghost replied, "I thought I was going 2 c u today."

On April 15, 2013 at 5:41 p.m., several hours after the attempted controlled delivery where the undercover agent left behind the re-delivery slip related to the Package, Castelluzzo received the following message from "Ghost": "Ok eagles landed and a slip was left I got 2 call the po."  Three minutes later, Castelluzzo received another message from "Ghost": "I got 2 grab the package 2morrow at the po."  At 5:46 p.m., Castelluzzo replied, "Ok."

The following day, April 16, 2013, the Hillsborough Post Office, which also services Manville, received a call from a male regarding the re-delivery slip.

7

The postal attendant suggested that the Package might be in-transit between the Hillsborough Post Office and the Manville Post Office, and suggested that the male caller call back after noon.

On April 16, 2013, at approximately 12:30 p.m., law enforcement officers observed a Silver Jeep Liberty (the "Jeep"), registered to Atwell and occupied by two individuals, entered the block where LA Courier Services was located. Thirty-five minutes later, Atwell drove the Jeep to the Manville Post Office. Atwell exited the Jeep while Castelluzzo remained in the passenger seat. Atwell entered the post office and presented the re-delivery slip which had been left at his place of business the previous day. He also presented other documents verifying that he was the owner of LA Courier Services. The Package was turned over to Atwell, who then exited the post office and returned to the Jeep. As Atwell began to back out of the parking space, HSI agents blocked his vehicle and placed both he and Castelluzzo under arrest. The Package was found between the driver and passenger seats in the front compartment of the Jeep.

At the time of his arrest, Castelluzzo was in possession of two cellular phones. HSI agents reviewed the text messages from Castelluzzo's T-Mobile phone, which contained the aforementioned texts from "Ghost" referencing the "eagle" landing and picking up the package at the "po." HSI agents also recovered an Apple iPhone and a flash drive key chain from Atwell.

After being advised of their *Miranda* warnings, Castelluzzo stated that he was not going to speak with law enforcement because he was "screwed"

8

anyway. Conversely, Atwell decided to speak with HSI agents and weaved an elaborate tale about an alleged person known to him only as "Pito." Atwell acknowledged that he was the owner of LA Courier Services and claimed that he started the business because his felony convictions prevented him from obtaining other jobs. He claimed that a month or two before this arrest, he responded to a Craig's List advertisement and made contact with "Pito," who allegedly communicated by email using the account "nychookah@gmail.com." Atwell acknowledged that he used his personal email address, "atwell.luke@gmail.com," during these communications. Atwell went on to describe "Pito" physically and stated that he thought the Package might contain a gun or explosives because "Pito" was foreign. Atwell also claimed he had only known Castelluzzo for a few months and that their initial introduction was at a strip club in Neptune, New Jersey. Atwell stated that the plan that day was for Castelluzzo to pay for the tolls and gas so that he and Castelluzzo could transport the Package to "Pito" in New York City.

Law enforcement's investigation uncovered the truth, which was drastically different than Atwell's story. Email correspondence that was later recovered demonstrated that Atwell and Castelluzzo had been involved in a drug conspiracy dating back to as early as 2010. Further investigation also revealed that the IP address used to create both the account "nychookah@gmail.com" and the Craig's List advertisement was registered to

9

Luke Atwell. [3]   The Luke Atwell IP address was also used to access "atwell.luke@gmail.com."

Atwell signed a written consent form allowing the agents to access his iPhone at the time of his arrest.  (Exhibit D.)  Separately, Atwell provided law enforcement access to his email account and showed the agents copies of some emails between himself and other individuals, including one exchange with an "Andrew Becker" of Colorado.  In the email exchange with Becker, Atwell was advised that "Molly" (MDMA), was being sold for $2,400 per kilogram through an underground marketplace on the internet known as the Silk Road.  Atwell also consented to a search of LA Courier Services resulting in the seizure of various business documents and his computer tower.  (Exhibit E.)

On April 17, 2013, Atwell and Castelluzzo were charged by criminal complaint, Mag. No. 13-6616, with conspiracy to import contraband, specifically methylone, into the United States.  At or around the time they were making their initial appearance in Court, the U.S. Postal Inspection Service ("USPIS") received information about another package destined for LA Courier Services.  Law enforcement applied for and received a search warrant to search the package ("Package 2").  The search warrant was authorized by the Honorable Joseph A. Dickson, United States Magistrate Judge for the District of New Jersey on April 18, 2013.  The search of Package 2 revealed the upper receiver of an M4 assault rifle which had been sent to LA Courier Services by

_____

[3] An "IP address" or "Internet Protocol address" is a series of numbers separated by three dots that identifies a particular computer on the Internet.

Krystel Lopez, Atwell's girlfriend who had been living in Colorado. Thereafter, on April 19, 2013, six other packages from Lopez to "Krystel Lopez c/o LA Courier Services" or care of Luke Atwell were searched pursuant to search warrants authorized by the Honorable Joseph A. Dickson, United States Magistrate Judge, and found to contain component parts which, when assembled, consisted of an M4 assault rifle and a Glock handgun.[4]

**Search Warrants**

On June 4, 2013, HSI Special Agent Alexandra deArmas presented three applications and affidavits to the Honorable Steven C. Mannion, United Magistrate Judge for the District of New Jersey. The first sought authorization to search (1) the computer tower recovered from LA Courier Services; and (2) the flash drive recovered from Atwell at the time of his arrest. (Exhibit F.) The second sought authorization to search the "atwell.luke@gmail.com" and the "nychookah@gmail.com" email accounts. (Exhibit G.) The third sought authorization to search the three cellular telephones recovered from Atwell and Castelluzzo at the time of their arrests. (Exhibit H.)

The search warrants pertaining to all seven items were signed and required that they be executed within fourteen (14) days. (Exhibits I, J, K, L, M, N, O.) Attachment B to each of the search warrants set forth that the property to be searched and seized was "evidence, contraband, fruits, and

---

[4] Lopez was indicted on November 1, 2013 and charged with conspiracy to transport firearms interstate and the transfer of firearms to a prohibited person. The case remains pending before the Honorable Michael A. Shipp, United States District Judge for the District of New Jersey (Crim. No. 13-720 (MAS)).

instrumentalities relating to violations of Title 18 U.S.C. §§ 371, 545, 922(e), 1715 and 21 U.S.C. §§ 952 and 963." The specified federal offenses were related to conspiracies to smuggle contraband into the United States, to illegally transport firearms, to illegally mail firearms, and to import controlled substances. After the search warrants were signed, the electronic devices were imaged and preserved within fourteen (14) days for the review and extraction of information by a forensic analyst. The search warrants for the gmail accounts were served on Google within the authorized fourteen (14) day time period.

Specifically, the search warrants were signed by Judge Mannion on June 4, 2013. HSI agents turned over Castelluzzo's two cellular phones to HSI's forensic analysts on June 6, 2013. The extraction process on both of these phones began on June 10, 2013 (well within the authorized time period) and the available information from the phones was downloaded one week later. The Apple iPhone recovered from Atwell proved to be more problematic. Atwell consented to the search of this phone at the time of his arrest (Exhibit D); however, the HSI analysts experienced technical problems in trying to extract information from the iPhone. HSI sent the iPhone to Apple to assist. On June 10, 2013, it was received by Apple, but the company failed to respond to the request in the warrant to provide reasonable technical assistance in order to gain access to the device's data. After speaking with representatives from Apple, HSI re-sent the iPhone, which was received by Apple on September 6, 2013, but Apple notified HSI that it, too, was unable to extract information from the phone.

The search warrant for the "atwell.luke@gmail.com" account was emailed to Google on June 5, 2013 and the search warrant for the "nychookah@gmail.com" account was emailed to Google on June 5, 2013 (both within the authorized time period).  The computer tower and flash drive were turned over to the forensic analyst at HSI on June 6, 2013.  The computer tower was imaged on June 6, 2013 and the flash drive was imaged the following day (both within the authorized time period).

The search of the computer tower revealed a large volume of emails between the accounts of Atwell and Castelluzzo related to the drug conspiracy dating back to 2010.  In September 2010, Atwell's self-admitted email address, "atwell.luke@gmail.com," exchanged a series of emails with "christopher castelluzzo" at "castelluzzo@gmail.com" regarding MDMA.  In these emails, they discussed obtaining a better price per pill if they purchased it in larger quantities.  (Exhibit P, at emails dated 9/7/10.)  When "christopher castelluzzo" asked "whats the name of them", in reference to the pills, Atwell responded that he would not know until the deal went down.  (Exhibit P, at emails dated 9/8/10.  Atwell did, however, provide a hyperlink to a web site regarding Ecstasy, a street name for MDMA.  (Exhibit P, at emails dated 9/8/10).  One week later, Atwell indicated that the imprint on the pill was for "Rolex Crowns." (Exhibit P at email dated 9/13/10).  On that date, "christopher castelluzzo" also made reference to entering into a "nice partnership thing" with Atwell.  (Exhibit P at email dated 9/13/10).

From November 2010 through January 2011, much of the focus of the emails turned toward developing a drug connection in Arizona and getting product out.  (Exhibit P, at emails dated 11/16/10.)  In an email addressed to "christopher castelluzzo" at "castelluzzo@gmail.com," Atwell referenced the logistics of transporting drugs from Arizona and expressed his concern with respect to a fair price to pay the driver. (Exhibit P, at email dated 12/28/10.) These emails also made reference to the loyalty of "Rule" and "Jay," and their perceived ability to help the business.  (Exhibit P, at emails dated 11/8/10 and 11/11/10.)  Notably, references to both of these names with contact numbers were found in notes recovered by the DEA at 28 Evergreen Greet, Bayonne, New Jersey—Castelluzzo's residence.

In January 2011, the focus of the emails between Atwell and "christopher castelluzzo" turned toward estimating their potential profits.  (Exhibit P, at emails dated 1/19/11 and 1/26/11.)  Atwell wrote to "christopher castelluzzo" and said, "Things are finally starting to fall together.  I got sales lined up and biz is about to be booming."  (Exhibit P, at emails dated 1/26/11.)  Atwell estimated their earning potential to be $10,000 per month and figured they "should be sitting at around 50K" by May.  (Exhibit P, at email dated 1/26/11.) Later that day, "christopher castelluzzo" responded, "lets do a mill each and walk away from the game for good."  (Exhibit P, at email dated 1/26/11.)

As the market fluctuated, so did the defendants.  In an email dated February 17, 2011 with a subject line listed as "mdma," Atwell expressed his reluctance to get "out of the weed game" and his discomfort with "going back

14

into the coke game." (Exhibit P, at email dated 2/17/11.) MDMA remained a focus of their conspiracy. They communicated with "janelizzy@rocketmail.com" and asked questions about dosage units and price per pill. (Exhibit P, at email dated 2/16/11). After receiving some information and a proposal from "janelizzy@rocketmail.com," Atwell sent "christopher castelluzzo" some links suggesting that the MDMA was being shipped from West Africa to Maryland. (Exhibit P, at email dated 2/23/11.) "christopher castelluzzo" responded that he didn't "care where the product is coming from." (Exhibit P, at email dated 2/23/11.) His concern was whether "janelizzy@rocketmail.com" was the "real deal . . . . . feds, or a scam." (Exhibit P, at email dated 2/23/11.)

Shortly thereafter, the defendants were back in the "coke game." In March 2011, "christopher castelluzzo" gave Atwell advice about which vice to buy, and noted that he liked one because "we can build a small box on it for the small quantities and upgrade to a bigger box when needed." (Exhibit P, at email dated 3/8/11.) Notably, vices or presses are commonly used to compress kilogram quantities of cocaine for concealment purposes. Shortly after ordering the press, they pursued the cocaine conspiracy. (Exhibit P, at email dated 3/27/11.) In April 2011, they located a buyer willing to pay $32,000 for a kilogram. (Exhibit P, at email dated 4/20/11.) "christopher castelluzzo" then instructed Atwell to purchase acetone (a cutting agent for cocaine), a powder sifter, a cocaine purity test kit, and wax paper. (Exhibit P, at email dated 5/2/11.) Later the same day, Atwell sought guidance as to when he should "add the cocaine" while using the test kit. (Exhibit P, at email

15

dated 5/2/11.)  Prior to his departure to meet with a cocaine source in New Orleans, Atwell again wrote to "christopher castelluzzo" laying out the "gameplan" regarding expenses for the trip and estimating their potential profits.  (Exhibit P, at email dated 5/10/11.)   In response, "christopher castelluzzo" wrote, "Im down 110% for everything.  I am good with all your numbers.  Lets get the show on the road then."   (Exhibit P, at email dated 5/11/11.)  Atwell projected about $2,500,000 in revenues for their business by the end of the year.  (Exhibit P, at email dated 5/13/11.)

**LEGAL ARGUMENT**

## I.   THE MOTION TO DISMISS THE SUPERSEDING INDICTMENT SHOULD BE DENIED

The defendants claim that the Superseding Indictment "is defective because it does not contain any factual statement and fails to state an offense." Joint Defense Brief ("JDB") at 21.   This contention is unsupportable.   The Superseding Indictment in this case contains a concise, written statement of the essential facts constituting the offense charged and is therefore legally sufficient.   *See* Superseding Indictment ("Ind.") at 1-2 attached as Exhibit R.

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment contain "a plain, concise and definite written statement of the essential facts constituting the offense charged."   F.R.C.P. 7(c)(1); *see also United States v. Moyer*, 674 F.3d 192, 203-4 (3d Cir. 2012) (holding that an indictment for falsifying documents sufficient under 7(c)(1) despite the absence of a complete factual record because "essential facts" were included).   An indictment is "an accusation only, and its purpose is to identify the defendant's alleged offense and fully inform the accused 'of the nature of the charges so as to enable him to prepare any defense he might have.'"   *United States v. Stansfield*, 171 F.3d 806, 812 (3d Cir. 1999) (internal citations omitted) (quoting *Zuziak v. United States*, 119 F.2d 140, 141 (9th Cir. 1941)).   In considering the joint defense motion to dismiss, this Court must accept as true all facts pled in the Superseding Indictment, and may grant the motion only where the allegations in that Superseding Indictment are insufficient to sustain a conviction for the offense with which the defendants are charged.   *See United States v. Hedaithy*,

392 F.3d 580, 589 (3d Cir. 2004); *United States v. Besmajian*, 910 F.3d 1153, 1154 (3d Cir. 1990).

An indictment is sufficient if it "[f]irst, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974).   As a general rule, "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989); *accord United States v. Addonizio*, 451 F.2d 49, 58 n. 7 (3d Cir. 1971) ("[An] indictment which charges a statutory crime by following substantially the language of the statute is amply sufficient, provided that its generality neither prejudices defendant in preparation of his defense nor endangers his constitutional guaranty against double jeopardy.").

Here, the Superseding Indictment consists of a one-count drug conspiracy charge that substantially follows the language of Title 21, United States Code, Section 846.  The two co-conspirators have been named, the dates of the conspiracy have been set forth, and the four controlled substances that they conspired to distribute and possess with intent to distribute have been included.   Further, under the Controlled Substances Act, the conspiracy charge does not require proof of an overt act in furtherance of the conspiracy. *See* 21 U.S.C. § 846.  Thus, the indictment need not allege any specific overt

18

acts. *United States v. Shabani*, 513 U.S. 10, 15 (1994); *United States v. Bey*, 736 F.2d 891, 895 (3d Cir. 1984) (finding neither statutory nor constitutional requirement that an overt act must be alleged to sustain a conviction under the Controlled Substances Act). Accordingly, the Superseding Indictment satisfies the pleading requirements of Rule 7(c)(1) and the Sixth Amendment.

*United States v. Cheatham*, 500 F.Supp.2d 528 (W.D. Pa. 2007), is illustrative. There, the court relied on Third Circuit precedent regarding the sufficiency of an indictment charging a violation of Title 21, United States Code, Section 846. *Id.* at 530-531 (citing *United States v. Johnstone*, 856 F.2d 539 (3d Cir. 1988)). In finding the indictment legally sufficient, the court noted that the indictment, like the Superseding Indictment in this case, tracked the language of the statute and alleged the dates of the conspiracy, the names of the co-conspirators, and the controlled substances that were alleged to have been distributed. *Id.*

Defendants further suggest, however, that the Superseding Indictment is insufficient because they "are left to speculate as to the criminal actions of which they are accused." JDB at 22. The defendants fail to cite any authority which requires a charging document to provide a precise accounting of all the criminal activities in which they participated over the course of the conspiracy as opposed to "fairly inform[ing] a defendant of the charge against which he must defend." *Hamling,* 418 U.S. at 117. Neither Rule 7(c)(1) nor the Constitution have been interpreted to require indictments to provide such specific information. The Government has no obligation to set out in the

19

Superseding Indictment every detail regarding the criminal activities of these defendants who engaged in a drug conspiracy.  "In order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating." *Hedaithy*, 392 F.3d at 589 (internal citation omitted); *accord United States v. Agostino*, 132 F.3d 1183, 1189 (7th Cir. 1997) ("Indictments need not exhaustively recount the facts surrounding the crime's commission.").[5]

Lastly, the Superseding Indictment cannot be dismissed due to unspecified future double-jeopardy concerns.  An indictment must contain only "enough detail that [the defendant] may plead double jeopardy in a future prosecution based on the same set of events."  *United States v. De la Pava*, 268 F.3d 157, 162 (2d Cir. 2001).  "Traditionally, courts have been understandably reluctant to interfere and require more particularity on potential double jeopardy grounds; it is a most difficult task to look ahead down the road and predict what future crimes may be charged by a subsequent indictment." *United States v. Stricklin*, 591 F.2d 1112, 1118-19 (5th Cir. 1979).

---

[5] It is worth noting that defendants have received voluminous discovery containing information about the evidence against them.  A review of the discovery provides defendants with ample notice of the allegations against them.  Moreover, the Government has offered to preview the case against each defendant during a courtesy, in-person meeting.  Castelluzzo and his counsel attended such a meeting in December 2014.  Despite several invitations, Atwell and his counsel have not met with the Government.  That said, this proffer by the Government is a courtesy, not a right. Defendants are not entitled to demand precise details about the evidence the Government anticipates will be presented at trial or the prosecution's theory of elements such as intent or knowledge.  "The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved."  *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981), *quoted in Agostino*, 132 F.3d at 1191.

In sum, there is no basis to dismiss the Superseding Indictment.

## II.   A BILL OF PARTICULARS IS NOT WARRANTED

The defendants have also moved for a bill of particulars "to clarify vague allegations" in the conspiracy charge.  JDB at 25.  The Superseding Indictment presented by the Government in this case more than adequately informs the defendants of the nature of the charges and provides ample information to enable them to conduct their own investigation regarding the conspiracy. Additionally, the large volume of discovery that has been turned over to the defense provides even more detail regarding the nature of the illegal activity, the respective roles that each of the defendants played in the conspiracy, and the dates, times, and places where the defendants acted in furtherance of the conspiracy.  *See supra* note 5.  The motion should be denied.

It is well established that a demand for a bill of particulars should be granted only if an indictment is so vague that it fails to adequately inform the defendant of the nature of the charges.  *United States v. Rosa*, 891 F.2d 1063, 1066-67 (3d Cir. 1989); *United States v. Zolp*, 659 F. Supp. 692, 706 (D.N.J. 1987).  A bill of particulars is not an investigative vehicle for the defense, nor is it a discovery tool to obtain either detailed disclosure of the Government's case prior to trial or a list of all overt acts.  *See Zolp*, 659 F. Supp. at 706-07 (citing *United States v. Kilrain*, 566 F.2d 979, 985 (5th Cir. 1978)).  Indeed, the Government is not required at the pretrial stage to "weave the information at its command into the warp of a fully integrated trial theory for the benefit of the defendant[]…"  *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971); *see*

*also United States v. Caruso*, 948 F. Supp. 382, 395 (D.N.J. 1996) ("Rule 7(f) of the Federal Rules of Criminal Procedure does not require the United States Attorney to furnish a three dimensional colored motion picture of the prosecution's proof prior to trial") (internal citations omitted).  Instead, the bill is "intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his own investigation." *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985).  If the defendant can derive this information from the indictment and discovery, there is no need for the bill to issue.  *See United States v. Sourlis*, 953 F. Supp. 568, 578-79 (D.N.J. 1996); *United States v. Boffa*, 513 F. Supp. 444, 485 (D. Del.), *aff'd in part, rev'd in part on other grounds*, 688 F.2d 919 (3d Cir. 1983).

This Court should "strike a 'prudent balance' between the defendant's interest in securing information and the government's interest in not committing itself to facts before it is in a position to do so." *United States v. Mariani*, 7 F. Supp. 2d 556, 560 (M.D. Pa. 1998) (quoting *Rosa*, 891 F.2d at 1066).  In this balancing, it should be recognized that the bill puts an onerous and potentially unfair burden on the Government, because "[g]enerally, when a bill of particulars is furnished to a defendant, the government is strictly limited at time of trial to the particulars which it has specified." *Mariani*, 7 F. Supp. 2d at 560 n.3; *see also United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) (stating that "[a] bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the

22

government intends to prove its case; interpret its evidence for the defendant; or disclose its legal theory"); *United States v. Jabali*, 2003 WL 22170595, *3 (E.D.N.Y. Sept. 12, 2003) (stating that requests "for exact dates, places, and times in which events occurred . . . ignore the proper scope and function of a bill of particulars and are to be denied").

As detailed above, the Government has provided adequate detail in the Superseding Indictment to inform the defendants of the nature of the charges. Atwell and Castelluzzo have been named as the co-conspirators.  The date range of the conspiracy, from November 2010 through April 2013, has been set forth.  The four controlled substances that were the subject of the conspiracy, methylone, cocaine, MDMA and marihuana, have all been included.  Thus, the Superseding Indictment, standing alone, furnishes the defendants with enough information for a thorough investigation to prepare their defenses sufficiently without surprise during the trial and to protect against a second prosecution for an inadequately described offense.  *See United States v. Wabo*, 290 F. Supp. 2d 486, 490 (D.N.J. 2003) (denying motion for bill of particulars on the basis of specifics in the indictment); *accord Sourlis*, 953 F. Supp. at 579 (same); *Zolp*, 659 F. Supp. at 706-07 (same).

In addition, the Government has provided to the defense extensive discovery which supports the charges contained in the Superseding Indictment.  *See* Exhibit Q (discovery letters sent by the Government to defense counsel).  Shortly after the defendants were arrested by HSI, they received discovery containing the police reports regarding their arrest on April 16, 2013.

As the investigation continued and connections were identified between the defendants and the East Orange drug packaging mill, more reports and supporting documentation were sent to the defendants.  The Government ultimately provided the defendants with hundreds of documents and multiple discs containing discovery related to this conspiracy.  Given the wealth of information provided by the United States, the defendants cannot reasonably suggest that the Superseding Indictment fails to inform them "of the date, time and place where the alleged illegal activity occurred."  JDB at 31.  *See supra*, note 5.

In these circumstances, a bill of particulars is neither warranted nor appropriate.  *United States v. Chen*, 378 F.3d 151, 162-63 (2d Cir. 2004) ("a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means," particularly where "extensive discovery furnished defendants with significant insight into the government's case") (internal marks and citations omitted).  Indeed, the Third Circuit has emphasized that the need for a bill of particulars is obviated in those cases where the United States supplements a charging document with substantial discovery.  *United States v. Urban*, 404 F.3d 754, 772 (3d Cir. 2005); *see also United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (affirming the denial of a motion for a bill of particulars where "the defendants have been provided with a wealth of evidentiary detail from the discovery to date") (internal citations omitted); *United States v. Munoz*, 736 F. Supp. 502, 504 (S.D.N.Y. 1990) (provision of substantial discovery weighs

against ordering bill of particulars).   Here, the Government has provided substantial discovery about the role both Atwell and Castelluzzo played in the drug conspiracy charged in the Superseding Indictment.   Thus, as the "discovery provided by the government fills in the outline of the Indictment, the necessity for a bill of particulars declines."   *United States v. Caruso*, 948 F.Supp. 382, 393 (D.N.J. 1996); *United States v. Grasso*, 173 F. Supp. 2d 353, 366 (E.D. Pa. 2001) (stating that "the Government has provided extensive discovery, which significantly lessens any need for a bill of particulars"); *United States v. Beech-Nut Nutrition Corp.*, 659 F. Supp. 1487, 1499-1500 (E.D.N.Y. 1987) (government's production of 30,000 pages in discovery "must have answered a great many, if not all, of defendants' requests" for bills of particulars).

A bill of particulars must not be co-opted as a tool for discovery or used to box the Government into a particular theory of the case.   "The functions of a bill of particulars are more akin to the functions of an indictment than to discovery.   For this reason, the Court will not order the Government to answer a set of detailed interrogatories in the guise of a bill of particulars."   *Grasso*, 173 F. Supp. 2d at 366 (internal marks and citations omitted).   The defense request that the Government identify all unindicted co-conspirators and to "[i]dentify the acts or conduct of all such other individuals that constitute their involvement in the crime alleged" (JDB at 32) shows that they are merely seeking "back-door" discovery to which they are not entitled, rather than that this information is necessary to an understanding of the charges and their

ability to mount a defense. *See*, *e.g.*, *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) ("demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied") (citing cases). Requests of this nature are routinely denied. *See*, *e.g.*, *United States v. Coffey*, 361 F. Supp.2d 102, 122 (E.D.N.Y. 2005) ("Courts have been highly reluctant to require a bill of particulars when defendants have asked for specific identities of co-conspirators or others allegedly involved."); *accord United States v. Glisson*, 2003 WL 21709502, at *3 (S.D.N.Y. July 23, 2003) (denying a request for the names of all co-conspirators and aiders and/or abettors, and noting that such requests are "routinely" denied); *United States v. Aparo*, 221 F. Supp.2d 359, 368 (E.D.N.Y. 2002) ("A bill of particulars is not intended to provide the defendant with the names of unindicted co-conspirators."); *United States v. Sampson*, 2012 WL 214707, at *2 (M.D.Pa. January 24, 2012) (same); *see generally United States v. Gatto*, 746 F. Supp. 432 (D.N.J. 1990) (stating that "this court agrees with other district courts within the circuit that have rejected defendants' argument that they are entitled to statements of coconspirators before trial," and collecting cases), *rev'd on other grounds*, 924 F.2d 491 (3d Cir. 1991); *United States v. Jiminez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) (noting that requests for the "whens," "wheres," and "with whoms" of a conspiracy "are routinely denied").

Here, the Superseding Indictment and the disclosure of voluminous discovery to the defense undermines any claim that the Government failed to

26

inform the defendant of the nature of the charges. The discovery related to both the DEA and the HSI investigations have been provided to the defense. Additionally, the documents subsequently received from the search warrants have been provided. The request to identify other co-conspirators is essentially a veiled attempt by the defense to gather information about the Government's witnesses before they are entitled to receive it. The defendants fail to cite any legal precedent which would require the Government to specify "the role that the government alleges each defendant played in the conspiracy charged." (JDB at 31). Similarly, there is no legal support for a bill of particulars to compel the Government to "identify the acts or conduct" that each defendant performed "that constitute his involvement in the crime alleged." (JDB at 32). Essentially, the defense is seeking a written preview of the Government's opening statement. Clearly, none of the information sought by the defense in a bill of particulars is "*necessary*, as opposed to merely helpful, in preparing a defense." *United States v. Morales*, 280 F. Supp. 2d 262, 274 (S.D.N.Y. 2003) (internal citations omitted).

The Superseding Indictment, along with the large amount of discovery made available, more than suffice to defeat the defendants' motion. *See*, *e.g.*, *United States v. Delle Donna*, 552 F. Supp. 2d 475, 497-99 (D.N.J. 2008); *United States v. Parlavecchio*, 903 F. Supp. 788, 795-96 (D.N.J. 1995); *United States v. Giampa*, 904 F. Supp. 235, 280 (D.N.J. 1995); *United States v. Eisenberg*, 773 F. Supp. 662, 688-92 (D.N.J. 1991). With all the information provided, it is no exaggeration to state that the Government's case has been

essentially laid out for the defendants.  Thus, for all the foregoing reasons, the defense motion for a bill of particulars should be denied.

## III.   THE DEFENSE REQUEST TO SEVER THE TRIALS SHOULD BE DENIED

Ironically, in the *joint* defense brief filed by Atwell and Castelluzzo, they seek to sever their trials.  Other than a passing reference (JDB at 44) regarding a brief oral statement Atwell made about Castelluzzo, neither defendant articulates how they would be unfairly prejudiced in a joint trial.  In fact, the fleeting references Atwell made about his short term relationship with Castelluzzo and that Castelluzzo was expected to pay for tolls and gas after they picked up the package in Manville, can be easily avoided during a joint trial.  As evidenced by their text and email correspondence, their appearance together at the Manville Post Office to pick up the package containing methylone, and their common links to the drug packaging mill in East Orange, one would be hard pressed to find two co-conspirators who were more inextricably intertwined than these two men.

Pursuant to Federal Rule of Criminal Procedure 8(b):

The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).  "Joint trials of defendants named in a single indictment are favored because they 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.' " *United States v. Jimenez*, 513 F.3d 62, 82 (3d Cir. 2008)

28

(quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).   Joinder of more than one defendant in a single indictment is proper under Rule 8 where the defendants are charged with a conspiracy. *See Lane*, 474 U.S. at 447.

Defendants seeking a severance bear a "heavy burden" to overcome a fundamental preference for joint trials in the federal judicial system.   *United States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005).   Generally, courts prefer to conduct joint trials of defendants who were indicted together in order to promote efficiency and avoid the inequity of inconsistent verdicts.   *Id.*   This preference also conserves judicial and prosecutorial resources. *United States v. Saunders*, 553 F.3d 81, 85 (1st Cir. 2009).   "The preference for a joint trial is particularly strong where the charge is conspiracy."   *Id.*; *see also United States v. Donnell*, 596 F.3d 913, 922-23 (8th Cir. 2010) (joinder of codefendants proper because defendants involved in the same drug conspiracy); *United States v. Baker*, 432 F.3d 1189, 1237 (11th Cir. 2005) (joinder of eleven co-defendants proper because all participated in cocaine distribution conspiracy and were jointly indicted).   Such joint trials protect the Government's case from premature disclosure, and in addition, "joint trials of defendants charged under a single conspiracy aid the finder of fact in determining the 'full extent of the conspiracy.' " *United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996) (quoting *United States v. Provenzano*, 688 F.2d 194, 199 (3d Cir. 1982)); *see United States v. Inigo*, 925 F.2d 641, 656 (3d Cir. 1991) (as it is "customary" to try co-conspirators together, severance justified "only for compelling reasons").   Furthermore, as "acts committed by one [co-conspirator] in furtherance of the

conspiracy [would be] admissible against the other" co-conspirator in a separate trial, severance would serve little to no purpose except to waste public resources. *United States v. Hart*, 273 F.3d 363, 370 (3d Cir. 2001); *see United States v. DePeri*, 778 F.2d 963, 984 (3d Cir. 1985) ("[P]ublic resources . . . would be lost if the same evidence were presented at separate trials.").

Here, Atwell and Castelluzzo participated in the same series of acts and transactions constituting the conspiracy offense. *See* Federal Rule of Criminal Procedure 8(b). Soto showed up at the East Orange drug packaging mill in a car registered to Castelluzzo. Atwell walked in on the DEA as they were searching the mill and stated that he was there to drop off gloves for Soto. Notably, Espinosa and Benigno were found in a back room wearing gloves while they were re-packing the methylone. Documents tying Castelluzzo to the drug packaging mill were also recovered inside the apartment. Less than six weeks after the East Orange incident, Atwell and Castelluzzo arrived together at the Manville Post Office. The Package that Atwell entered the post office and claimed was previously examined and found to contain approximately three (3) kilograms of methylone.

Atwell tried to distance himself from Castelluzzo during his post-arrest interview on April 16, 2013, claiming that he had only known him for a few months. Further investigation revealed, however, that Atwell and Castelluzzo had known each other since at least 2010 and that they exchanged a large number of emails where they overtly communicated about plans to distribute various controlled substances. As noted *supra*, the email communications

30

between these co-conspirators dated back to September 2010 when they shared information about the pricing and profits to be made from the sale of MDMA.  There was even communication about a "nice partnership thing" that they hoped to get going.  From November 2010 through January 2011, the focus between them became the development of a good marijuana connection and the distribution of the drugs.  By February 2011, they shifted focus back to MDMA before they ventured into the "coke game" in March 2011.  The defendants shared information about kilogram presses and cocaine testing kits, and projected $2,500,000 in revenues from their cocaine business by the end of the year.  Clearly these two men were knee deep in all of these drug ventures together, and there is no basis to sever their trial.

Any concern about the references to Castelluzzo during the post-arrest statement of Atwell can be easily remedied in a joint trial.  The oral statement was memorialized in an interview report.  If the Government introduces any of what was largely a self-serving statement by Atwell, it can be sanitized so as to excise the references to Castelluzzo's payment of the gas and tolls as well as the reference to the inception of their relationship.  Thus, there is no *Bruton* issue and severance is unnecessary if the defendant is not directly implicated by a co-defendant's out-of-court statement. *Bruton v United States*, 391 U.S. 123, 137 (1968); *see also United States v. Jass*, 569 F.3d 47, 61-62 (2d Cir. 2009) (no *Bruton* violation because co-defendant's confession was adequately redacted).  Accordingly, the joint motion for severance should be denied.

## IV.   THE DEFENSE MOTIONS TO SUPPRESS THE EVIDENCE ARE WITHOUT MERIT AND SHOULD BE DENIED IN THEIR ENTIRETY.

The Fourth Amendment bars "unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless search is presumptively unreasonable. *Horton v. California*, 496 U.S. 128, 133 (1990). Nonetheless, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).   The defendants move to suppress certain evidence, including evidence obtained during searches conducted under valid exceptions to the warrant requirement, as well as evidence obtained from valid search warrants.   Each of the defendants' arguments fails, and their motions should be denied.

First, the search of Castelluzzo's residence and vehicle located at his Bayonne address was done with the consent of his live-in girlfriend, Naivene Mahgoub.   Second, the HSI agents acted in good faith when they searched Castelluzzo's phone incident to his arrest, and regardless, the relevant text messages would have inevitably been discovered because the agents had ample probable cause to obtain—and in fact did later secure—a search warrant for the phone.   Finally, the defense cannot show that the search warrants related to the seized electronics were improper.

### A. Agents Properly Conducted a Consent Search of the Residence in Bayonne and the Range Rover.

Government officials may conduct a consent search without a warrant if it is given voluntarily by a person authorized to give it.   *Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Wilson*, 413 F.3d 382, 388 (3d Cir. 2005).   To determine whether consent was given voluntarily, courts examine the totality of the circumstances.   *United States v. Stabile*, 633 F.3d 219, 231 (3d Cir. 2011).

On March 7, 2013, agents recovered several documents related to Castelluzzo while searching the drug packaging mill in East Orange.   Later that day, several agents went to Castelluzzo's residence at 28 Evergreen Street, Bayonne, in an attempt to locate him.   They were met by Naivene Mahgoub whose name appeared with Castelluzzo's on a deposit slip and several checks located at the East Orange drug mill.   Ms. Mahgoub identified herself as the mother of Castelluzzo's children and a resident of the target location.   She had no difficulty communicating with the officers and was cooperative for the duration of the relatively brief search.   *United States v. Price*, 558 F.3d 270, 279-80 (3d Cir. 2009) (consent to search defendant's home voluntary because wife's age, intelligence, and education were "at least average.") Ms. Mahgoub verbally consented to a search of the Bayonne residence and the vehicles located at the property, including a 2009 Range Rover that was parked in the driveway of the residence.   Her consent for the residence was memorialized in writing.   (Exhibit B.)

The suggestion that the agents lacked authority to search the Bayonne residence because Castelluzzo did not provide consent is misplaced.   *See* JDB at 47-48.   Anyone who has a reasonable expectation of privacy in the place or the effects being searched can consent to a warrantless search.   *United States*

33

*v. Coleman*, 588 F.3d 816, 819-20 (4th Cir. 2009) (search valid when girlfriend signed consent to search house).  Any person with common authority over or other sufficient relationship to the place or effects being searched can give valid consent.  *Stabile*, 633 F.3d at 231 (cohabitant had actual authority to consent because she mutually used the property and had joint access and control); *United States v. McGee*, 564 F.3d 136, 140-41 (2d Cir. 2009) (defendant's live-in girlfriend had authority to consent to search of the house).  Here, Ms. Mahgoub identified herself as the mother of Castelluzzo's children and a resident of the target location.  She therefore had authority to consent to the search conducted by the agents, and the evidence obtained during the search should be deemed admissible in the Government's case-in-chief.

### B. The Good Faith Exception and Inevitable Discovery Doctrines Apply to the Search of Castelluzzo's Cellular Phone.

On April 16, 2013, fourteen months before the United States Supreme Court announced its decision in *Riley v. California*, 134 S. Ct. 2473 (2014), HSI agents reviewed the text messages contained on one of Castelluzzo's cellular phones incident to his arrest.  This evidence should not be suppressed because the agents acted in reasonable reliance on then-existing judicial precedent.  Further, the evidence would have inevitably been discovered by the agents who later obtained a search warrant for the T-Mobile cellular phone in question.

### 1. Agents Acted in Good Faith When They Searched Castelluzzo's Phone Incident to His Arrest.

The Supreme Court has long recognized the "unqualified authority" of officers to "search the person of the accused when legally arrested to discover

34

and seize the fruits and evidences of crime" without obtaining a warrant, including examining any object found on the arrestee's person. *United States v. Robinson*, 414 U.S. 218, 224-25 (1973) (quoting *Weeks v. United States*, 232 U.S. 383, 392 (1914)); *United States v. Edwards*, 415 U.S. 800, 808-809 (1974). The exception to the warrant requirement for searches of an arrestee's person and items found on his person "appl[ied] categorically and thus d[id] not require an assessment of whether the policy justifications underlying the exception" – including protecting officer safety and preserving evidence – were served by searches of particular items. *Missouri v. McNeely*, 133 S.Ct. 1552, 1559 n.3 (2013); *Robinson*, 414 U.S. at 235. Numerous courts held that Robinson's bright-line rule extended to the contents of objects used to store information. *See, e.g., United States v. Ortiz*, 84 F.3d 977, 984 (7th Cir. 1996) (pager); *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1223 (11th Cir. 1993) (wallet, address book, and pager); *United States v. Frankenberry*, 387 F.2d 337, 339 (2d Cir. 1967) (diary).

Prior to *Riley*, several federal courts of appeals held that the Fourth Amendment permitted police to conduct a warrantless search of all the contents of a cell phone seized incident to arrest. *See United States v. Murphy*, 552 F.3d 405, 411-12 (4th Cir. 2009) (referencing the "manifest need . . . to preserve evidence" enabling officers to retrieve text messages and other information from cell phones searched incident to arrest) (citing cases); *United States v. Finley*, 477 F.3d 250, 259-60 (5th Cir. 2007) (holding that a search incident to arrest of the contents of a cell phone found on an arrestee was

allowable, analogizing it to a search of a container found on an arrestee's person); *United States v. Rodriguez*, 702 F.3d 206 (5th Cir. 2012) (same). Another circuit had previously upheld a more limited search of a cellular phone to determine its assigned telephone number. *United States v. Flores-Lopez*, 670 F.3d 803, 809-10 (7th Cir. 2012). The Third Circuit was silent on the issue— and therefore there was no binding authority for the agents to look to here— but the Third Circuit's recent decision in *United States v. Katzin*, 769 F.3d 163 (3d Cir. 2014) (en banc), is instructive. There, the Court held that a reasonable officer may "correctly conclude, based upon a panoply of non-binding authority establishing a 'constitutional norm,' that a particular police practice does not violate the Fourth Amendment." *Id.* at 185 (citation omitted). Thus, prior to *Riley*, a reasonable officer could have concluded, as did a majority of the courts confronted with the question, that cell phones did not enjoy a special exemption from the established precedent permitting the search of any object found on an arrestee's person without a warrant.

The purpose of the exclusionary rule is to deter future Fourth Amendment violations, not to remedy past ones. *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011). The Supreme Court has emphasized that "the exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'" *Herring v. United States*, 555 U.S. 135, 141 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). Because suppression imposes a "costly toll upon truth-seeking and law enforcement objectives" by "letting guilty and possibly dangerous defendants go free," a

court must find that "the benefits of deterrence . . . outweigh the costs" before excluding evidence obtained in violation of the Fourth Amendment. *Id.* (quotation marks omitted); *Davis*, 131 S. Ct. at 2427 ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs. . . . Our cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.'"); *accord United States v. Katzin*, 769 F.3d 163, 171 (3d Cir. 2014).

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. Suppression may therefore be warranted "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.*; *Davis*, 131 S. Ct. at 2427. "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis*, 131 S. Ct. at 2427-2428 (internal citations and quotation marks omitted).

Here, the HSI agents acted with an objectively reasonable good-faith belief that their conduct was lawful when they reviewed the text messages from Castelluzzo's T-Mobile phone after he was arrested for his participation in a conspiracy to import methylone. The T-Mobile phone contained a series of relevant coded text messages between Castelluzzo and "Ghost" related to the conspiracy. Specifically, on the day before the arrest of the defendants,

Castelluzzo received a message from "Ghost" at 2:46 p.m. stating "Hit me when u wake up."   At 5:36 p.m., Castelluzzo responded by asking, "So wat u up to today."   One minute later, "Ghost" answered, "Got 2 collect 2600 and pay u back other than that I ain't doing shit."   At 5:40 p.m., Castelluzzo responded, "U aint drop it in the account yet" to which Ghost replied, "I thought I was going 2 c u today."

At 5:41 p.m. on the same day the agents attempted a controlled delivery and left a re-delivery slip at Atwell's place of business, Castelluzzo received the following message from Ghost, "Ok eagles landed and a slip was left I got 2 call the po."   Three minutes later, Castelluzzo received another message from Ghost, "I got 2 grab the package 2morrow at the po."   At 5:46 p.m., Castelluzzo replied, "Ok."

Fourteen months prior to the Supreme Court's decision in *Riley*, HSI agents reasonably relied on then-existing case law; the agents could not have predicted the resulting change in the law.   They did not deliberately or recklessly violate Castelluzzo's constitutional rights.   Nor did they engage in some type of systemic wrongdoing that suppression might deter.   At worst, the agents chose the losing side in a judicial disagreement concerning a novel legal issue on which reasonable minds could (and did) disagree.   Under these circumstances, there is no reason to conclude that the agents who conducted the warrantless search had knowledge that the search they conducted on April 16, 2013 would later be found to be unconstitutional.   *Leon*, 468 U.S. at 919; *see also Katzin*, 769 F.3d at 184 (applying the good faith exception to the

38

exclusionary rule where non-binding authority authorized the actions of agents who installed a battery operated GPS onto the undercarriage of a vehicle).

> **2. The Text Messages on Castelluzzo's Phone Inevitably Would Have Been Discovered Through An Independent, Lawful Search Warrant.**

Alternatively, even if the Court were to conclude that the warrantless search was improper, the inevitable discovery exception to the exclusionary rule would allow for the admission of the text messages located on Castelluzzo's cellular phone.  Under this exception, a court may admit evidence, even if it was unlawfully obtained, if the evidence inevitably would have been discovered through independent, lawful means.  *United States v. Stabile*, 633 F.3d 219, 245-47 (3d Cir. 2011).  Under this doctrine, "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rational has so little basis that the evidence should be received."  *Id.* at 245; *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) (quoting *Nix v. Williams*, 467 U.S. 431 (1984)).  Moreover, much of the deterrence benefit is lost when the Government attempted to secure search warrants at almost every step of the search.  *Id.* at 246; *Vasquez De Reyes*, 149 F.3d at 195.

Here, the Government inevitably discovered the text messages contained on Castelluzzo's T-Mobile cellular phone through a search warrant.  In the statement of probable cause related to the T-Mobile cellular phone, the Government set forth that a package from China destined for LA Courier

Services was intercepted and searched by CBP agents in San Francisco. (Exhibit H at ¶ 6). The affiant noted that the package contained approximately three (3) kilograms of methylone, a controlled substance, that Atwell and Castelluzzo showed up at the Manville Post Office to pick up the package, and that they were later arrested after Atwell brought the package back to the vehicle in which Castelluzzo was in the passenger seat. (Exhibit H at ¶¶ 6-9). The affidavit also contained a lengthy explanation as to how cellular phones are commonly used to further drug trafficking activity. (Exhibit H at ¶ ¶ 32-40). Thus, even if the information regarding the text messages from Castelluzzo's T-Mobile cellular phone was excised from the affidavit, the reviewing magistrate had ample probable cause to sign the search warrant for the review of all three phones that the agents recovered from Castelluzzo and Atwell incident to their arrests. *See United States v. Conley*, 4 F.3d 1200, 1208 (3d Cir. 1993) (noting that "the affidavit must be read as a whole" and that "apart from the problematic statement, the other portions of the affidavit . . . provide a substantial basis for a probable cause determination"). Thus, the text messages recovered from Castelluzzo's T-Mobile cellular phone inevitably would have been discovered and therefore should not be excluded.

### C. The Motion to Suppress Evidence Obtained Pursuant to Search Warrants is Meritless and Should be Denied.

The defendants assert a series of claims challenging the legality of the searches executed pursuant to seven search warrants signed by the Honorable Steven C. Mannion on June 4, 2013. It is undisputed that all of these searches were conducted pursuant to judicially authorized federal search warrants. *See*

40

Exhibit I through  Exhibit O.  Nevertheless, the defendants allege a litany of purported deficiencies in the warrants, including a lack of probable cause for the searches, a lack of particularity in the items to be seized, and failure to stay within the scope set forth in the warrants.  *See* JDB at 50-67.  The defense claims are factually inaccurate and legally baseless; they should be denied.

### 1. Probable Cause for the Search Warrants.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."  U.S. Const. amend. IV. In a motion to suppress, the defendant carries the burden of showing by a preponderance of the evidence that a search was invalid and that his rights were violated.  *See United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992); *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).  Where a search is conducted pursuant to a warrant, a reviewing court need only determine whether the magistrate or issuing judge had a substantial basis to conclude that probable cause existed, based on the totality of the circumstances. *See United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (citing *Illinois v. Gates*, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983)); *see also United States v. Daly*, 937 F. Supp. 401, 407 (E.D. Pa. 1996); *United States v. Martinez-Zayas*, 658 F. Supp. 79, 82 (E.D. Pa. 1987).

When presented with an application for a search warrant, the task of the magistrate is "to make a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a

particular place." *Gates*, 462 U.S. 213, 238; *see also United States v. Nance*, 500 Fed. Appx. 171, 180-181 (3d Cir. 2012).  It is well established that "direct evidence is not required for the issuance of a search warrant." *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993).  Rather, when determining whether a sufficient nexus exists to justify a search, "probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [the contraband]." *Nance*, 500 Fed. Appx. at 181 (citation and internal quotation marks omitted).  Indeed, "[b]ecause probable cause is a 'practical, nontechnical conception,' we are concerned with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Gates*, 462 U.S. at 231).

Three affidavits were prepared in support of the seven search warrants that were sought.  The first affidavit sought permission to search the computer tower recovered from Atwell's business and the flash drive recovered from his person. (Exhibit F.)  The second affidavit sought permission to search Atwell's personal email account as well as the email account of the alleged person posting the solicitation for courier services. (Exhibit G.) The third affidavit sought permission to search the two cellular phones recovered from Castelluzzo and the one cellular phone recovered from Atwell incident to their arrests on April 16, 2013.  (Exhibit H.)     The facts set forth in these affidavits in support of the warrants for the requested items clearly demonstrated that

the records were "relevant and material to an ongoing criminal investigation." A review of just some of the relevant facts is instructive.

The statements of probable cause contained in all three affidavits were identical.   On April 10, 2013, CBP intercepted a package containing approximately three (3) kilograms of methylone, a Schedule I controlled substance.   (Exhibits F, G, H at ¶ 6.)   On April 16, 2013, Atwell and Castelluzzo arrived together at the Manville Post Office.  (Exhibits F, G, H at ¶ 9.)   Atwell picked up the Package and returned to the vehicle still occupied by Castelluzzo, and both men were placed under arrest as they attempted to exit the parking lot.  (Exhibits F, G, H at ¶ 9.)  A review of text messages from Castelluzzo's phone showed that he had received messages from "Ghost" regarding picking up the package at the "po" [Post Office].  (Exhibits F, G, H at ¶ 10.)  The affidavit listed the items recovered from each of the defendants and included information from the post-arrest statement of Atwell regarding an alleged person named "Pito." (Exhibits F, G, H at ¶ ¶ 10-13).  A consent review of Atwell's email account also suggested his involvement with an individual involved in the powdered form of MDMA.  (Exhibits F, G, H at ¶ 14).  Detail was also provided with respect to seven other intercepted packages destined for LA Courier Services which contained the component parts of a M4 assault rifle and a Glock handgun.  (Exhibits F, G, H at ¶ ¶ 16-17).

Following the statements of probable cause, each of the three affidavits provided background information about the items sought.   (Exhibit F at ¶ ¶ 19-29, Exhibit G at ¶ ¶ 19-27, and Exhibit H at ¶ ¶ 19-26, 32-40.)

43

Thereafter, each of the three affidavits specified the property to be searched. (Exhibit F at ¶ ¶ 31-35, Exhibit G at ¶ ¶ 28-34, and Exhibit H at ¶ ¶ 27-30, 41-44.) The search warrants all contained attachments which provided more specific detail about the items to be searched as well as a description of the items to be searched and their related federal offenses. (Exhibit I through Exhibit O, attachments A and B.)

Taken together, these facts, along with numerous others set forth in the affidavits, clearly established that the proposed searches of the electronic devices and email accounts were "relevant and material to an ongoing criminal investigation." Indeed, the affidavits were replete with specific facts supporting the police suspicion that the cellular phones, computer tower, flash drive and email accounts were involved, at a minimum, in conspiracies to import methylone, firearms and possibly other controlled substances. Accordingly, it is clear that the evidence derived from the search warrants was obtained properly under federal law and thus is admissible at trial.

### 2. Particularity of the Search Warrants.

Defendants also claim that all of the electronic evidence seized should be suppressed because the search warrants at issue failed to satisfy the Fourth Amendment's particularity requirement. *See* JDB at 54 - 61. In essence, the defense claim is that all the warrants were prohibited "general warrants." *See* JDB at 56. This is factually inaccurate and legally erroneous.

The requirement that a search warrant particularly describe the things to be seized renders invalid "general warrants," which "'vest the executing officers

with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence.'" *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d 137, 149 (3d Cir. 2002) (quoting *United States v. Christine*, 687 F.2d 749, 752-53 (3d Cir. 1982)) (hereinafter, "*Ninety-Two Thousand*"). That a search is "indubitably broad," permits the seizure of a broad range of evidence, or uses "inclusive generic terms" permitting the seizure of "all" examples of certain types of evidence, *Christine*, 687 F.2d at 753, however, does not render the warrant impermissibly "general." Indeed, "no tenet of the Fourth Amendment prohibits a search merely because it cannot be performed with surgical precision." *Christine*, 687 F.2d at 760. Instead, agents will frequently need to seize and search innocuous materials as they search for responsive evidence, *id.*, and pieces of evidence that would appear to show "comparatively little" in isolation will sometimes mean much more when linked with other pieces of seized evidence. *Andresen v. Maryland*, 427 U.S. 463, 480 n.10 (1976).

Here, contrary to the unfounded suggestion that the warrants "did not restrict the searches to specific files or locations likely to contain information" (JDB at 59), all of the search warrants contain attachments setting forth in detail the items to be seized at each location. (Exhibit I through Exhibit O, attachments B). Indeed, far from being a general warrant, all of the warrants described what was to be seized as "evidence, contraband, fruits, and instrumentalities relating to violations" of the statutes specified in the warrants themselves, namely the conspiracy to smuggle contraband into the United

45

States, illegal transportation of firearms, and conspiracy to import controlled substances. *See id*; *see also Christine*, 687 F.2d at 753. Moreover, each warrant provided a specific, detailed list of items to be seized related to the particular form of electronic medium. The Government's request related to the computer tower and flash drive sought evidence, including but not limited to email messages, other forms of electronic information, video and audio files, subscriber information, contact information, browser history, and any notes or calendar entries. (Exhibits I and J at attachment B). The Government's specifically articulated request related to the Google accounts sought evidence, including but not limited to the content of the email messages, the types of service utilized by the account, and records pertaining to the identification of the owner and user of the account. (Exhibits K and L at attachment B). The Government's request related to the cellular phones recovered from the defendants at the time of arrest sought evidence, including but not limited to voice mail, texts and multimedia messages stored on behalf of the account, as well as billing records and call detail records dating back for a limited time period to March 1, 2013. (Exhibits M, N, O at attachment B).

Given the specificity of items to be seized and the federal crimes for which the agents were searching for evidence, the warrants cannot be said to have vested "the executing officers with unbridled discretion to conduct an exploratory rummaging" in search of criminal evidence. *Christine*, 687 F.2d at 751, 753. Indeed, when each warrant is read "in context" and "as a whole," as it must be, *Conley*, 4 F.3d at 1209, "'there exists a sufficient nexus between the

evidence to be seized and the alleged offenses,'" *United States v. Yusuf*, 461 F.3d 374, 394 (3rd Cir. 2006) (quoting *United States v. Am. Investors of Pittsburgh, Inc.*, 879 F.2d 1087, 1105-06 (3d Cir. 1989)), such that "the search warrant allows the seizure of items indicative of [the interstate transportation and receipt of stolen property]." *Conley*, 4 F.3d at 1208.  Because the warrants here "'described in . . . inclusive generic terms what is to be seized,'" "[i]t did not vest the executing officers with 'unbridled discretion to search for and seize whatever they wished." *Ninety-Two Thousand*, 307 F.3d at 149 (quoting *Christine*, 687 F.2d at 753)).  Therefore, the defense argument must be rejected. *E.g.*, *Yusuf*, 461 F.3d at 395 (concluding search warrants did not violate the particularity requirement where such warrants were limited in three respects, including specifying agents were searching for evidence of several enumerated federal crimes); *Christine*, 687 F.2d at 753 (warrant not general where it allowed the seizure of, *inter alia*, "all folders and all documents contained therein and all other documents relating to home improvements and home improvement contracts" and "all other documents, papers, instrumentalities and fruits of the crime of submission of false statements").  Thus, all seven search warrants contained sufficient particularity and should be upheld.

### 3. Execution of the Search Warrants.

The defense states that the search warrants signed by Judge Mannion related to the electronic information "mandated that a search of the materials be conducted by June 18, 2013."   JDB at 66.   This argument erroneously

suggests that the Government had 14 days to complete a full forensic analysis of the computer tower, flash drive, cellular phone and email accounts.

Neither the Federal Rules of Criminal Procedure nor the Fourth Amendment provides for a specific time limit in which a computer and other related electronic devices must undergo a forensic examination after it has been seized pursuant to a search warrant. *United States v. Hernandez*, 183 F. Supp. 2d 468, 480 (D.P.R. 2002); see also *United States v. Triumph Capital Group, Inc.,* 211 F.R.D. 31, 66 (D. Conn. 2002) ("[N]either Rule 41 nor the Fourth Amendment impose any time limitation on the government's forensic examination of the evidence seized."). Federal Rule of Criminal Procedure 41(e)(2)(A)(i) is dispositive of the issue here. It provides that the warrant must command the officer to "execute the warrant within a specified time no longer that 14 days" and specifically addresses warrants seeking electronically stored information, stating that the time for executing the warrant "refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review."

Even before that language become part of Rule 41 in 2009, federal courts were unanimous in concluding that forensic examination did not need to be completed within the fourteen-day period. *See United States v. Mutschelknaus,* 592 F.3d 826, 830 (8th Cir. 2010); *United States v. Brewer,* 588 F.3d 1165, 1173 (8th Cir. 2009) ("Because of the nature of this evidence, the several months' delay in searching the media did not alter the probable cause analysis."); *United States v. Syphers,* 426 F.3d 461, 468-69 (1st Cir. 2005);

*United States v. Hodges,* No. 1:09-CR-562-CAP-LTW, 2010 WL 4639238, \*3 (N.D. Ga. 2010); *United States v. Cameron,* 652 F.Supp.2d 74, 81 (D. Me. 2009); *United States v. Burns*, 2008 WL 4542990, at \*8-9 (N.D. Ill. Apr. 29, 2008) (ten month delay); *Matter of the Search of the Scranton Housing Authority,* 436 F.Supp.2d 714, 727 (M.D. Pa. 2006), *vacated on other grounds,* 487 F.Supp.2d 530 (M.D. Pa. 2007) (forensic exam that continues "up to this day" valid on computer seized more than a year earlier); *United States v. Gorrell*, 360 F. Supp. 2d 48, 55 n.5 (D.D.C. 2004) (ten month delay); *United States v. Hernandez,* 183 F. Supp.2d 468, 480 (D.P.R. 2002) (forensic exam 36 days after the 10-day deadline); *United States v. Habershaw,* 2002 WL 33003434, at \*8 (D. Mass. 2002) (forensic exam 4 days after the 10-day deadline); *United States v. Hernandez*, 183 F. 3d 468, 480 (D.P.R. 2002) (six week delay); *United States v. Triumph Capital Group, Inc.*, 211 F.R.D. 31, 66 (D. Conn. 2002). Courts reasoned that the rationale used to permit off-site review of large quantities of hard copy documents found in file cabinets after the execution of a search warrant is equally applicable in the electronic context.  In cases involving the large seizure of documents, the warrant requires the seizure of the documents within the time frame established by the warrant, but the examination of these documents may take longer without requiring another search warrant.  *Hernandez*, 183 F. Supp. 2d at 480; *see also United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988) ("we do not think it is reasonable to have required the officers to sift through the large mass of documents and computer files found in the . . . office, in an effort to segregate those few papers

that were outside the warrant."); *Marvin v. United States*, 732 F.2d 669, 675 (8th Cir. 1984); *Hernandez*, 183 F. Supp. 2d at 480 ("the rationale that searches can be executed off-site because of the volume of information has been extended to include computers.")

In this case, an HSI agent presented three affidavits to Judge Mannion seeking permission to search the computer tower and flash drive from Atwell's business (Exhibit F), the Google accounts or "atwell.luke@gmail.com" and "nychookah@gmail.com," (Exhibit G) and the three cellular telephones recovered from the defendants at the time of their arrests. (Exhibit H.) After the search warrants were signed, the electronic devices were imaged and preserved within fourteen (14) days for the review and extraction of information by a forensic analyst. The search warrants for the gmail accounts were also served on Google within that time period. Thus, the execution of these warrants took place when the government took the necessary steps to access the electronic data in ways that intruded on the reasonable expectation of privacy. To suggest that the agents needed to complete the forensic analysis of the files contained in these electronic mediums runs contrary to the plain language of Rule 41 and the well-established precedent. The motion should be denied.

### 4. A Suppression Hearing Is Not Warranted.

Evidentiary hearings on motions to suppress evidence "are not granted as a matter of course." *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010) (citing Fed. R. Crim. P. 12(c)). Rather, to require a hearing, a

suppression motion must raise 'issues of fact material to the resolution of the defendant's constitutional claim." *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996). "A motion to suppress requires an evidentiary hearing only if the motion is sufficiently specific, non-conjectural, and detailed to enable the court to conclude that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion to suppress." *Hines*, 628 F.3d at 105. At its core, "the purpose of an evidentiary hearing in the context of a suppression motion is to assist the court in ruling upon a defendant's specific allegations of unconstitutional conduct," not to assist the defendant "in making discoveries that, once learned, might justify the motion after the fact." *Id.*

Thus, to merit an evidentiary hearing, a defendant's suppression motion must set forth and identify specific and concrete "issues of fact material to the resolution of the defendant's constitutional claim." *Id.* (citation omitted). A defendant is entitled to a hearing only when his moving papers present a "colorable claim" for relief. *United States v. Brink*, 39 F.3d 419, 424 (3d Cir. 1994). To be "colorable," a defendant's motion must consist of more than mere allegations of misconduct. *Voigt*, 89 F.3d at 1067; *United States v. Blackwell*, 954 F. Supp. 944, 964 (D.N.J. 1997).

As the Supreme Court has cautioned, "claims that taint attaches to any portion of the Government's case must satisfy the trial court with their solidity and not be merely a means of eliciting" the prosecution's case in advance of trial. *Nardone v. United States*, 308 U.S. 338, 342 (1939). "[A]llegations which

51

are general and conclusory or based upon suspicion and conjecture will not suffice" to meet the *Nardone* standard of "solidity" for ordering an evidentiary hearing. *Cohen v. United States*, 378 F.2d 751, 760 (9th Cir. 1967). Rather, the defendant must support the suppression motion with sworn factual allegations from a person with personal knowledge of those facts, that, if true, would entitle the defendant to relief. *See United States v. Ruggiero*, 824 F. Supp. 379, 393-94 (S.D.N.Y. 1993) (holding that a motion to suppress evidence from warrantless search must fail because defendant failed to submit an affidavit based on personal knowledge), *aff'd*, 44 F.3d 1102 (2d Cir. 1995); *cf. United States v. Madoch*, 149 F.3d 596, 600-01 (7th Cir. 1998) (evidentiary hearing was warranted where the defendant submitted her own affidavit containing specific, detailed allegations in support of her claim that she was "in custody"). Representations made by counsel or upon information and belief are insufficient. *Id.* at 393; *see also* Local Rule 7.2 (affidavits "shall be restricted to statements of fact within the personal knowledge of the affiant").[6] A motion to suppress made without even supporting affidavits should "fail on this ground alone." *Id.* at 394. Only after a defendant establishes a factual basis for a suppression motion does the burden shift to the Government to prove, by a preponderance of the evidence, that the evidence is admissible.

---

[6] *Accord United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967) (attorney's affidavit that does not allege personal knowledge of disputed facts is inadequate to justify a suppression hearing); *United States v. Shaw*, 260 F. Supp. 2d 567, 570 (E.D.N.Y. 2003) ("Courts have made clear that attorney affidavits are insufficient to warrant a hearing.").

*United States v. Matlock*, 415 U.S. 164, 177 (1974); *Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).  A defendant seeking an evidentiary hearing "must carry a fairly heavy burden."  *United States v. Royal*, 100 F.3d 1019, 1026 (1st Cir. 1996).

Neither defendant has made the factual showing necessary to warrant a suppression hearing regarding the evidence recovered from Castelluzzo's residence and vehicle on March 7, 2013, the evidence recovered from the defendants at the time of their April 16, 2013 arrest, or from the subsequently issued search warrants.  Indeed, neither defendant has presented an affidavit or other sworn statement from someone with personal knowledge about the relevant facts, nor have they raised a single disputed factual issue—let alone a material one—regarding the suppression of the evidence obtained from the search warrants.  The defendants have also failed to raise any colorable constitutional claim regarding the evidence recovered from the search warrants.  Therefore, the defendants are not entitled to a suppression hearing regarding the evidentiary items that they have challenged.

## V.  EVIDENCE REGARDING THE EMAIL COMMUNICATIONS PREDATING THE CHARGED CONSPIRACY IS ADMISSIBLE.

At trial, the Government intends to introduce evidence that emails were exchanged between the Google accounts registered to Atwell and Castelluzzo dating back to September 2010, two months prior to the time period noted in the charged conspiracy.[7]  These communications are intrinsic to the crimes

---

[7] These emails include, but are not limited to, several emails attached in Exhibit P.

charged. Alternatively, these emails are clearly admissible as evidence of a common scheme or plan under F.R.E. 404(b).

### A. Intrinsic evidence.

The computer tower recovered from Atwell's business contained a large volume of emails between the accounts of Atwell and Castelluzzo related to the drug conspiracy dating back to 2010.  In September 2010, Atwell's self-admitted email address, "atwell.luke@gmail.com," exchanged a series of emails with "christopher castelluzzo" at "castelluzzo@gmail.com" regarding MDMA.  In these emails, they discussed obtaining a better price per pill if they purchased in larger quantities.  (Exhibit P at emails dated 9/7/10.)  When "christopher castelluzzo" asked "whats the name of them," Atwell responded that he would not know until the deal went down.  (Exhibit P at emails dated 9/8/10.)  He did, however, provide a hyperlink to a web site regarding Ecstasy, the street name for MDMA.  (Exhibit P at emails dated 9/8/10.)  One week later, Atwell indicated that the imprint on the pill was for "Rolex Crowns." (Exhibit P at email dated 9/13/10.)  On that date, "christopher castelluzzo" also made reference to doing a "nice partnership thing" with Atwell.  (Exhibit P at email dated 9/13/10.)

Evidence regarding these email communications is intrinsic to the charged offenses because the emails directly prove the origin of the "partnership" among these co-conspirators.  Therefore, the emails should be admitted in the Government's case-in-chief.  This evidence goes directly to the government's theory that the defendants had a long standing business

relationship related to the distribution of various controlled substances. Indeed, there can be no question that these communications provide direct evidence of the defendants in a drug conspiracy which included, but was not limited to MDMA.  Thus, as direct evidence, these emails do not fall within the scope of Rule 404(b).  The details contained in these September 2010 emails are necessary to demonstrate the nature of the agreement.  Likewise, such details are necessary to fully inform the jury about the origins of the partnership and to rebut any suggestion from either of the defendants that they were innocent bystander or just package couriers.   As such, evidence of the emails about the formation of this drug dealing partnership is necessary to present to the jury.  These communications are intrinsic to the Government's case-in-chief and should be admitted without regard to Rule 404(b).

### B. Rule 404(b).

If the Court does not find that the September 2010 emails to be evidence intrinsic to the Government's case-in-chief, the Court should still allow the admission of this evidence under F.R.E. 404(b).  Under F.R.E. 404(b), the trial court first must consider "whether the [evidence] is logically relevant under Rules 402 and 404(b), to any issue other than the defendant's propensity to commit crime."  United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992). In the present case, the email exchange in September 2010 regarding MDMA and the proposed partnership is relevant and proper 404(b) evidence because it is probative of their mutual intent, plan, knowledge, and absence of mistake in the charged offense.   Specifically, the emails go to prove the motive,

opportunity, intent, preparation, plan, or knowledge of the existence of, and participation in, the charged drug conspiracy.

Additionally, knowledge and intent as to the existence of a drug conspiracy will be key issues at trial, and the Government has the burden of proving that the defendants, in some way, aided, assisted, or facilitated the object of the conspiracy.   This evidence will further serve to counter any argument that Castelluzzo was just along for the ride at the Manville Post Office, or that Atwell just provided a courier service for the packages. The Third Circuit explicitly condoned this use of 404(b) evidence in *United States v. Butch*, 256 F.3d 171, 177 n.5 (3d Cir. 2001), stating, "We also agree with the Government's contention that it also could have introduced the evidence under Rule 404(b) to rebut Butch's testimony that he acted without criminal intent. Such evidence is permissible to show criminal intent and the absence of innocent association." *See United States v. Zackson*, 12 F.3d 1178, 1182-83 (2d Cir. 1993) (ruling evidence of appellant's prior involvement with the co-defendant in a marijuana trafficking and conspiracy properly admitted under Rule 404(b) as relevant to intent and to rebut defense of innocent association); *see also United States v. Howell*, 231 F.3d 615, 628-29 (9th Cir. 2000) (admitting evidence of appellant's previous drug-trafficking convictions under Rule 404(b) to rebut claimed innocent motive for being present where drugs were found); *United States v. Williams*, 31 F.3d 522, 527 (7th Cir. 1994) (ruling evidence regarding appellant's prior drug smuggling was properly

admitted in a drug-trafficking conspiracy prosecution to rebut defense that he was merely an innocent Spanish interpreter for a co-conspirator).

The admission of the September 2010 emails is critical to show that the defendants possessed the motive, intent, plan or knowledge to commit the charged offenses. *See United States v. Cross*, 308 F.3d 308, 324 (3d Cir. 2002) ("Rule 404(b) evidence is especially probative when the charged offense involves a conspiracy. For this reason, the Government has broad latitude to use 'other acts' evidence to prove a conspiracy."). The September 2010 emails are not "propensity" evidence, but rather relevant and proper evidence to prove the charged offense, and accordingly should be admitted.

## C. Rule 403.

Pursuant to F.R.E. 403, relevant evidence may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice. The district court has broad discretion to weigh evidence under this standard. *United States v. Givan*, 320 F.3d 452, 461 (3d Cir. 2003). In determining whether to admit or exclude evidence under Rule 403, the Court "is required to balance the probative value of evidence against its prejudicial effect. The [trial] court must appraise the genuine need for the challenged evidence and balance that necessity against the risk of prejudice to the defendant." *United States v. Bradley*, 173 F.3d 225, 230 (3d Cir. 1999) (quoting *Government of the Virgin Islands v. Archibald*, 987 F.2d 180, 186 (3d Cir. 1993) (internal quotation marks and citations omitted)).

Here, the probative value of the proffered evidence outweighs any danger of unfair prejudice.  Evidence of other bad acts in which the defendants have engaged is not rendered inadmissible merely because it may be prejudicial.  *See Wright & Graham, Federal Criminal Practice & Procedure* Sec. 5215 (1978).  To properly exclude such evidence, the Court must find that the prejudice visited upon the defendants is unfair and "substantially" outweighs the probative value of the evidence.  *United States v. Scarfo*, 850 F.2d 1015, 1019 (3d Cir. 1988); *United States v. Long*, 574 F.2d 761, 766 (3d Cir. 1978).  As the Court noted in *Scarfo*, "in making this determination, the trial judge must appraise the genuine need for the challenged evidence and balance that necessity against the risk that the information will influence the jury to convict on improper grounds." *Scarfo*, 850 F.2d at 1019.

In the present case, the Government has a substantial need for admission of the September 2010 emails because as previously proffered, Castelluzzo will likely claim that he was just along for the ride in Manville and Atwell will likely claim the he was just a package courier without knowledge of its contents—in other words, that they lacked the *mens rea* to commit the crimes charged.  *See United States v. Vega*, 285 F.3d 256, 263 (3d Cir. 2002) (noting that the government's 404(b) evidence was of "critical importance" where the defendant denied knowledge of the drug conspiracy and alleged that he met a co-conspirator "merely to provide plumbing services").

The need for the 404(b) evidence substantially outweighs any unfair prejudice.  The evidence of the drug partnership dating back to September

2010 in the context of discussing the distribution of MDMA is necessary to prove knowledge of the defendants, their efforts to facilitate this conspiracy, and to rebut any claims of ignorance—material facts at issue in this case. "The evidence demonstrates his 'knowledge,' 'intent' and 'lack of mistake or accident' [and thus is admissible] . . . to rebut his defense of ignorance . . . ." *See United States v. Boone*, 279 F.3d 163, 187 (3d Cir.), *cert. denied*, 535 U.S. 1089 (2002); *see also United States v. Zolicoffer*, 869 F.2d 771, 773 (3d Cir.) (upholding district court's admission of prior cocaine deals and finding such evidence more probative than prejudicial because "[t]he evidence permitted the jury to infer that [the defendant] had access to drugs, especially cocaine, and that he was willing and hoping to engage in large scale drug transactions – especially in light of the defense that he was engaged in a seafood distribution business rather than a drug distribution business"), *cert. denied,* 490 U.S. 1113 (1989).

Admission of the September 2010 emails may help convince a juror of guilt through the permissible suggestion that the defendants knew about the totality of the plan. *See Boone*, 270 F.3d at 187 n.18. The government has a substantial and genuine need for the proffered evidence which goes to material facts at issue in this case – knowledge, intent and absence of mistake – and requests that the evidence be admitted.

Any potential unfair prejudice to the defendants from the admission of such evidence can be cured by a cautionary instruction that the jury may not consider this evidence as a substitute for proof that the defendants committed

the crime charged or as evidence of criminal propensities on the part of either defendant. *United States v. Huddleston*, 485 U.S. 681, 691-92 (1988); *Scarfo*, 850 F.2d at 1019.  In this case, like in many of the other cases cited above, the Court could cure any danger of unfair prejudice by instructing the members of the jury as to the limited purposes for which the evidence was admitted. *Scarfo*, 850 F.2d at 1020; *Givan*, 320 F.3d 452, 264 n.2 (setting forth the district court's limiting instruction to the jury).

## __Conclusion__

For the foregoing reasons, the Court should deny the defense motions in their entirety and grant the Government's request to admit the September 2010 emails in its case.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

By:   _/s/ Thomas S. Kearney_
Special Asst. U.S. Attorney

By:   _/s/ Courtney A. Howard_
Assistant U.S. Attorney

cc:   Dawn Florio, Esq. (by e-mail)
Pasquale Giannetta, Esq. (by e-mail)