# PASQUALE F. GIANNETTA

## ATTORNEY AT LAW

E-MAIL ADDRESS: PGIANNETTA@FBNJLAW.COM

| WAYNE OFFICE | | NEWARK OFFICE |
|---|---|---|
| 36 MOUNTAIN VIEW BOULEVARD | | 475 BLOOMFIELD AVENUE |
| WAYNE, NEW JERSEY 07470 | | NEWARK, NEW JERSEY 07107 |
| TEL. (973) 872-9700 | | TEL. (973) 482-7910 |
| FAX (973) 696-8898 | | FAX (973) 482-7930 |

March 27, 2015

The Honorable Freda L. Wolfson
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, N.J. 08608

**RE:** **USA v. Christopher Casteluzzo and Luke Atwell**
 **13-560 (FLW)**

Dear Judge Wolfson:

 In reference to the above matter, attached hereto please find Defendant's Reply Brief to the Government's Response along with Defendant Atwell's Affidavit in furtherance of Defendant's Request for a <u>Franks</u> hearing.

 Respectfully submitted,

 /s/Pasquale F. Giannetta, Esq.

PFG:dam
Enclosures
cc:  Thomas S. Kearny, AUSA

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Honorable Freda L. Wolfson |
| v. | Criminal No. 13-560 (FLW) |
| CHRISTOPHER CASTELLUZZO and  LUKE ATWELL, | **MEMORANDUM OF POINTS & LEGAL AUTHORITIES IN REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS** |

## PRELIMINARY STATEMENT

Defendants have moved to dismiss the superseding indictment, require production of a bill of particulars, and sever the trial of this matter.  Defendants have also moved to suppress all evidence illegally seized and searched, along with any and all fruits of such evidence, based on a lack of probable cause for issuance of the warrants in the first instance, law enforcement's warrantless and illegal search of certain information and places – including, most notably here, defendant Luke Atwell's email account, as well as, equally importantly, defendant Castelluzzo's cellular telephone – and law enforcement's general and consistent failure to properly execute, inventory, and return the total seven warrants issued in this case, as well as in light of the general search of electronic hardware, media, and data permitted and executed pursuant to the warrants, and the government's improper seizure and retention of such information.

1

In its memorandum of law in opposition to the defense motions, the government utterly fails to address and, in fact, outright ignores the wealth of authority cited and relied upon by defendants in support of their applications. The government even goes so far as to suggest that defendants have failed to offer any authority warranting the relief sought. The government's opposition, most respectfully, speaks volumes to the true agenda and motive of the government in this case, as well as the constitutionally defunct activities in which the government and its agents engaged, which defendants here reassert, both individually and collectively, warrant the relief sought.

## LEGAL ARGUMENT

### POINT I

**IN SPITE OF THE GOVERNMENT'S PROTESTATIONS TO THE CONTRARY, DISMISSAL OF THE SUPERSEDING INDICTMENT IS WARRANTED AND NECESSARY IN THIS CASE IN LIGHT OF THE GOVERNMENT'S FAILURE TO PROPERLY AND SUFFICIENTLY PLEAD THE CRIME THERE CHARGED AGAINST DEFENDANTS.**

As will here be established with respect to each and every one of defendants' applications for relief, the government begins its opposition by flatly contending, quite significantly, that defendants' motion to dismiss the indictment is "unsupportable." Gb17.[1] The government argues, as it does with respect to each of the defendants' requests for relief, that the defense motion in this regard is untenable – without offering even an iota of legal or factual support – or even so much as mentioning (never mind addressing) the considerable authority provided by and relied upon by the defendants in support of their application, which is, undoubtedly, applicable and controlling under the facts and circumstances of this case. A cautious review of even the singular authority relied upon in exclusivity by the government in its opposition, however,

---

[1] Gb refers to the Brief of the United States of America in Opposition to Defendants' Pretrial Motions.

renders the same indisputable.

Indeed, a close examination the only decision upon which the government relies in opposing the defendants' motion to dismiss reveals that it is based upon palpably inapposite facts and inapplicable reasoning, in addition to being far from "illustrative" in this case. See Gb19. In that decision, upon which the government in totality rests its opposition, the Western District of Pennsylvania concluded, after relying upon certain specified Third Circuit authority, that the indictment in the case before it did not present the defendant "with a vagueness that is improper." United States v. Cheatham, 500 F. Supp. 2d 528, 530-31, 531 (W.D. Pa. 2007). The Third Circuit precedent relied upon by the court in the Cheatham included two decisions, generally, as well as one decision, specifically, among and in addition to a decision rendered by the District Court of Kansas:

> McDade challenges the indictment stating: "[T]he Indictment in this case merely tracks the language of the statute charged and that the relatively long length of the alleged conspiracy and wide geographic area cited are without factual particularity." McDade's Motion, p. 3, ¶ 5. In support of her argument McDade cites to the cases of United States v. Rankin, 870 F.2d 109, 112 (3d Cir. 1989) and United States v. Eufrasio, 935 F.2d 553 (3d Cir. 1991).

> Rankin sets forth three requirements in order for an indictment to be legally sufficient under "Federal Rule of Criminal Procedure 7(c) and the Fifth and Sixth Amendments":

> > An indictment is generally deemed sufficient if it: 1) "contains the elements of the offense intended to be charged," 2) "sufficiently apprises the defendant of what he must be prepared to meet," and 3) allows the defendant to "show with accuracy to what extent he may plead a former acquittal or conviction" in the event of a subsequent prosecution. It is equally well established that no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.

3

U.S. v. Rankin, 870 F.2d 109, 112 (3d Cir. 1989) (citations and internal citations omitted). Two years later in Eufrasio, the Court of Appeals for the Third Circuit recognized:

> Furthermore, an indictment charging a statutory crime is sufficient if it substantially follows the language of the criminal statute, provided that its generality does not prejudice a defendant in preparing his defense nor endanger his constitutional guarantee against double jeopardy. See United States v. Addonizio, 451 F.2d 49, 58 n. 7 (3d Cir. 1971), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972).

U.S. v. Eufrasio, 935 F.2d 553, 575 (3d Cir. 1991).

Turning to a specific instance of an indictment made under 21 U.S.C. § 846, the Third Circuit in the case of United States v. Johnstone concluded that an indictment containing the language "[f]rom in or about January of 1985, and continuing thereafter to on or about December of 1986, in the Eastern District of Pennsylvania, . . . ." met the requirements of "Fifth Amendment right to indictment by a grand jury" in that "the indictment specified both the time frame and the geographical area of the conspiracy" and that this information along with other information set forth in the conspiracy count "was sufficient to inform Johnstone of the conspiracy charged and to enable him to plead double jeopardy in future prosecution for the same offense." United States v. Johnstone, 856 F.2d 539, 540, 541-542 (3d Cir. 1988). Johnstone had alleged that "the indictment did not allege his specific role in the conspiracy." Id. at 540.

The District of Kansas considered a similar issue of date and location plead within a conspiracy charge:

> "An indictment charging a count of conspiracy is sufficiently precise as to the time frame if the operative period of the conspiracy is set out." United States v. Edmonson, 962 F.2d at 1541; see United States v. Harrison-Philpot, 978 F.2d 1520, 1525 (9th Cir. 1992) (indictment is sufficient when it places the illegal conduct "within an identifiable time frame"), cert. denied, 508 U.S. 929, 113 S.Ct. 2392, 124 L.Ed.2d 294 (1993). It is not necessary to specify the exact dates on which the defendants committed the alleged conspiratorial acts. United States v. Ellender, 947 F.2d 748, 756 (5th Cir. 1991). It is enough that the defendant through discovery

> learns the basics of the government's conspiracy case
> without knowing the precise time and place of the acts
> constituting the alleged conspiracy.  The court denies the
> defendant's motion for bill of particulars.

U.S. v. Ramos, 839 F.Supp. 781, 786-787 (D. Kan. 1993).

Cheatham, 500 F. Supp.2d at 530-31.

The defendant in Cheatham was charged with the precise offense with which the

defendants were here ultimately charged.  Quite unlike the superseding indictment eventually

returned in this case, however, the indictment in Cheatham was sufficiently detailed.  Indeed, in

that matter, the grand jury charged the following notably more specific conduct against the

defendant in support of his alleged guilty commission of a violation of 21 U.S.C. § 846:

> From on or about May 4, 2004, to on or about December 6, 2005,
> in the Western District of Pennsylvania, the defendants,
> CONSEOR M. CHEATHAM, a/k/a "Skinny," a/k/a "Blue,"
> MARISSA M. HEATHAM, a/k/a "Shell," MAURICE R.
> CHEATHAM, a/k/a "Reese," ANDREW S. EDWARDS, a/k/a
> "Drew," KELLY L. HUFF, BRAHEEM HUGER, a/k/a "Heem,"
> JENNIFER McDADE, and NATHAN L. WILLS, a/k/a "Nate,"
> did knowingly, intentionally and unlawfully conspire, confederate
> and agree together and with one another to distribute and possess
> with the intent to distribute fifty (50) grams or more of a mixture
> and substance containing a detectable amount of cocaine base, in
> the form commonly known as "crack," a Schedule II controlled
> substance, and five hundred (500) grams or more of a mixture and
> substance containing a detectable amount of cocaine, a Schedule II
> controlled substance, contrary to the provisions of Title 21, United
> States Code, Sections 841(a)(1), 841(b)(1)(A)(iii), and
> 841(b)(1)(B)(ii).

> In violation of Title 21, United States Code, Section 846.

Cheatham, 500 F. Supp.2d at 529-30.

Much unlike the incredibly broadly charged offense in this case, the defendant in

Cheatham was deemed to have been afforded constitutionally sufficient notice in view of the

aforementioned greater detail provided in the charging document in his case.  Considering the

above-referenced precedents, the <u>Cheatham</u> court therefore concluded that the indictment in the

case before it did not present the defendant with "a vagueness that is improper," rationalizing:

> The date and location of the conspiracy in which [defendant] is
> alleged to have participated are sufficiently set forth and the dates
> in particular are more specific than the dates of the <u>Johnstone</u>
> indictment in that a specific beginning date and end date are set
> forth, while in <u>Johnstone</u> only a beginning and end month are set
> forth. The location is set forth as the district of this court, a proper
> allegation of location according to <u>Johnstone</u> and <u>Ramos</u>. The
> counties encompassing this district are readily ascertainable by
> [defendant's] legal counsel. From the content of the indictment,
> [defendant] should be able to ascertain the elements of § 846 and
> any known facts supporting a defense thereto, such as an alibi, and
> also plead double jeopardy, if it is available; the presence of these
> matters establishes the indictment's sufficiency. See <u>Hamling v.</u>
> <u>U.S.</u>, 418 U.S. 87, 117,94 S.Ct. 2887, 2907, 41 L.Ed.2d 590, 620-
> 621 (1974).

<u>Id.</u> at 531; <u>see also Johnstone, supra</u>, 856 F.2d at 541-42 (holding that where "the indictment

specified both the time frame and the geographical area of the conspiracy[,] specified the

purpose of the conspiracy, and described the role of several of [defendant's] co-defendants," the

information is "sufficient to inform [a] defendant of the conspiracy charged and to enable him to

plead double jeopardy in future prosecutions for the same offense. <u>Id.</u> at 542.

In stark contrast to the charging documents at issue in <u>Cheatham</u> and <u>Johnston</u>, the

superseding indictment in this case fails to contain a plain, concise, and definite statement of the

essential facts constituting a violation of 21 U.S.C. § 846. Although it outlines the necessary

elements of a prosecution pursuant to 21 U.S.C. § 846, it fails to properly allege how either

defendant "did knowingly and intentionally conspire and agree with each other and with others

to distribute and to possess with the intent to distribute controlled substances." See <u>Superseding</u>

<u>Indictment</u> (Crim. No. 13-560 (S-1)). Indeed, all that is alleged in the superseding indictment is

that the defendants "did knowingly and intentionally conspire and agree with each other and with

others to distribute and to possess with the intent to distribute" certain "controlled substances" from "in or about November 2010 through in or about April 2013, in the District of New Jersey, and elsewhere." Id.

Adding to such ambiguity, most particularly here, is the government's use of the phrases "[f]rom in or about," as well as "elsewhere," and "with others." Id. Likewise contributing to the vagueness of the superseding indictment is the indisputable fact that the core of the government's case here – the precise conduct that is alleged to have inculpated both defendants – is their purported involvement in the smuggling of a precise quantity of methylone – conduct that has now been lost among the sea of an overly broad and vastly encompassing conspiracy charge relating to alternate, independent investigations that have absolutely nothing whatsoever to do with the instant case before this Court. Again, defendants implore the Court:

> Is the basis for this new charge some other non-disclosed activity that is not rooted in their alleged smuggling activities? Did the alleged action occur on some other date? Did the alleged action involve other known individuals? The answer to each of the aforementioned rhetorical questions is the same – there is no answer in light of the government's deficient charging document.

Db23.[2]

Quite revealingly, in opposing the defense request for relief in this regard, the government fails to even acknowledge the law in this circuit, which has been adopted in light of longstanding precedent that has been consistently acknowledged and upheld by the United States Supreme Court. The fact remains, nevertheless, that even though the "language of the statute may be used in the general description of an offense, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." See, e.g., United States v.

---

[2] Db refers to the Memorandum of Points and Legal Authorities in Support of Defendants' Motions.

Hess, 124 U.S. 483, 487 (1888).

In this case, there is no question that the superseding indictment alleges a violation of 21 U.S.C. § 846. That is, the grand jury somehow found a basis for charging such conduct and crime. Most especially in light of that return, however, and considering the paucity of defendants' criminal culpability for such vast and expansive conduct, the defense motion in this respect probes the basis for the government's allegation of such criminal activity and explores the legal consequences of its inclusion in and return by way of superseding indictment.

Rather remarkably and, indeed, quite telling of the government's true agenda in this case, the superseding indictment here is entirely devoid of even one fact or circumstance constituting the crime charged, and merely parrots the statutory language. Although in its opposition the government argues that the defendants "fail to cite any authority [that] requires a charging document to provide a precise accounting of all the criminal activities in which they participated over the course of the conspiracy," the government not only overlooks the wealth of authority cited and relied upon by defendants, but also, quite frankly, misses the ball. Defendants are not seeking an exact detailing of their criminal activities, or, in fact, any inappropriate specificity. Much to the contrary, defendants are seeking only that information necessary and constitutionally required to "'fairly inform [them] of the charge against which [they] must defend.'" See Gb19 (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)).

In fact, it is beyond revealing that a superseding indictment of such a nature has been returned in this case, particularly in light of the government's prosecution of this matter and position taken with respect to not only this application, but also the entirety of the defense applications – a tone and demeanor that proves, most respectfully, to be in steadfast pursuit of an agenda to subject to defendants to prosecution in the absence of and in detriment to their

constitutionally entitled protections.   The same does not obviate, however, this Court's obligation to ensure protection of the constitutional safeguards to which each of the defendants is entitled.

Although the government is, of course, not obligated to set forth in a charging document "every detail regarding the criminal activities of the[] defendants who engaged in a drug conspiracy," some detail and specificity is, indeed, required.   Accordingly, and for all of the foregoing reasons, including, most particularly, the fact that absolutely no detail has been here provided, defendants respectfully renew their request for dismissal of the superseding indictment.

## POINT II

**ABSENT DISMISSAL, THE GOVERNMENT MUST PROVIDE THE LIMITED BILL OF PARTICULARS REQUESTED WHERE THE INDICTMENT FAILS TO OFFER THE INFORMATION NECESSARY TO ADEQUATELY DEFEND THE CASE AND THE GOVERNMENT'S OBJECTION DOES NOT SUPPORT ITS VIGILANT PLEA FOR DENIAL OF THE INFORMATION SOUGHT.**

In order to understand the vague allegations in the superseding indictment and adequately prepare to defend themselves at trial, defendants sought a limited bill of particulars consistent with Federal Rule of Criminal Procedure 7(f).   Unlike a broad discovery request pursuant to Federal Rule of Criminal Procedure 16, defendants requested that this Court order the government to provide certain narrow information that is required to clarify specific ambiguities in the superseding indictment.

Contrary to the government's contention, the defense request for a bill of particulars in this instance does not amount to a request for "'back-door' discovery to which they are not entitled," or "a veiled attempt by the defense to gather information about the government's witnesses before the are entitled to receive it," or even "a written purview of the government's

opening statement." Gb25, Gb27.   Rather, just as the government also indicated in its opposition, the defense request has been narrowed in scope to only that information "necessary to an understanding of the charges and their ability to mount a defense." See Gb25-26.

A simple review of the defense request renders the same clear.   To be sure, the information sought is precisely that envisioned by a request for a bill of particulars.  Here, the information will enable the defendants to adequately prepare their defense, avoid surprise during the trial, and ensure continued protection of defendants' constitutional rights. See United States v. Addonizio, 451 F.2d 49, 63-64 (3d Cir. 1971) ("The purpose of the bill of particulars is to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense.").

Not surprisingly, however, when opposing defendants' limited request, the government utterly neglects to address the authority provided by the defense warranting the issuance of the particulars requested, instead contending that (1) the superseding indictment in this case, which, rather notably, defendants are seeking to dismiss for failure to provide sufficient notice of the crime alleged, "more than adequately informs the defendants of the nature of the charge[] and provides ample information to enable them to conduct their own investigation regarding the conspiracy" and (2) the "large volume of discovery that has been turned over to the defense provides even more detail regarding the nature of the illegal activity, the respective roles that each of the defendants played in the conspiracy, and the dates, times, and places where the defendants acted in furtherance of the conspiracy." Gb21.  The fact that the defense in general has had access to extensive discovery, however, does not in any way alleviate the need for the bill of particulars here requested, which are directed toward ambiguities in the superseding

indictment – an indictment that, in stark contrast to the government's claims, is far from detailed and, in fact, constitutionally defunct. Indeed, absent a return of the very limited particulars here requested by defendants, they will not be able to adequately prepare themselves for trial, and will not only be subject to prejudicial surprise, but also likely face subsequent, unconstitutional charges in light of the inadequacy of the offense here charged. See Addonizio, supra, 451 F.2d at 63-64.

It is here where a review of the limited particulars sought is necessary. Starting first with defendants' fourth request, which seeks identity of "all individuals that the government will allege are unindicted coconspirators and/or among the 'others' referenced in the superseding indictment," it is common practice in this district to identify unindicted coconspirators and others referenced in a charging document. This district has recognized that a defendant is entitled to the "central facts" that will permit him to conduct his own investigation into the charges against him and to present a proper and adequate defense. United States v. Vastola, 670 F. Supp. 1244, 1269-70 (D.N.J. 1987). Such central facts include, despite the government's protestation here otherwise, the "others" with whom defendant is alleged to have conspired to the extent the same is known and does not create safety concerns. See United States v. Gatto, 746 F. Supp 432, 477 (D.N.J. 1990) ("[T]he government must disclose the names of the participants in the alleged offenses unless it can show that the disclosure might endanger the safety of specific witnesses. To the extent the indictment alleges that 'others' were involved, the government must specify who the 'others' are."), rev'd on other grounds, 924 F.2d 491 (3d Cir. 1991); see also United States v. Rosa, 891 F.2d 1063, 1066 (3d Cir. 1989) (holding a bill of particulars necessary to inform the defendant of the identities of individuals he allegedly controlled in a continuing criminal enterprise); United States v. Rogers, 617 F. Supp. 1024, 1028-29 (D. Colo. 1985) ("It is

well-settled that the government must identify undisclosed and unidentified co-conspirators, aiders and abettors, and other individuals involved in the criminal acts charged . . . ."); United States v. Ahmad, 53 F.R.D. 194, 199 (M.D. Pa. 1971) (ordering production of "the names and addresses of all co-conspirators who have come to the knowledge of the government" and any additional co-conspirators "if the government shall acquire knowledge of" the same before trial).

Such central facts also include the information sought in the remaining five requests, which consist entirely of the requests for the particulars of the involvement of each of the defendants and any "others" in the crimes alleged. This district has deemed the "central facts" that will permit a defendant to conduct his own investigation into the charges against him and present a proper defense to include a "more detailed factual description" of a defendant's "alleged role" in a conspiracy. See United States v. Vastola, 670 F. Supp. 1244, 1260 (D.N.J. 1987). That description includes, notwithstanding the government's claims to the contrary, a detailing of the actions in which all of the charged defendants and any "others" are alleged to have specifically, personally, or directly committed in furtherance of the conspiracy. See Gb27.

Furthermore, the fact that there is no overt act requirement in some of the statutes charged in this matter does not obviate the need for the provision of such material. Indeed, nothing short of providing the same will permit necessary and adequate preparation for trial. See, e.g., Lefkowitz v. Schneider, 51 F.2d 685, 687 (3d Cir. 1931) (holding a bill of particulars appropriate to determine "the parts which [the defendants] . . . played in the conspiracy"); United States v. Lewis, No. 88-00519-11, 1990 WL 4383, at *1 (E.D. Pa. Jan. 18, 1990) (concluding a defendant is entitled to "specifics as to what conspiratorial acts she allegedly did"); United States v. Cole, 717 F. Supp. 309, 316-17 (E.D. Pa. 1989) (directing the Government to particularize allegations in indictment by informing defendant of precise unlawful conduct charged against

12

him); United States v. Holeman, 490 F. Supp. 755, 762 (E.D. Pa. 1980) (requiring provision of

the exact date and place, if known to the Government, of each event alleged in the indictment);

United States v. Iannelli, 339 F. Supp. 171, 182 (W.D. Pa. 1972) (ordering the Government to

state "the capacity or capacities in which [each defendant] is alleged to have participated in [an]

illegal . . . business"); United States v. Ahmad, 53 F.R.D. 185, 201-203 (D. Pa. 1971) (ordering

identification of conspiratorial acts and dates, times, and places of meetings); see also Rogers,

617 F. Supp. at 1029 (ordering the government to provide enough information to apprise

defendants of the nature of their own alleged overt acts as well as those of their purported

coconspirators).

    It is not surprising that the government neglected to address any of the foregoing

authority in its opposition because the government failed to deal with the defense requests

specifically in any detail whatsoever.  In generally opposing the requests, the government in a

conclusory and unsupportable manner argued:

> The superseding indictment presented by the government in this
> case more than adequately informs the defendants of the nature of
> the charges and provides ample information to enable them to
> conduct their own investigation regarding the conspiracy.
> Additionally, the large volume of discovery that has been turned
> over to the defense provides even more detail regarding the nature
> of the illegal activity, the respective roles that each of the
> defendants played in the conspiracy, and the dates, times, and
> places where the defendants acted in furtherance of the conspiracy.
> See supra note 5.  The motion should be denied.

Gb21.  After then citing standard authority applicable to requests of this nature, the government

again summarily and baselessly alleged:

> [T]he Third Circuit has emphasized that the need for a bill of
> particulars is obviated in those cases where the United States
> supplements a charging document with substantial discovery.
> United States v. Urban, 404 F.3d 754, 772 (3d Cir. 2005); see also
> United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990)

(affirming the denial of a motion for a bill of particulars where "the defendants have been provided with a wealth of evidentiary detail from the discovery to date") (internal citations omitted); United States v. Munoz, 736 F. Supp. 502, 504 (S.D.N.Y. 1990) (provision of substantial discovery weighs against ordering bill of particulars).   Here, the government has provided substantial discovery about the role both Atwell and Castelluzzo played in the drug conspiracy charged in the superseding indictment.  Thus, as the discovery provided by the government fills in the outline of the indictment, the necessity for a bill of particulars declines.  United States v. Caruso, 948 F.Supp. 382, 393 (D.N.J. 1996); United States v. Grasso, 173 F. Supp. 2d 353, 366 (E.D. Pa. 2001) (stating that "the government has provided extensive discovery, which significantly lessens any need for a bill of particulars"); United States v. Beech-Nut Nutrition Corp., 659 F. Supp. 1487, 1499-1500 (E.D.N.Y. 1987) (government's production of 30,000 pages in discovery "must have answered a great many, if not all, of defendants' requests" for bills of particulars).

Gb24.

Quite telling of defendants' entitlement to the very information requested is the fact that none of the foregoing authority offered by the government negates the constitutional impediment to its objection.  Indeed, a cursory review of the mere two decisions applicable and prevailing in this instance remarkably reveals their inapposite nature.  In both cases, the defendants were faced with charging documents that contained strikingly more detail than that provided in this case.  In light of precisely that additional information, the courts in both cases rendered a bill of particulars unwarranted.  In the Third Circuit decision, it was first found that the indictment, which not only "tracked the language of the Hobbs Act," but also "further identified in chart form the approximate dollar amounts of the 'things of value' (the payments taken by appellants) as well as the persons and businesses who made the payments," provided "more than enough information to allow appellants to prepare an effective trial strategy."  See United States v. Urban, 404 F.3d 754, 771 (3d Cir. 2005).  It was then additionally subsequently determined that access to discovery "weaken[ed] the case for a bill of particulars [in the case]," as the appellants

14

had "access through discovery to the documents and witness statements relied upon by the government in constructing its case, including trial evidence reflecting the dates of payments to appellants and the approximate amounts of those payments." Id. at 772. Similarly, in the decision rendered by the District of New Jersey, the court found that where the government had "provided the defendant with discovery which, together with the detailed information contained in the indictment," the defendant had been provided with "enough information to adequately inform him of the nature of the charges brought against him, to prepare his defenses, to avoid surprise during the trial, and to protect him against a second prosecution for an inadequately described offense." United States v. Caruso, 948 F.Supp. 382, 393 (D.N.J. 1996) (citing Addonizio, supra, 451 F.2d at 63-64).

As was the case in both decisions, quite unlike in this case, "the discovery provided by the government" coupled with "the factual and legal information provided in the indictment," clearly obviated the need for a bill of particulars. That is simply not the case here. In fact, a more detailed review of the limited requests for information renders the same patently obvious.

In specifically objecting to the defense request to "identify all unindicted coconspirators," and "'the acts or conduct of all such other individuals that constitute their involvement in the crime alleged,'" the government merely suggests that defendants' request for such information "shows that [the defendants] are merely seeking 'back-door' discovery to which they are not entitled, rather than . . . information [that] is necessary to an understanding of the charges and their ability to mount a defense." Gb25-26. Equally telling, the government then, yet again, relies almost exclusively on precedent that is not only not controlling but also contradicted by the precedent of this district and circuit relied upon and cited at length by defendants in support of their application. Gb26. Indeed, other than citing authority applicable and precedential in New

15

York, the government cites only a single decision of this district that – even more revealingly – actually supports the granting of the requests here sought.

Even though, quite unlike in this case, the government had in that case provided the defense with a "list of 76 coconspirators," the District of New Jersey nevertheless concluded in the same case here relied upon by the government in its opposition that the government had to additionally "disclose the names of the participants in the alleged offenses unless it can show that the disclosure might endanger the safety of specific witnesses." United States v. Gatto, 746 F. Supp. 432, 477 (D.N.J. 1990), rev'd on other grounds, 924 F.2d 491 (3d Cir. 1991). The court further determined and ordered that, "[t]o the extent the indictment alleges that 'others' were involved, the government must specify who the 'others' are," in addition to finding that "further specificity" was required in the indictment concerning the "dates and locations of the alleged offenses," and requiring that the government "provide precise dates and locations of the alleged acts," specifically noting in so ruling that the "allegations in the indictment that events occurred 'elsewhere' are insufficiently specific 'to inform the defendant of the nature of the charges brought against him [or her], to adequately prepare his [or her] defense, to avoid surprise during the trial and to protect him [or her] against a second prosecution for an inadequately described offense.'" Id. (citing Addonizio, supra, 451 F.2d at 63-64).

In next specifically objecting to the remainder of the defense requests for particulars as the involvement of all alleged participants in the crime charged – indicted, named, or otherwise – the government outright erroneously argues that "[t]he defendants fail to cite any legal precedent [that] would require the government to specify 'the role that the government alleges each defendant played in the conspiracy charged'" and that "there is no legal support for a bill of particulars to compel the government to 'identify the acts or conduct' that each defendant

16

performed 'that constitute his involvement in the crime alleged.'" Gb27. Perhaps most telling of the government's opposition, however, it here, once again, blatantly ignores the many decisions relied upon by defendants in support of this very application.

In sum, in opposing the requests for particular as to the unindicted coconspirators and others referenced in the superseding indictment, as well as defendants' requests for particulars as to the involvement of each of them and "others" in the crime alleged, the government utterly neglected the clear authority in this district for the provision of the precise information sought, instead citing to and relying upon authority from other districts that in no way negates defendants' entitlement to such information, and outright ignoring the lack of specificity provided in the superseding indictment in this case.

As the initially cited and aforementioned controlling and applicable legal authority undoubtedly acknowledges, the identity of those individuals with whom a defendant is alleged to have conspired and the involvement of all such individuals charged with engaging in an offense has both legal and factual significance. Legally, it helps the defense be informed as to the identity of a person who may attribute vicarious liability to the defendant under Federal Rule of Evidence 801(D)(2)(E) and other controlling authority. Factually, on the other hand, it assists the defense in making certain investigative priorities, as unindicted coconspirators and their potential involvement contrasted with that of the contended involvement of each of the defendants would clearly be among the highest priority. Indeed, to not provide the defense with the information requested, as the government suggests to this Court, is truly dismaying.

Finally, the fact that the defense has had access to discovery by no means obviates their constitutional entitlement to such information or the government's obligation in this regard. The defense has been inundated with hundreds of files in discovery. It is only fair that the

17

government identify that which is to be used at trial. Otherwise the defense needs to investigate the details of many hundreds of purportedly irrelevant material provided in both electronic and paper form – all of which the government flatly indicates it "intends to use at trial" – relating to an alleged conspiracy that the government protests to span "approximately 29 months," accumulated as a result of "[t]hree distinct investigations," and contended to portray the involvement of an unspecified number of both known and unknown individuals of unmistakably varying culpability. See Gb2. To the extent the hundreds of pages of discovery objectively establish wrongdoing by coconspirators and others without the individual or collective involvement of the defendants, that fact must be disclosed in discovery pursuant to Brady, Giglio, and their progeny, or provided specifically in answers to a request for a bill of particulars. To the extent that the same wrongdoing is implicated by the actions of defendants specifically, that too must be specifically provided, as well as, of course, the nature of each alleged participant's wrongdoing in the scheme charged.

The fact remains that, despite the extensive discovery provided, there is a lack of detail provided in the superseding indictment warranting the relief here sought and, at a minimum, the provision of the requests sought by way of a bill of particulars. The involvement of each of the defendants, as well as the identity and alleged participation of any "others" contended to have participated in the crime charged in this case, is entirely unspecified. Moreover, a superficial review of that which has been provided, which, rather notably, exists only in the form of voluminous paper and electronic discovery, reveals that the involvement of each of the charged defendants and any "others" referenced by the government is, at best, peripheral, and, most likely, completely absent and incapable of proof. Accordingly, absent, at a minimum, a return of the particulars here requested, defendants will remain unable to adequately understand the charge

against them, unable to properly prepare a defense, and unprotected against the prospect of subsequent, unconstitutional prosecution.

Contrary to the government's contention, the defense requests do not amount to a demand for a "written purview of the government's opening statement." Gb27. Much to the contrary, the information sought by way of the defense request for a bill of particulars is outright necessary to an understanding of the nature of the charge – that, very informatively, cannot be ascertained based on either the superseding indictment, or the discovery provided, or both. In short, "the indictment is [not] detailed enough, and discovery has [not] been generous enough, to present [either defendant] with a clear picture of the charges against him, or to enable [either defendant] to prepare an adequate defense." See, e.g., United States v. McDade, 827 F. Supp. 1153, 1188 (E.D. Pa. 1993). Accordingly, and for all of the foregoing reasons, the government should be ordered to provide the information requested.

## POINT III

### THE COURT MUST SEVER THE TRIALS OF THE DEFENDANTS IN THIS CASE BECAUSE THE JOINDER OF SUCH INDIVIDUALS IS BOTH IMPROPER AND UNFAIRLY PREJUDICIAL.

In challenging the defense application for severance, the government incorrectly asserts that no prejudice has been show by defense to support severance and that a jury can compartmentalize the evidence. Nothing can be further from the truth. A defendant is entitled to severance from codefendants if the evidence against the codefendants cannot be compartmentalized and a jury will consider it to his prejudice. See, e.g., United States v. Inigo, 925 F.2d 641, 655 (3rd Cir. 1991) (citing United States v. Meester, 762 F.2d 867, 883 (11th Cir.), cert. denied, 474 U.S. 1024 (1985)).

Furthermore, and in stark contrast to the government's once again blanket and baseless

contention that defendants have failed "articulate[d] how they would be unfairly prejudiced in a joint trial," defendants have in fact identified the specific prejudice they will face at such a trial. See Gb28. The articulation of such prejudice, moreover, extended well beyond a sheer "passing reference [in defendants' initial memorandum] regarding a brief oral statement Atwell made about Castelluzzo." See Gb28.

Indeed, defendants specifically and in detailed fashion identified the very real and dangerous prejudice likely to result from a joint trial of this case:

> [I]f a single trial of the defendants proceeds on one conspiracy charge relating to four drugs, there will be a substantial risk of confusion and spillover prejudice that might induce the jury to convict either defendant of a massive illegal drug scheme in which they were not involved or unfairly impact them on their involvement with methylone specifically because of the allegations undoubtedly concerning the massive drug scheme and the potential for the jury to conclude that, if the defendants are charged with the possession and intended distribution of multiple drugs, they must be guilty of something.

> This risk is increased because the evidence against both defendants with regard to the non-methylone drugs, evidence of which remains utterly unknown, pales in comparison – should such sufficient evidence even exist – to the core methylone charge. . . .

> Consider the potential for confusion and spillover prejudice that would inevitably result from a joint trial of the defendants on their alleged involvement with all four of the charged drugs. Obviously, the subject matter of the unrelated drug offenses is radically different from that of the alleged smuggling of methylone charges. Although the connection is not yet fully ascertainable, the time frames are clearly different, and surely additional defendants are involved. Nonetheless, if tried together, then there would be a real risk that the evidence of the unrelated drug charges would induce the jury to convict the defendants of a massive drug possession and distribution scheme in which neither was involved or inappropriately apportion conduct, acts, and evidence to one defendant as opposed to the other.

> The fact remains that the heart and focus of the government's case here is activities relating to the illegal smuggling of methylone.

20

> There is no transactional nexus or common plan between the
> conspiracy count charged against defendant Castelluzzo and the
> conspiracy count charged against defendant Atwell. Indeed, the
> superseding indictment on its face fails to establish that either
> defendant's alleged activities have any relation to the activities
> alleged against the other. Accordingly, joinder is clearly improper
> pursuant to both Rule 8 and Rule 14 and a severance must be
> granted.

Db41-43 (citations omitted).

In sum, the defense specifically relied on the prejudice warranting a severance that is
present if information that may be relevant to one count will cause the jury to infer a criminal
disposition on the part of the defendant from which is found his guilt of the other crime or crimes
charged. The defense also specifically relied upon the prejudice warranting a severance that is
present when the jury may cumulate the evidence of the various crimes charged and find guilt
when, if considered separately, it would not so find.  See, e.g., United States v. Torres, 251 F.
App'x 763, 764 (3d Cir. 2007) ("When considering whether a criminal defendant was prejudiced
by joinder of multiple charges, we have considered factors such as whether the presentation of
separate counts with distinct and extensive evidence confused the jury, whether the charging of
several crimes made the jury hostile, and whether the jury was able to segregate the evidence as
to each count." (citing United States v. Weber, 437 F.2d 327, 332 (3d Cir. 1970), cert. denied,
402 U.S. 932 (1971));  United States v. Coleman, 22 F.3d 126, 132 (7th Cir. 1994) (observing
that "jury cumulation of evidence, and jury inference of criminal disposition " are primary
concerns when considering joint trials); United States v. Jones, 16 F.3d 487, 492-93 (2d Cir.
1994) (court should have severed count because of "spillover effect occasioned by proof of
[defendant's] tawdry record"; jurors instructed to compartmentalize evidence cannot be asked to
"act with a measure of dispassion and exactitude well beyond mortal capacities") (quoting
United States v. Daniels, 770 F.2d 1111, 1118 (D.C. Cir. 1985)); United States v. Foutz, 540

F.2d 733, 739 (4th Cir. 1976) (finding a "strong likelihood" that the jury found the defendant guilty of one robbery "under the rationale that with so much smoke there must be fire," and further concluding that,"[h]ad the two offenses not been joined for trial, these 'spillovers' could not have occurred, and [the defendant] might well have been acquitted of the first crime; possibly of both.").

Outright ignoring those arguments, and the authority upon which the same advanced, the government merely suggests – notably by relying exclusively on unconstitutionally obtained evidence – that "[a]s evidenced by their text and email correspondence, their appearance together at the Manville Post Office to pick up the package containing methylone, and their common links to the drug packaging mill in East Orange, one would be hard pressed to find two coconspirators who were *more inextricably intertwined* than these two men." Gb28.

Again relying exclusively on illegal acquired text message and email correspondence, the government continues by alleging, without addressing or even relying upon an iota of legal authority, the following in opposition to the defense request:

> Here, Atwell and Castelluzzo participated in the same series of acts and transactions constituting the conspiracy offense. See Federal Rule of Criminal Procedure 8(b). Soto showed up at the East Orange drug packaging mill in a car registered to Castelluzzo. Atwell walked in on the DEA as they were searching the mill and stated that he was there to drop off gloves for Soto. Notably, Espinosa and Benigno were found in a back room wearing gloves while they were re-packing the methylone. Documents tying Castelluzzo to the drug packaging mill were also recovered inside the apartment. Less than six weeks after the East Orange incident, Atwell and Castelluzzo arrived together at the Manville Post Office. The Package that Atwell entered the post office and claimed was previously examined and found to contain approximately three (3) kilograms of methylone.
>
> . . . As noted supra, the email communications between these

coconspirators dated back to September 2010 when they shared information about the pricing and profits to be made from the sale of MDMA. There was even communication about a "nice partnership thing" that they hoped to get going. From November 2010 through January 2011, the focus between them became the development of a good marijuana connection and the distribution of the drugs. By February 2011, they shifted focus back to MDMA before they ventured into the "coke game" in March 2011. The defendants shared information about kilogram presses and cocaine testing kits, and projected $2,500,00 in revenues from their cocaine business by the end of the year. Clearly these two men were knee deep in all of these drug ventures together, and there is no basis to sever their trial.

Gb30 (emphasis added).

The inescapable conclusion remains, nevertheless, that the factual arguments advanced by the government in its opposition to the defense application for severance fall woefully short of defeating defendants' right to the same and, in fact, substantiates their entitlement to a severance in this instance. Unlike in many cases, a severance and separate trial of the defendants in this case would not duplicate the overall case. Rather, it will entirely avoid the otherwise unavoidable prejudice that each defendant will face if they are tried collectively and force the jury to focus on the weaknesses in the government's proof of the crime alleged. Absent the severance here requested, not one, but both of the defendants – singularly and collectively – will be unfairly tarred as individuals (or, worse yet, coconspirators in a massive scheme containing varying degrees of culpability on the basis of incredibly varying proofs) who surely must be guilty of at least some (if not all) of that which each is accused. It is for that reason – and not the failure of the defense to articulate the real prejudice in this instance that will materialize in a joint trial – that the government opposes this application. The question for this Court yet remains how best to ensure that this trial is a fair one.

In the matter at hand, the prejudice that would result for a joint trial of both defendants is clear. Without question, the government would be permitted to seek a conviction against either or both of the defendants based upon evidence that would be inadmissible absent a joint trial, but would nonetheless give rise to an inference of propensity that the law does not permit. Specifically, the jury would be invited and certainly tempted to convict either one or both of the defendants of a massive scheme in which neither was involved based upon utterly distinct allegations and offers of proof," and "coldly compartmentalize the evidence of [the five separate drug offenses here charged and encapsulated in the singular offense contained in the superseding indictment] would require them to "act with a measure of dispassion and exactitude well beyond mortal capacities." United States v. Jones, 16 F.3d 487, 493 (2d Cir. 1994).

In spite of the government's failure to even address the issue, none of the severed conduct would be admissible at separate trials of the defendants pursuant to Rule 404(b). Rather revealingly, the government does not even mention or attempt to specify how such disparate conduct would be admissible – or even offer a viable theory as to its admissibility. Instead, the government presents a strident response and summarily suggests to this Court – based on unconstitutionally obtained and utterly inadmissible evidence – that the two defendants here charged are "inextricably intertwined" and were "knee deep in all of these drug ventures together." Gb28, Gb 31. Those unfounded allegations, however, quite curiously do not appear in the superseding indictment whatsoever – in any shape or form – and there is, in fact, no evidence – admissible or otherwise – to substantiate such allegations, which, standing alone, fail to substantiate the same.

In closing, it is beyond dispute that "the choice of whether to sever defendants' trials rests in the sound discretion of the district courts." United States v. Lore, 430 F.3d 190, 205 (3d Cir.

2005).  Although the Court <u>may</u> exercise that discretion in the prosecution's favor and deny a severance "because joint trials promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts," it <u>must</u> exercise that discretion in defendant's favor when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." <u>Zafiro v. United States</u>, 506 U.S. 534, 537, 539 (1993).

In this case, the Court may and should foresee the prejudice that will result from a joint trial.  In fact, Federal Rule of Criminal Procedure 14, as well as this Court's inherent power over its docket, provides sufficient tools to minimize or eliminate that very prejudice to each of the defendants as such prejudice appears likely to arise.  The question is not whether defendants have an entitlement to such a severance, but, rather, whether this Court should exercise its broad discretion – the same discretion that make its decisions on such issues virtually unappealable – in the interest of justice and grant a severance.  Therefore, Rule 14 requires that this Court act where "it appears" to the Court that there will be prejudice, and grant a severance or such relief as "justice requires."  That is the forward-looking mandate of Rule 14, as opposed to the appellate standard of review of a conviction, and the task of this Court, as opposed to that of the prosecution.  As one district judge put it, "the government is in the 'charging' business,'" but [reviewing courts are] in the justice business, and justice demands a severance." <u>United States v. Campo</u>, 307 F. Supp. 2d 216, 219 (D. Mass. 2004) (severing count to which defendant was willing to plead guilty and accept responsibility).

Indeed, each of the defendants' alleged and rather disparate activities in this case bear no relation to the purported activities of the other and, without a severance, highly improper and prejudicial spillover evidence relating to one defendant will preclude the other from receiving a

fair trial. What the defendants are seeking by their application is nothing more than a level playing field where their guilt or innocence will be determined on the basis of the evidence introduced against them rather than on an impressionistic view that a jury may reach as to their overall character, which is a serious risk if the matter proceeds against them collectively. Accordingly, and for all the foregoing reasons, defendants' respectfully request that their application for severance be granted.

**POINT IV**

**IN SPITE OF THE GOVERNMENT'S CLAIMS, THE FACT REMAINS THAT ALL EVIDENCE AND ANY FRUITS OF SUCH EVIDENCE SEIZED PURSUANT TO WARRANTLESS SEARCHES, AS WELL AS THE CONSTITUTIONALLY DEFUNCT SEARCH WARRANTS IN THIS CASE THAT THE GOVERNMENT UNLAWFULLY SOUGHT, SEIZED, SEARCHED, AND RETAINED MUST BE SUPPRESSED BECAUSE THE INFORMATION WAS ILLEGALLY OBTAINED, IN THE ABSENCE OF SUFFICIENT PROBABLE CAUSE, AND IN VIOLATION OF DEFENDANTS' FOURTH AMENDMENT RIGHTS.**

In opposing the suppression component of defendants' application, the government mischaracterizes and misstates the arguments advanced by the defendants in their brief in an apparent effort to avoid confrontation of the very real constitutional deficiencies and deprivations there identified and articulated. The government even goes so far as to present in excess of twenty pages of distraction to the Court in its attempt to evade proper consideration of the constitutional issues presented. Such an enormous effort on behalf of the government is proof positive of its tacit acknowledgment of blatant vulnerability on the constitutional infirmities outlined in the defense application and speaks volumes as to the clear unconstitutionality of the searches and seizures unlawfully executed and permitted.

In addition to mischaracterizing and misstating the constitutional issues before the Court, the government presents a wealth of inapposite authority, and tellingly fails to address

26

precedential authority so closely aligned with the facts of this matter. In some instances, the government simply provides a knee jerk response to the arguments raised, in others it attempts to distract the Court with voluminous and non-consequential legal authority or inaccurate information, and in yet others it simply avoids confrontation of the real issue by either improperly framing the issue presented or suggesting that it is synonymous with unparalleled facts or authority.

The defense motions for suppression are comprised of four main components: (1) a motion to suppress the information unlawfully obtained from the seizure of certain items without a warrant, (2) a motion to suppress all information – electronic or otherwise – obtained pursuant to the search warrants authorized in this case in view of the totality of the circumstances set forth in the three matching affidavits, all of which fail to establish a fair probability that contraband or evidence of a crime would be found in the specified locations or items, (3) a motion to suppress all electronic evidence obtained following execution of the search warrants because the warrants permitted impermissible general searches, and (4) a motion to suppress all electronic evidence obtained from the searches because the search, seizure, and retention of such electronic information ultimately amounted to an impermissible general search and seizure. All four applications stand on legal and factual bases that independently and cumulatively establish violations of defendants' rights pursuant to the Fourth Amendment and warrant imposition of the relief here sought. Indeed, the undeniable reality remains, in spite of the government's many, desperate affirmations to the contrary, that the evidence seized following the searches of defendant Castelluzzo's cellular telephone and defendant Atwell's email account – both of which were seized and searched without a warrant and in the absence of defendants' consent or the execution of a consent form incident to defendants' arrest – as well as the evidence seized from

the computer tower recovered from LA Courier Services, the flash drive recovered from Atwell at the time of his arrest, the atwell.luke@gmail.com and the nychookah@gmail.com email accounts, and the three cellular telephones recovered from the defendants at the time of their arrests – all of which was seized pursuant to warrants obtained on the basis of either false information or information submitted with reckless disregard for the truth and which were searched in flagrant disregard of the terms of the warrants and prevailing authority – must, most respectfully, be suppressed.

### A. The Evidence Obtained Following The Warrantless And Unauthorized Search Of Defendant Castelluzzo's Cellular Telephone And All Evidence Derived Therefrom Must Be Suppressed.

In its quite distressed attempt to preserve all evidence seized from defendant Castelluzzo's cellular telephone, which the government acknowledges it "reviewed . . . incident to arrest," the government alleges that the evidence "should not be suppressed because the agents acted in reasonable reliance on then-existing judicial precedent" when reviewing the text messages contained on the phone on April 16, 2013 – "fourteen months before the United States Supreme Court announced its decision in Riley v. California, 134 S. Ct. 2473 (2014)" – and that the same evidence "would have inevitably been discovered by the agents who later obtained a search warrant for the T-Mobile cellular phone in question." Gb34.

In support of the foregoing contentions, the government asserts and relies upon the following authority in sheer conclusory fashion:

> The Supreme Court has long recognized the "unqualified authority" of officers to "search the person of the accused when legally arrested to discover and seize the fruits and evidences of crime" without obtaining a warrant, including examining any object found on the arrestee's person. United States v. Robinson, 414 U.S. 218, 224-25 (1973) (quoting Weeks v. United States, 232 U.S. 383, 392 (1914)); United States v. Edwards, 415 U.S. 800, 808-809 (1974). The exception to the warrant requirement for

> searches of an arrestee's person and items found on his person
> "appl[ied] categorically and thus d[id] not require an assessment of
> whether the policy justifications underlying the exception" –
> including protecting officer safety and preserving evidence – were
> served by searches of particular items. <u>Missouri v. McNeely</u>, 133
> S.Ct. 1552, 1559 n.3 (2013); <u>Robinson</u>, 414 U.S. at 235.

Gb34-35.  In alleging the same, however, the government blatantly ignores the fact that the

search of a cellular telephone incident to arrest is much unlike the search of other items found on

an arrestee's person.  Indeed, a cellular telephone, with all the data it can access and all the

privacy expectations accompanying the same, pales in comparison to and is far from the

constitutional equivalent of other items on an arrestee's person such as the crumpled package of

cigarettes in <u>Robinson</u>, <u>supra</u>, or the clothing in <u>Edwards</u>, <u>supra</u>.

    Perhaps more importantly, the touchstone of the analysis has always been the reasonable

expectation of privacy in the item explored in the absence of a warrant and the necessity for the

warrantless search of the item.  <u>Oliver v. United States</u>, 466 U.S. 170, 171 (1984).  As the United

States Supreme Court long ago explained:

> The test of reasonableness under the Fourth Amendment is not
> capable of precise definition or mechanical application.  In each
> case it requires a balancing of the need for the particular search
> against the invasion of personal rights that the search entails.
> Courts must consider the scope of the particular intrusion, the
> manner in which it is conducted, the justification for initiating it,
> and the place in which it is conducted.

<u>Bell v. Wolfish</u>, 441 U.S. 520, 559 (1979).

    To be sure, it is matter of longstanding precedent that the fundamental purpose behind the

search incident to arrest exception is necessity:

> In plain English, the right to search incident to arrest is merely one
> of those very narrow exceptions to the guaranties and immunities
> which we had inherited from our English ancestors, and which had
> from time immemorial been subject to certain well-recognized
> exceptions arising from the necessities of the case. . . .

> . . . Its basic roots, however, lie in necessity.   What is the necessity?  Why is search of the arrested person permitted?  For two reasons: first, in order to protect the arresting officer and to deprive the prisoner of potential means of escape, . . . and, secondly, to avoid destruction of evidence by the arrested person.

United States v. Rabinowitz, 339 U.S. 56, 71 (1950) (Frankfurter, J., dissenting) (citations omitted).  When that necessity is not present, a search incident to the exception is no longer reasonable.  The law in this regard is unmistakable and a matter of enduring precedent reiterated by the Supreme Court over five years ago: "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply."  Arizona v. Gant, 556 U.S. 332, 339 (2009); see also Thornton v. United States, 541 U.S. 615, 627 (2004) (Scalia, J., concurring) ("[C]onducting a Chimel search [incident to arrest] is not the Government's right; it is an exception – justified by necessity.")

For obvious reasons, the government here neither protests nor even attempts to argue necessity or provide any justification for its search of defendant Castelluzzo's phone whatsoever, as any claim of necessity, in the case of a cellular telephone, is undoubtedly illusory.  Indeed, the government entirely overlooks the reasonableness and necessity requirements and summarily contends that "a reasonable officer may 'correctly conclude, based upon a panoply of non-binding authority establishing a constitutional norm, that a particular police practice does not violate the Fourth Amendment.'"  Gb36 (citing United States v. Katzin, 769 F.3d 163, 185 (3d Cir. 2014)).

Rather notably, the same aforementioned decision upon which the government solely relies in support of its unlawful and inappropriate conduct was also rendered after the search of defendant Castelluzzo's telephone was conducted in this case.  In fact, the same decision upon

30

which the government relies was rendered months after the Supreme Court issued decision in Riley, supra, declaring the government's very conduct in this case unconstitutional. In spite of such glaring inconsistencies, the government nevertheless claims that, "prior to Riley, a reasonable officer could have concluded, as did a majority of the courts confronted with the question, that cell phones did not enjoy a special exemption from the established precedent permitting the search of any object found on an arrestee's person without a warrant." Gb36.

Putting aside the fact that the established precedent unquestionably fails to permit the search of any object incident to arrest, it is clear that the government's arguments in this regard utterly miss the mark. Indeed, the inescapable conclusion remains in this case that the government violated defendant Castelluzzo's constitutional rights guaranteed pursuant to the Fourth Amendment. Accordingly, the only means by which the evidence obtained through such a violation could be used is through application of the good faith exception. In arguing that the good faith exception should apply in these circumstances, however, and suggesting that this Court should acknowledge and uphold the government's very contention – in spite of its clear accountability for the mistakes and constitutional blunders in which it engaged – the government seeks absolute evisceration of the application of the requirements of the good faith exception to the warrant requirement. Indeed, the government suggests that this Court should uphold application of the good faith exception notwithstanding the reliance of law enforcement in this case on authority that is not binding in this circuit or even this district. Most respectfully, if this Court were to acknowledge and affirm such a contention, it will effectively sanction and provide carte blanche to law enforcement to interpret legal propositions without any consequence if and when they are wrong. That simply cannot be what the framers envisioned when they drafted the Fourth Amendment and will, undeniably, allow for the good faith exception to become the rule,

rather the constitutional safeguards imbedded in the Fourth Amendment that have long been articulated and established.

Here, law enforcement made a deliberate decision to forego securing a warrant before searching defendant Castelluzzo's cellular telephone in the absence of binding Fourth Amendment precedent authorizing such a search. In spite of longstanding constitutional protections and, without even an iota of guidance from this circuit or even district, law enforcement in a clear back door manner subsequently looked to and now relies upon decisions from sister circuits that are not controlling but, ironically, are now offered to support their position – decisions that, rather notably, have been overruled by virtue of the Supreme Court's decision in Riley. In sum, instead of seeking approval from a neutral magistrate, which the government does not allege was unavailable or even inopportune in this instance, law enforcement purportedly sought and operated – not pursuant to any binding proclamation or authority – but rather decisions made by other circuit courts that are neither controlling nor applicable.

Quite simply, law enforcement dodged a constitutional mandate and assumed authority on the basis of decisions that are not binding. The fact remains, nevertheless, that such arbitrary action and conduct on the part of law enforcement can and should be deterred. Indeed, it is a matter of established authority that law enforcement should be encouraged to "err on the side of constitutional behavior." United States v. Johnson, 457 U.S. 537, 561 (1982). The government clearly failed to do so here and its opposition bespeaks of the impropriety of its actions. Rather than alleging, with any specificity, the basis for application of the good faith exception in this instance, the government merely cites to the evidence it found following its unconstitutional

conduct and contends that the same establishes good faith at the time of its execution of the search.

In light of all of the foregoing, the government's contentions in this respect should be disregarded. Even if, as the government itself concedes, law enforcement "[a]t worst . . . chose the losing side in a judicial disagreement concerning a novel legal issue on which reasonable minds could (and did) disagree," Gb38, the fact of the disagreement, or the novelty of the legal issue, or both, should render law enforcement's conduct unconstitutional and unworthy of application of the good faith exception. Indeed, upholding the government's assertions in this regard would eliminate the objectively reasonable source underpinning the good faith exception, namely, authorization from a neutral magistrate or binding judicial precedent. United States v. Davis, 131 S. Ct. 2419, 2428 (2011).

Furthermore, in spite of the government's allegation that the inevitable discovery exception to the exclusionary rule would allow for admission of text messages unlawfully searched on defendant Castelluzzo's phone, it is likewise clear that the foregoing exception is also inapplicable. Following extraction of the information regarding the text messages illegally obtained and predominately relied upon by the government in its regurgitated affidavit, which was submitted in triplicate in support of the search of defendant Castelluzzo's cellular telephone and all other items seized pursuant to the seven warrants here issued, it is clear that no probable cause would be afforded for the search of any such items. Furthermore, United States Supreme Court precedent renders clear that acceptance of the very argument here advanced by the government would transgress constitutional bounds and completely eviscerate the protections and safeguards guaranteed the defendants in this case and all others pursuant to the Fourth Amendment:

> The point of the Fourth Amendment, which often is not grasped by
> zealous officers, is not that it denies law enforcement the support
> of the usual inferences which reasonable men draw from evidence.
> Its protection consists in requiring that those inferences be drawn
> by a neutral and detached magistrate instead of being judged by the
> officer engaged in the often competitive enterprise of ferreting out
> crime.   Any assumption that evidence sufficient to support a
> magistrate's disinterested determination to issue a search warrant
> will justify the officers in making a search without a warrant would
> reduce the Amendment to a nullity and leave the people's homes
> secure only in the discretion of police officers.

Johnson v. United States, 33 U.S. 10, 13-14 (1948) (footnotes omitted); see also United States v.

Lefkowitz, 285 U.S. 452, 464 (1932) (holding that "the informed and deliberate determinations

of magistrates empowered to issue warrants as to what searches and seizures are permissible

under the Constitution are to be preferred over the hurried action of officers and others who may

happen to make arrests," as "[s]ecurity against unlawful searches is more likely to be attained by

resort to search warrants than by reliance upon the caution and sagacity of petty officers while

acting under the excitement that attends the capture of persons accused of crime").

Indeed, to accept the government's argument in this regard would, in effect, condone a

search of all cellular telephones incident to arrest in drug trafficking cases on the sheer

proposition, as the government her proffers, that cellular telephones are "commonly used to

further drug trafficking activity." Gb40.  That surely is not the law, most especially in a case

such as this one, where, absent the unlawful search of defendant Castelluzzo's cellular telephone,

there is not any evidence of the utilization of such a device in connection with the alleged illegal

activity in this case, or even an advancement by the government of a likelihood that the specific

device would contain evidence of criminality.

In sum, excluding the evidence obtained from defendant Castelluzzo's cellular telephone

in this case, in spite of the government's protestations and, indeed, quite contrary to the same, is

necessary to ensure "appreciable deterrence" of future Fourth Amendment violations. United States v. Leon, 468 U.S. 897, 909 (1984). The choice here exercised by law enforcement to commandeer the unmistakably daunting task of analyzing the confines of the Fourth Amendment in the face of conceded ambiguity and in the absence of controlling precedent surely falls within the sort of "deliberate, reckless, or grossly negligent" conduct that provides a strong "deterrent value of exclusion" that may "outweigh the resulting costs." Davis, 131 S. Ct. at 2427 (citations omitted). Accordingly, and in light of all of the foregoing, it is respectfully requested that defendants' application in this regard be granted and all evidence obtained from defendant Castelluzzo's cellular telephone as well as all evidence derived therefrom be suppressed.

### B. The Evidence Obtained Following The Warrantless And Unauthorized Search Of Defendant Atwell's Email Account And All Evidence Derived Therefrom Must Likewise Be Suppressed.

In its inevitably distressed attempt to preserve it's the rather exploratory and unquestionably unlawful expedition for fruits and instrumentalities of a crime in this case, the government alleges in its opposition that defendant Atwell "signed a written consent form allowing the agents to access his iPhone at the time of his arrest," and "[s]eparately . . . provided law enforcement access to his email account and showed the agents copies of some emails between himself and other individuals." Gb10. Notably, however, the government does not contend or even offer proof of defendant Atwell's consent to the search of his email account, which, most respectfully, begs the question. Indeed, if defendant Atwell had consented to a search of his email account, he surely would have been provided and also executed, as he did in the case of the search of his cellular telephone, a consent form authorizing such a search. The lack of such a consent form, in fact, speaks volumes as to the veracity of the government's

allegation that defendant Atwell provided the consent here alleged to the search of his email account.

Pursuant to the consent exception to the warrant requirement, the government bears the burden of proving consent by "clear and convincing" or "clear and positive" evidence. United States v. Medlin, 842 F.2d 1194, 1197 (10th Cir. 1988). The consent to search must be unequivocal, specific, and intelligently given, and is evaluated in light of the traditional indulgence of the courts against a presumption of waiver of constitutional rights. United States v. Zapata, 997 F.2d 751, 758 (10th Cir. 1993).

Before the government can rely upon consent to justify a search, it must meet its burden of demonstrating that the consent was "freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). Whether consent is voluntary requires a court to examine "the totality of all the surrounding circumstances" – both the characteristics of the person who gave consent and whether the officer who asked for consent engaged in improper behavior. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); see also United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994). Simply put, when "examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the [defendant.]" Id. at 230.

Relevant factors in evaluating the voluntariness of a consent to search derive from both the person's characteristics and the details of the encounter and include but are not limited to: the defendant's age, lack of education, intelligence, physical punishment, length of the detention, lack of any advice as to his constitutional rights, and evidence of duress or coercion such as prolong detention, repeated questioning and deprivation of food or sleep. Id. at 226 (citations omitted); accord United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003). Similar to the

analysis for a coerced confession, a reviewing court must "determine[] the factual circumstances surrounding the [consent,] assess[] the psychological impact on the [defendant,] and evaluate[] the legal significance of how the [defendant] reacted." Id. As Justice Stewart wrote: "The ultimate test remains ... [whether] the [consent was] the product of an essentially free and unconstrained choice by [the defendant, or whether] his will [was] overborne and his capacity for self-determination critically impaired." Id.

The existence of governmental undue pressure or improper means of securing consent has been met by judicial skepticism and mistrust. For example, in United States v. De Los Santos Ferrer, 999 F.2d 7, 11 (1st Cir. 1993), the First Circuit, reversing the suppression of evidence on other grounds, cautioned the government that consents obtained in the manner at issue in the case before it "are likely to be looked upon with a jaundiced eye by the reviewing courts." In that case, the agents obtained consent by telling the defendant that if she did not consent, the agents would obtain a warrant. Id. at 8. The court maintained that "[i]f the government exerts undue pressure or improper means to secure consent, instead of obtaining a warrant as it can easily do, it is going to lose cases." Id. at 11.

The Third Circuit also examined this issue in United States v. Molt, 589 F.2d 1247 (3d Cir. 1978). There, law enforcement agents claimed a statutory right to examine the defendant's business records. Id. at 1249. In addition, the defendant was informed that if the authorities were denied access, they would simply obtain a warrant to examine the records. Id. The district court suppressed the evidence because it concluded that the "agents' innocent misrepresentation of their statutory authority to inspect Molt's records rendered his alleged consent invalid." Id. In affirming the district court decision, the Third Circuit cited the lower court's reasoning that the agents' actions "conveyed a false impression of authority to search." Id. at 1251. The Third

37

Circuit also reiterated that a defendant's knowledge of his right to refuse remains a factor to be considered in assessing voluntariness. Id. at 1251. Although acknowledging the difficulty in proof of a person's subjective understanding, the court declared:

> When evidence exists to show . . . that a defendant believed he must consent such evidence weighs heavily against a finding that consent was voluntarily given. And when that belief stems directly from misrepresentations by government agents, however innocently made, we deem the consent even more questionable.

Id. at 1252-53; See also United States v. Acosta, 965 F.2d 1248, 1253 (3d Cir. 1992) (recognizing that "the words 'trickery' and 'subterfuge' are employed in the Fourth Amendment context to invalidate police conduct in situations where officers accomplished their objective through deceptive strategy"); David S. Kaplan & Lisa Dixon, Symposium on Coercion: An Interdisciplinary Examination of Coercion, Exploitation, and the Law, 74 Denv. U.L. Rev. 941, 948 (1997) (theorizing that the "flexibility which makes consent searches favored among law enforcement officials also creates a strong potential for abuse").

The combination of subjective and objective factors in the instant case compels the conclusion that if, in fact, any consent was indeed provided by defendant Atwell -- consent that the government has not even attempted to and is utterly unable to substantiate -- such consent was impermissibly compelled. Even if proven to have assisted, it is clear that defendant Atwell believed he had no choice but to consent, which renders his consent involuntary.

Equally relevant to the Court's consideration, although not dispositive in isolation, is knowledge of one's right to refuse to consent to a search, which is also a factor to consider in evaluating the validity of a warrantless search. See United States v. Mendenhall, 446 U.S. 544, 558-59 (1980) (concluding that proof of knowledge to refuse consent "was highly relevant to the determination that there had been consent" (emphasis added)). Here, defendant Atwell was not

only not told that he could refuse to consent to the search of his email account, but also compelled to provide access to the account. Such facts clearly support the contention that no reasonable person in his shoes would feel as though he or she had a right to refuse to consent to search the vehicle in question. See, e.g., United States v. Perdue, 8 F.3d 1455, 1466-67 (10th Cir. 1993) (holding that defendant's statements were not made voluntarily due to the "overwhelmingly coercive atmosphere created by many different elements" including "the large and intimidating presence of police officers" and vehicles).

The combined factual setting and psychological effect of the actions and statements of law enforcement identified in the discovery provided in this case also weigh in favor of a finding an involuntary consent. As one legal commentator has observed:

> [E]mpirical studies over the last several decades on the social psychology of compliance, conformity, social influence, and politeness have all converged on a single conclusion: the extent to which people feel free to refuse to comply is extremely limited under situationally induced pressures. These situational pressures often are imperceptible to a person experiencing them; at the same time, they can be so overwhelming that attempts to reduce them with prophylactic warnings are insufficient.
>
> The question of whether a citizen feels free to terminate a police encounter depends crucially on certain empirical claims, as does the question of whether a citizen's grant of permission to search is voluntary. These questions cannot reliably be answered solely from the comfort of one's armchair, while reflecting only on one's own experience. An examination of the existing empirical evidence on the psychology of coercion suggests that in many situations where citizens find themselves in an encounter with the police, the encounter is not consensual because a reasonable person would not feel free to terminate the encounter. Furthermore, such evidence suggests that often the subsequent search is not in fact voluntary, because a reasonable person would not be, under the totality of the circumstances, in a position to make a voluntary decision about consent. . . .

> Even worse, the existing empirical evidence also suggests that observers outside of the situation systematically overestimate the extent to which citizens in police encounters feel free to refuse.

Janice Nadler, <u>No Need to Shout: Bus Sweeps and the Psychology of Coercion</u>, 2002 Sup. Ct. Rev. 153, 155-56 (2002) (emphasis added).

In closing, consideration of all of the circumstances and authority identified above and advanced in support of defendants' applications compels only one conclusion – defendant Atwell's consent was not voluntary. Accordingly, all evidence obtained pursuant to the warrantless search of his email account and all evidence derived therefrom must, most respectfully, be suppressed.

### C. In Light Of The Same Authority, The Evidence Obtained Following The Warrantless And Unauthorized Search Of Defendant Castelluzzo's Residence And Vehicle And All Evidence Derived Therefrom Must Too Be Suppressed.

The government bears the burden of establishing voluntary consent, and the law is clear that its "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548-49 (1968). As anticipated and alleged in defendants' initial memorandum, the government alleged in its opposition to the defense applications concerning the legality of the searches here conducted that "the search of [defendant] Castelluzzo's residence and vehicle located at his Bayonne address was done with the consent of his live-in girlfriend, Naivene Mahgoub." Gb32. Remarkably, however, in support that allegation the government advances – without any explanation or supporting factual contentions at all, solely the following – "Here, Ms. Mahgoub identified herself as the mother of [defendant] Castelluzzo's children and a resident of the target location. She therefore had authority to consent to the search conducted by the agents, and the evidence obtained during the search should be deemed admissible in the government's case in chief." Gb34.

Utterly revealing of the lack of such consent proffered by the government, as well as,

equally important, its inability to substantiate the consent alleged to have been provided,

however, is the indisputable fact that the government neglects to even mention (or remotely

address) the contentions raised with respect to the anticipated offering of Ms. Mahgoub's consent

in defendants' initial application.  In seeking suppression of the information obtained pursuant to

the government's projected protestation of consent that it must alone establish to be knowingly

and voluntarily given, defendants argued:

> Although executing officers will likely allege that the mother of
> defendant Castelluzzo's children consent to a search of his
> residence, such consent – if even obtained at all – was obtained
> after three officers rushed through the home after she opened the
> door, and was only thereafter possibly provided – again, if even at
> all – after the executing officers threatened to contact the New
> Jersey Division of Youth and Family Services and have defendant
> Castelluzzo's children taken away from the both of them.  Clearly,
> such circumstances cannot possibly be construed as affording
> knowing, willing, and voluntary consent to the presumptively
> unreasonable search conducted by federal agents of the DEA.

Db49.  The government, however, failed to even address the foregoing allegations.  Instead, the

government summarily alleged – without even attempting to substantiate its burden – that

consent was afforded by Ms. Mahgoub, and advanced in accordance with constitutional norms.

The burden, however, is clearly upon the government to establish that that consent was

knowingly and voluntarily given.  See, e.g., United States v. Matlock, 415 U.S. 164, 172, 177

(1974).

Once again quite telling of the constitutional validity of the consent here alleged by the

government to have been provided and, indeed, utterly revealing of the absence of the affordance

of such consent, is the absence of even an attempt by the government in its opposition to

substantiate its burden of proof with respect to the consent advanced.  As was the case with

41

respect to the government's aversion of consent by defendant Atwell to the search of his email account, the government utterly fails to address, never mind alleviate its burden.

The decision rendered by the United States Supreme Court in Kaupp v. Texas, 538 U.S. 626 (2003), is instructive in this regard. The police in that case, without probable cause, awoke the seventeen-year-old defendant in his home at 3 a.m., and advised that they needed to speak with him concerning a murder investigation. Defendant responded with "okay," whereupon law enforcement officers handcuffed and led him – shoeless and dressed only in his boxer shorts and T-shirt – to a patrol car. The Court there resolved that, under the circumstances, the defendant's "'okay'" offered "no showing of consent." Id. at 631. In reaching that conclusion, the Court determined that there was "no reason to think [that defendant's] answer was anything more than a mere submission to a claim of lawful authority." Id. (citations omitted).

Also pertinent here is the decision rendered by the Ninth Circuit in United States v. Washington, where the court concluded that that the fact that defendant had been seized prior to the alleged consent had a "major impact" on its consent decision. 490 F.3d 765, 775 (9th Cir. 2007). Although only one factor of five, the court there held that the fact of custody "raise[d] grave questions" as to the voluntariness of the consent alleged to have been provided – questions that should be similarly raised in this instance. Indeed, the fact of the government's seizure of defendants should hold similar regard in this case.

In sum, as is the case with respect to defendant Atwell's purported consent to the search of his emails, consideration of all of the requisite circumstances with respect to Ms. Mahgoub's alleged offering of consent compels one conclusion – Ms. Mahgoub's consent was not voluntary. Accordingly, and for all of the foregoing reasons, all evidence obtained pursuant to the

warrantless search of defendant Castelluzzo's residence and vehicle and all evidence derived therefrom must too be suppressed.

### D. All Evidence Seized Pursuant To The Seven Search Warrants Issued In This Case, Which Were Supported By Illegally Obtained Evidence As Well As Illegal Assertions And Exclusive Of Pertinent Information, Must Also Be Suppressed.

In challenging the defense claims respecting the lack of requisite probable cause for issuance of the search warrants here sought and authorized, the government, yet again, and, evermore significantly, fails to even remotely touch upon or address the lack of probable cause advanced in the singular affidavit upon which it relies, which was repeated in triplicate in support of the seven search warrants it sought. Instead, it merely regurgitates information provided within the replicated affidavit, and alleges that the same "clearly demonstrated that the records were 'relevant and material to an ongoing criminal investigation,'" justifying its ultimate search and seizure of the seven specified items. Gb42-43.

A simple review of the government's opposition renders clear, nevertheless, that it is utterly unable to even begin to substantiate – never mind proffer – sufficient evidence of probable cause. Indeed, although controlling law is clear that neither relevancy nor materiality is the quintessential requirement for issuance of a warrant, the government relies solely upon that insupportable advancement, and neglects to even touch upon the unquestionable and constitutionally mandated requirement of probable cause.

The fact that the government utterly failed to address this very important prerequisite and constitutional impediment to its conduct, however, is of no surprise. Indeed, after excluding the improperly and illegally obtained information advanced in the effectively singular affidavit submitted in support of the seven search warrants, it is inevitable that there never was, and never could be, a fair probability that any of the items the government sought to search would contain

contraband or evidence of the crimes proffered in the warrants. The effectively undisputed lack of probable cause in this case, moreover, becomes ever clear upon consideration and analysis of critical information omitted from the affidavits.

Following exclusion of the unlawfully obtained evidence, including, most notably and importantly, the information derived from the warrantless search of defendant Castelluzzo's cellular telephone and the warrantless search of defendant Atwell's email account, the inescapable fact remains that the government is entirely unable to substantiate its advancement of probable cause necessary for issuance of each and every one of the warrants here sought and authorized. In fact, once the affidavits are stripped of the foregoing information, and further buttressed by the information outright omitted from the affidavits, the lack of probable cause in this case is palpable.

Among the information omitted from the affidavit replicated in triplicate in support of the seven searches in this case includes, most blatantly, the fact that the shipment of firearms by defendant Atwell's girlfriend, Krystel Lopez, ultimately resulted in the issuance of a criminal complaint against Ms. Lopez that was dismissed just days following her arrest based on a finding that there was no probable cause that an offense was committed or that Ms. Lopez committed such an offense. Again not unexpectedly, however, and in apparent desperation to validate otherwise unlawful and constitutionally impermissible searches, the government neglected to reference in all three of the affidavits, which were sworn to on June 4, 2013, that the shipment of the aforementioned firearms was found legal and proper by Magistrate Judge Boyd N. Boland of the United States District Court of the District of Colorado on May 23, 2013. Indeed, in spite of the lack of criminality and, in fact, finding of legality associated with such proffered activity – of which the government was unmistakably aware – it indiscriminately relied upon the shipment of

the firearms by defendant Atwell's girlfriend to herself in each of the affidavits it advanced.  In spite of its now obvious agenda to obtain approval for the constitutional rummaging of items that it so obviously would be without constitutional authorization to search, however, the fact remains that the government lacked probable cause for authorization of the searches ultimately conducted, which were issued without mention of and, in fact, in the obvious absence of, the apparent and ruled upon legality relating to the shipment of the aforementioned weapons, although it was undeniably well known to the affiant at the time of submission of the affidavits that such conduct was not illegal and could not substantiate an offering of probable cause in this case.

As the government indicates in its brief in opposition to the defense motions, "[t]hree affidavits were prepared in support of the seven search warrants that were sought." Gb42.  The first affidavit was submitted in support of a request seeking "permission to search the computer tower recovered from Atwell's business and the flash drive recovered from his person." Id.  The second was submitted in support of a request seeking "permission to search Atwell's personal email account as well as the email account of the alleged person posting the solicitation for courier services." Id.  The third and final affidavit was submitted in support of a request seeking "permission to search the two cellular phones recovered from Castelluzzo and the one cellular phone recovered from Atwell incident to their arrests on April 16, 2013." Id.

Rather telling of the lack of probable cause provided within each of the three affidavits is the government's concession that the "statements of probable cause contained in all three affidavits were identical." Gb43.  Those statements, as summarized by the government, consisted of the following:

> On April 10, 2013, CBP intercepted a package containing approximately three (3) kilograms of methylone, a Schedule I controlled substance. (Exhibits F, G, H at ¶ 6.) On April 16, 2013

Atwell and Castelluzzo arrived together at the Manville Post
Office. (Exhibits F, G, H at ¶ 9.) Atwell picked up the Package
and returned to the vehicle still occupied by Castelluzzo, and both
men were placed under arrest as they attempted to exit the parking
lot. (Exhibits F, G, H at ¶ 9.) A review of text messages from
Castelluzzo's phone showed that he had received messages from
"Ghost" regarding picking up the package at the "po" [Post
Office]. (Exhibits F, G, H at ¶ 10.) The affidavit listed the items
recovered from each of the defendants and included information
from the post-arrest statement of Atwell regarding an alleged
person named "Pito." (Exhibits F, G, H at ¶¶ 10-13.) A consent
review of Atwell's email account also suggested his involvement
with an individual involved in the powdered form of MDMA.
(Exhibits F, G, H at ¶ 14.) Detail was also provided with respect to
seven other intercepted packages destined for LA Courier Services
which contained the component parts of a M4 assault rifle and a
Glock handgun. (Exhibits F, G, H at ¶¶ 16-17.)

Gb43.

Quite feebly and hollowly, the government, on the basis of solely the foregoing
information, emptily contends in its brief in opposition that the aforementioned facts pass
constitutional muster:

Taken together, these facts, along with numerous others set forth in
the affidavits, clearly established that the proposed searches of the
electronic devices and email accounts were "relevant and material to
an ongoing criminal investigation." Indeed, the affidavits were
replete with specific facts supporting the police suspicion that the
cellular phones, computer tower, flash drive and email accounts were
involved, at a minimum, in conspiracies to import methylone,
firearms and possibly other controlled substances. Accordingly, it is
clear that the evidence derived from the search warrants was obtained
properly under federal law and thus is admissible at trial.

Gb44.

In spite of the government's assertions, however, the fact remains that, following a
"practical, common-sense" review of "all the circumstances set forth in the affidavit[s that were
submitted in this case]," there is not any probability, and certainly not a "fair probability," that
"contraband or evidence of a crime would be found" on the cellular telephones, computer

hardware, or information associated with the named email addresses on the basis of such information.   See Illinois v. Gates, 462 U.S. 213, 238 (1983).   Consideration of such circumstances here includes the fact that blanket allegations are made with respect to defendants' alleged involvement in such vast crimes as "conspiracies to smuggle contraband into the United States, to illegally transport firearms, to illegally mail firearms, and to import controlled substances," Gb12, even though there is no proof of such involvement other than information that was either obtained illegally obtained, misrepresented, or presented in a misleading form in support of the sole affidavit upon which the government relied in support of each of its seven applications for search warrants – revealing that a strong effort was made in his case to seek what would otherwise be impermissible evidence.

To be sure, not one of the search warrants issued in this case can be established to pass constitutional muster, as each is lacking of the probable cause required for issuance of the warrants in the first instance.   Once stripped of unlawfully obtained and outright misleading information, there is an utter lack of probable cause for the searches ultimately authorized and conducted, as all that remains in the government's singularly proffered affidavit is the defendants' retrieval of a controlled package.   Certainly, such a fact alone is utterly insufficient to warrant the issuance of the seven searches here ultimately conducted.

Noting the troubling line between mere suspicion and probable cause, the United States Supreme Court most cogently explained the concept of probable cause many decades ago, indicating:

> In dealing with probable cause . . . as the very name implies, we deal with probabilities.   These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act . . . .
>
> Probable cause has come to mean more than bare suspicion:

> Probable cause exists where "the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed . . . .

> These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime.

Brinegar v. United States, 338 U.S. 160, 175-76 (1949), reh'g denied, 338 U.S. 839 (1949).  As the Court in that same case indicated, the term "probable cause" means something less than evidence that "would justify condemnation or conviction."  Id. at 175 (citations omitted).  However, "common rumor or report, suspicion, or even 'strong reason to suspect'" does not establish probable cause.  Henry v. United States, 361 U.S. 98, 101 (1959).

Although the Supreme Court's decisions respecting probable cause have generated few sustaining principles, one unquestionably clearly established is that probable cause may not be sustained by a conclusory affidavit that does not provide a magistrate with sufficient facts to make an independent determination as to whether the warrant should issue.  The leading case for this proposition is Nathanson v. United States, 290 U.S. 41 (1933).  There, the challenged warrant recited that a federal officer had:

> stated under his oath that he has cause to suspect and does believe that certain merchandise, to wit: Certain liquors of foreign origin a more particular description of which cannot be given, upon which the duties have not been paid, or which has otherwise been brought into the United States contrary to law, and that said merchandise is now deposited and contained within the premises of J.J. Nathanson said premises being described as a 2 story frame dwelling located at 117 No. Bartram Ave.

Id. at 44.  The Court held, in view of the foregoing, that the warrant had been issued without probable cause, observing that nothing "indicates that a warrant to search a private dwelling may

rest upon mere affirmance of suspicion or belief without disclosure of supporting facts or circumstances." Id. at 47.

In recognition of the insistence that the Court then and long ago acknowledged by the Supreme Court in Nathanson, an officer's affidavit allege specific facts and not conclusions is based on the principle that:

> the inferences from the facts which lead to the complaint "[must] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." The purpose of the complaint, then, is to enable the appropriate magistrate, here a Commissioner, to determine whether the "probable cause" required to support a warrant exists. The Commissioner must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime.

Giordenello v. United States, 357 U.S. 480, 486 (1958) (quoting Johnson v. United States, 333 U.S. 10, 14 (1948)). As the Supreme Court succinctly put it first in Nathanson, a search warrant may not issue unless the issuing magistrate can find probable cause from the facts or circumstances presented to him under oath or affirmation – "[m]ere affirmance of belief or suspicion is not enough." 290 U.S. at 47.

In spite of the fact that the "probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances," the Court has nevertheless proclaimed "that '[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'" Maryland v. Pringle, 540 U.S. 366, 371 (2003) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). The Court has further held "that the belief of guilt must be particularized with respect to the person to be searched or seized." Id. (citing Ybarra v. Illinois, 444 U.S. 85, 91 (1979)). Indeed, it is well

settled that the issuance of a warrant to search requires evidence or credible information, under oath or affirmation, which would 'warrant a man of reasonable caution in the belief' that a felony has been committed." Wong Sun v. United States, 371 U.S. 471, 479 (1963) (citations omitted).

In this case, the government has proven itself unable to satisfy the probable cause standard the Fourth Amendment demands. In fact, the conclusion is inescapable that the seven searches authorized and ultimately conducted in this case on the basis of three identical affidavits were not reasonable because they were not justified by probable cause. A simple review of the identical three affidavits submitted in support of the seven search warrants, in fact, unmistakably establishes the same. The warrants were issued improvidently and remain invalid.

Without demonstrating any facts or circumstances supporting a theory that either defendant violated any of the specified offenses, or that any evidence, fruits, or instrumentalities existed, or that such evidence would be found within the items to be searched, the three affidavits supporting the seven warrants merely list a total of six crimes against the United States, and flatly aver that defendants and "other persons known and unknown to the Government" have committed such offenses and that there is "probable cause to search the property described in Attachments A1 through A2 for evidence, instrumentalities, and fruits of the crimes further described in Attachments B1 through B2." See Discovery Production ("Discovery") at 000060. The affidavits do not substantiate that anyone – and certainly not either defendant – violated any federal law, including those specifically listed. In fact, in listing the six specified criminal offenses, the affiant in all three of the affidavits fails to provide any basis or offer of proof as to what statue, if any, was violated, or the purported individual who violated the statute, or what evidence was likely to be found in each of the specified search locations.

In United States v. Crozier, the Ninth Circuit determined that a warrant authorizing the seizure of "evidence of a violation of 21 U.S.C. 841, 846" was overbroad. 777 F.2d 1376, 1381 (9th Cir. 1985). The affidavits propounded in this case suffer from the other extreme, listing six and seven separate items under the control of various individuals. Other than the cavalier statement that he knows that they are crimes, the affiant in each case says no more about them, never alleging or even speculating that any listed statutes were violated.[3] Accordingly, the reader is left to sort the inter-relationships between persons, property, lawful conduct, and criminal activity, and classify which crime may have been violated, as well as the relationship of the crime to each of the specified search locations.

Perhaps most revealing of the invalidity of the warrants and the government's inability to substantiate the same is the fact that the government neglects to address the precedential decision of the Third Circuit in Virgin Islands v. John, 654 F.3d 412 (3d Cir. 2011), in which circumstances less than those present in this case were found to warrant suppression. In that matter, a warrant was sought to search Tydel John's home for child pornography based "solely on an affidavit that established only probable cause to believe that [one] would find evidence that he had sexually assaulted several children at the school where he taught." Id. at 413. The affidavit did not contain "any direct evidence that [the defendant] possessed child pornography, did not aver the existence of any connection between the two crimes, and did not claim either a good faith belief in such a connection or any basis for thinking that one had been established." Id. Despite such deficiencies, however, a Virgin Islands Superior Court judge issued the

---

[3] In the probable cause section of the affidavits submitted, the affiant simply states that items of physical evidence were recovered on April 16, 2013 during the investigation and arrest of the defendants, at the time of their arrest the defendants were in joint possession of approximately three kilograms of methylone, and during subsequent searches of parcels sent to LA Courier Services law enforcement officers recovered the component parts of a handgun and an assault rifle. Discovery at 000072, 000085-000086, 000103-000104. The totality of the foregoing information is then summarily and in the absence of needed specificity to provide probable cause that the defendants were involved in trafficking illegal contraband, specifically drugs and firearms. Id.

warrant, and the search of the defendant's home actually "turned up incriminating documents," although "no [evidence of] child pornography." Id. The Third Circuit there granted certiorari to determine whether that evidence had been properly suppressed and ultimately determined that "the catalogue of the affidavit's 'indicia of probable cause' with respect to child pornography [was] completely empty." Id. at 413, 418.

Here, as was the case in John with respect to a lack of evidence of sexual assault, the "catalogue of the affidavit's 'indicia of probable cause' with respect to [the defendants' alleged involvement in anything other than the smuggling of methylone was] completely empty." See id. at 418. Indeed, even under the most cynical examination of defendants' purported involvement in the massive scheme now charged against them as a result of three independent investigations – none of which, quite tellingly, are addressed in the three identical affidavits submitted in support of the seven search warrants ultimately authorized and issued – there remains an utter lack of probable cause for the searches conducted. Indeed, "a cursory reading of [the] affidavit[s] reveal[] that there is not a single assertion that [the defendants] were in any way associated with [the non-methylone drugs]," or the illegal transport of firearms, or that they engaged in any criminal conduct whatsoever apart from the methylone offenses – if they even in fact engaged in such conduct at all. See id. at 418-19 (citations omitted).

Accordingly, the massive searches conducted of the cellular telephones, computer equipment, and information relating to certain email addresses should not have been authorized in this case, and the evidence seized on the basis of the misleading affidavits submitted in support of the searches should be suppressed. Indeed, in view of such precedential authority and in light of all of the other foregoing and previously advanced reasons, defendants' application to suppress all evidence seized pursuant to the seven warrants issued in this case should, most

respectfully, be granted.

**E. Even Assuming Probable Cause Existed For Issuance Of The Seven Warrants On The Basis of Three Identical Affidavits, All Evidence Seized Pursuant To The Warrants Must Still Be Suppressed Because The Warrants Failed To Satisfy The Particularity Requirement Of The Fourth Amendment And Allowed For The General Searches Unconstitutionally Conducted.**

Interestingly, in opposing this component of defendants' application, the government, once again, without even an offering of proof or advancement of controlling authority, suggests that "contrary to the unfounded suggestion [advanced by defendants] that the warrants 'did not restrict the searches to specific files or locations likely to contain information,' all of the search warrants contain attachments setting forth in detail the items to be seized at each location." Gb45. Rather than addressing those purported details specifically, however, the government thereafter summarily alleges that "all of the warrants described what was to be seized as 'evidence, contraband, fruits, and instrumentalities relating to violations' of the statutes specified in the warrants themselves, namely the conspiracy to smuggle contraband into the United States, illegal transportation of firearms, and conspiracy to import controlled substances." Gb45-46. The government continues:

> Moreover, each warrant provided a specific, detailed list of items to be seized related to the particular form of electronic medium. The Government's request related to the computer tower and flash drive sought evidence, including but not limited to email messages, other forms of electronic information, video and audio files, subscriber information, contact information, browser history, and any notes or calendar entries. (Exhibits I and J at Attachment B). The Government's specifically articulated request related to the Google accounts sought evidence, including but not limited to the content of the email messages, the types of service utilized by the account, and the records pertaining to the identification of the owner and user of the account. (Exhibits K and L at Attachment B). The Government's request related to the cellular phones recovered from the defendants at the time of arrest sought evidence, including but not limited to voice mail, texts and multimedia messages stored on behalf of the account, as well as billing records and call detail records dating back for a limited time period to March 1, 2013. (Exhibits M, N, O at Attachment B).

Gb46.

53

In addressing the government's unsubstantiated and impossibly unsustainable arguments in opposition, it bears repeating that the suppression application is based on the blanket seizure of all evidence found on the electronic devices and hardware for which permission to search was sought and granted. Indeed, in the affidavit in support of the request to search computer tower recovered from Atwell's business and the flash drive recovered from his person, the government sought and was granted permission to search "[a]ny and all computer software," as well as any "subscriber information," any "photographs, video, and audio files, and any "email messages, chats, multimedia messages, installed applications, or other electronic communications," among a whole host of other components of the electronic devices. Discovery at 000071. Request was sought to search, copy, image, and seize the computer hardware, in its virtual entirety, as well as to conduct an off-site search of the image or hardware for evidence relating to a drug and firearms trafficking enterprise. Id. The same general exploratory rummaging, moreover, was sought and authorized with respect to the searches of the email accounts and cellular telephones.

It bears repeating here, particularly in light of the government's failure to address the controlling authority specifically identified in defendants' memorandum, that the searches ultimately authorized were precisely akin to a search of the sort found impermissible by the Third Circuit, and entirely distinguishable from a search of the sort upheld by the same court. As defendants initially advanced:

> In Klitzman, Klitzman, and Gallagher v. Krut, 744 F.2d 955 (3d Cir. 1984), the Third Circuit found a warrant that authorized the search and seizure of all of a law firm's client records and business documents – without connecting the documents to the crime alleged – to be impermissibly overbroad, as it "authorized virtually a wholesale search and seizure of the business records of the firm." Id. at 960; see also United States v. Wecht, 619 F. Supp. 2d 213, 241 (W.D. Pa. 2009) (deeming impermissibly overbroad a warrant that "authorized the seizure of the computer itself, as well as 'all information and data contained therein, including data stored on any associated data storage devices,'" noting that the "agents

54

executing the warrant did not need to execute any discretion at all because the warrant, by its terms, permitted them to seize every single piece of data contained in the computer and associated storage devices" without referring to any particular crime or any particular kind of material). In In re Impounded Case (Law Firm), 840 F.2d 196 (3d Cir. 1988), on the other hand, another case from the Third Circuit, the warrant was found to be sufficiently particular, as it expressly limited the authorized search to specific files and did not allow for the seizure of any and all business documents.

The warrants issued in this case are strikingly similar to that authorized in Klitzman, Klitzman, and Gallagher, and utterly distinguishable from that issued in In re Impounded Case, as they effectively permitted a blanket seizure of all of the electronic records that could be found on the referenced devices or at the business facility maintained by defendant Atwell. The warrants – in application and as executed – allowed the agents to seize the entirety of the cellular and hardware components, regardless of their relationship and the relationship of the data contained therein to the illicit activity identified in the affidavits. The warrants did not restrict the searches to specific files or locations likely to contain the information, or to specific information.

Db58-59; see also United States v. Fleet Mgmt. LTD., 521 F. Supp. 2d 436, 447 (E.D. Pa. 2007) (suppressing all evidence resulting from the search and seizure of a single computer because the entire computer was taken, amounting to a general search and constitutionally impermissible).

What has utterly been left unaddressed by the government in its opposition is the fact that the warrants failed to particularize the relevant computer files and locations contained in and among the electronic hardware and information for which permission to search was sought and granted and, therefore, both improperly and unconstitutionally permitted a general search, in contravention of a wealth of controlling authority identified by defendants but not even broached by the government in its opposition. Tellingly, yet again, however, the failure of the government to address the defense contentions in this regard is unsurprising, as courts have not hesitated in similar circumstances where a warrant fails to so particularize the relevant computer files that

may properly be searched pursuant to the warrant and instead "authoriz[es] a search of 'any and all information and/or data' stored on a computer" or electronic device to find that the warrant unquestionably permits nothing "but the sort of wide-ranging search that [has been recognized to fail] to satisfy the particularity requirement" of the Fourth Amendment. United States v. Otero, 563 F.3d 1127, 1132 (10th Cir. 2009), cert. denied, 130 S. Ct. 330 (2009); see also United States v. Carey, 172 F.3d 1268, 1275 (10th Cir. 1999) (stating that a warrant to seize evidence stored on a computer should specify "which type of files are sought" on the computer); United States v. Wecht, 619 F. Supp. 2d 213, 244 (W.D. Pa. 2009) (finding that the affidavit's failure to "provide sufficient information to justify a reasonable inference that all of the data on the . . . computer would likely be probative of the crimes under investigation" nullified "the Government's contention that its interest in the computer was as broad as all of the contents of the computer itself" (emphasis in original)).

In short, in opposing the defense application, the government utterly ignores the constitutional question presented and then further attempts to distract the Court by suggesting that defendants contended something that they did not. Defendants' claim in this regard is based on nothing other than the generality of the warrants, which failed to specify the particular locations and files on the computer and other electronic hardware and devices seized that could permissibly be searched, and therefore permitted unconstitutional general searches of all electronic data. The fact that the warrants "described what was to be seized as 'evidence, contraband, fruits, and instrumentalities relating to violations' of the statutes specified in the warrants themselves," moreover, as the government here contends, is utterly irrelevant. Gb45. Indeed, even with such limiting criteria, if a warrant fails to identify with particularity the components of the electronic hardware and information that may be searched and seized, the

warrant fails.

This case, in fact, in spite of the government's failure to address the same, is utterly undistinguishable from the decision rendered in United States v. Fleet Mgmt. LTD., 521 F. Supp. 2d 436 (E.D. Pa. 2007). In that case, as in this case, and unlike in United States v. Christine, 687 F.2d at 749 (3d Cir. 1982), or in U.S. v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents, 307 F.3d 137, 146 (3d Cir. 2002), "the warrant at issue did not describe in "'specific and inclusive generic terms'" what was to be seized, and did "'vest the executing officers with unbridled discretion to search for and seize whatever they wished.'" Fleet Mgmt. LTD., 521 F. Supp. 2d at 443 (quoting Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents, 307 F.3d at 144) (emphasis in original). Indeed, the warrants in this case authorized the seizure of essentially all of the electronic hardware and components for which authorizations to search were sought, which is precisely what the court in Fleet Mgmt. LTD. found unconstitutional because the "warrant did not even attempt to differentiate between data that there was probable cause to seize and data that was completely unrelated to any relevant criminal activity." 521 F. Supp. 2d at 447. Under the circumstances there present and here present, "the warrant manifested no judicial control over the search of the hard drives, but rather, left it entirely to the executing officers' discretion to determine what on the hard drives could and could not be seized" and "thereby did nothing to prevent a general, exploratory rummaging through [defendants'] belongings, which the Fourth Amendment prohibits." Id. Defendants' suppression application in this case, therefore, like the suppression application there at issue, should be granted.

Aside from the general nature of the warrant, the government's execution of the warrants provides a separate ground, in and of itself, for suppression of all evidence seized pursuant to the

warrants. In challenging this component of defendants' application, the government alleges that the defense argument "erroneously suggests that the Government had 14 days to complete a full forensic analysis of the computer tower, flash drive, cellular phone and email accounts." Gb47-48. Then, relying on precedent that is contrary to that which is controlling in this instance and, furthermore, not binding upon this Court, the government erroneously and without even an advancement of legal support contends: "Neither the Federal Rules of Criminal Procedure nor the Fourth Amendment provides for a specific time limit in which a computer and other related electronic devices must undergo a forensic examination after it has been seized pursuant to a search warrant." Gb48.

In spite of the government's protestations to the contrary, as the discovery provided by the government in this case renders clear, the executing agents indiscriminately seized all of the electronic hardware and information without making even the slightest attempt to determine whether potentially relevant information was located in the files, on the drives of the electronic equipment, or the devices themselves until months after the warrants was executed – well beyond the time specified in the warrant and, in any event, any reasonable time. The wide-sweeping searches and seizures conducted here are, most respectfully, and undoubtedly, constitutionally deficient. Indeed, in this instance, the government's seizure of all electronically stored information on the specified devices for which it requested authorization to search makes it even more evident that the warrants were not sufficiently particular to appropriately limit the government's searches of such devices. Accordingly, all of the electronic evidence seized and the fruits of that evidence must be suppressed.

The indisputable fact remains in this case that the government in this case chose to search virtually every electronic repository of information and seize obviously non-responsive items. Indeed, the executing agents indiscriminately seized all of the electronic devices and components

for which it requested authorization to search without making even the slightest attempt to determine whether potentially relevant information identified in the warrants was in fact located in the files or on the drives of the electronic equipment and devices seized until long after the warrant was executed, well beyond the time specified in the warrant and, in any event, well beyond any reasonable time.[4]   Quite contrary to established precedent, which the government wholeheartedly fails to address, the government asks this Court to uphold its contention and argument that there is no upper limit as to how long it has to conduct electronic searches.

In sum, it is clear that impermissible searches were permitted and that the government executed its searches in an unconstitutional manner, impermissibly copying the entirety of the electronic data seized, well beyond any reasonable scope of the warrant, and without authorization to conduct such searches and seizures offsite, although permission to engage in the same was specifically sought in the affidavits submitted.  The government had absolutely no authority for the conduct in which it engaged and its lack of good faith can be inferred from such conduct and the additional conduct in which it engaged following execution of the warrants in failing to timely search the seized information.  Such conduct only compounds the assaults on defendants' privacy concerns.

Rather than directly address these constitutional deficiencies and the lack of good faith and reasonableness identified defendants, however, the government outright avoids any genuine or adequate confrontation of the real issue, namely its blatant disregard for and relinquishment of the constitutional requirement that it alone bears to ensure the proper execution of a warrant.

---

[4] It bears mentioning here that the government also fails to adequately address the fact that it sought, but was not granted permission, to conduct an off-site examination of the electronic data seized.  Although neither of the defendants, on the basis of lawfully obtained information, were referenced in any of the affidavits as subjects known to have been using such eletronic devices, permission was nevertheless sought and granted to search and seize all such defvices, and authority was then executed – beyond that which was permitted in the warrant itself – to take such devices offsite and conduct searches of the same in conrtavention of the warrants clear demands.

The government's response is illuminating of the unconstitutionality of its conduct, which independently and cumulatively warrants the suppression of all electronic evidence seized, even assuming probable cause existed for the searches and the warrants are found to meet the particularity requirement of the Fourth Amendment, in light of the general searches ultimately permitted and conducted in this case.

## POINT V

**A FRANKS HEARING IS APPROPRIATE AND WARRANTED IN THIS CASE BECAUSE THE AFFIDAVITS SUBMITTED IN SUPPORT OF THE SEARCH WARRANTS INCLUDED MATERIAL FALSEHOOLDS AND OMITTED MATERIAL EVIDENCE.**

In support of its applications to seize and search the seven separate items ultimately reviewed in this case, the government included in each of the three identical affidavits submitted in purported substantiation of the same blatant and material inaccurate statements of fact, and also omitted critical information, of which the government could not have been unaware, or even profess ignorance, clearly denigrating its advancement of probable cause. As a result, all of the searches were conducted in the absence of a valid basis. Accordingly, all evidence and the fruits thereof should be suppressed or, at a minimum, an evidentiary hearing should be held.

The law is unmistakable that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." Franks v. Delaware, 438 U.S. 154, 155-56 (1978). The same requirements for a hearing apply where the case concerns omissions. United States v. Frost, 999 F.2d 737, 743 n.2 (3d Cir. 1993).

The first step in the <u>Franks</u> analysis is to identify false information contained in the affidavit, as well as take into consideration material omissions or distortions. <u>Wilson v. Russo</u>, 212 F.3d 781, 787-88 (3d Cir. 2000). With respect to false statements, the Third Circuit has defined such assertions by indicating that it has "borrowed from the free speech arena and equated reckless disregard for the truth with a 'high degree of awareness of [the statements'] probable falsity." <u>Id.</u> Regarding omissions, the Third Circuit has explained such "are made with reckless disregard if an officer withholds a fact in his ken that 'any reasonable person would have known that this was the kind of thing the judge would wish to know.'" <u>Id.</u> at 788; <u>see also</u> <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 399 (3d Cir. 1997) (holding that, at a <u>Franks</u> hearing, the defendant must prove by a preponderance of the evidence: "(1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary to the probable cause determination" (citing <u>Franks</u>, 438 U.S. at 171-72)).

A defendant "must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the original finding." <u>Yusuf</u>, 461 F.3d at 384. When faced with an omission, as here, the court "must remove the falsehood created by the omission by supplying the omitted information to the original affidavit." <u>Id.</u> (citations omitted). If the defendant meets this burden, "the Fourth Amendment requires that . . . the fruits of the search [must be] excluded to the same extent as if probable cause was lacking on the face of the affidavit." <u>Frost</u>, 999 F.2d at 743 (quoting <u>Franks</u>, 438 U.S. at 156).

In this case, the affidavits of purported probable cause advanced by the government, as previously advanced, contain numerous statements that are false on their face and omit material

61

information relevant to the probable cause determination.   Furthermore, when the tainted portions of the affidavits are excised, what remains are bare assertions by the affiant.   Indeed, if the issuing magistrate had been apprised of what was falsely alleged and omitted from the affidavits – the warrantless, unlawful search of defendant Castelluzzo's cellular telephone and defendant Atwell's email, as well as the lack of any criminal attenuation from the shipment of weapons from defendant Atwell's girlfriend – the facts take on an entirely different tack.   In light of the foregoing, and based upon the entire factual record now before this Court, it is, most respectfully, impossible to prudently find that probable cause existed to support the warrants issued, and, at a minimum, a <u>Franks</u> hearing is required.

Quite bespeaking of its inability to adequately proffer or now substantiate probable cause for the issuance of the seven search warrants authorized in this case is the practice here adopted and utilized by the government – reliance upon a single affidavit – replicated in triplicate – to establish probable cause for seven disparate and remote items.   Putting aside the fact that the government's stance in this case is not only unusual, but also unprecedented, pursuit of such a practice on the part of the government achieves no efficiency, serves no purpose, and, furthermore, is unnecessary.   Indeed, although the use of such identical affidavits is not proscribed by the courts, per se, its very nature and practice requires extreme and thoughtful scrutiny, as the use of such affidavits transforms a simple, straightforward probable cause review into an endless nightmare, and evokes overreaching, bias, and prejudice, in the end polluting the review process of an otherwise neutral and detached magistrate.

A review of all three affidavits underlying the search and seizure of the seven separate items reviewed in this case renders clear that each and all rely upon an interpretation of law based on supposition, speculation, and conjecture, and, furthermore, lack any evidence or

information to support probable cause for the issuance of the each of the seven search warrants authorized. In addition to relying upon the general use of a singular, identical affidavit, in triplicate, the government advanced in each of the affidavits many pages of narrative without a plan. Indeed, the paragraphs contained within the replicated affidavits drift along aimlessly. Very little of the content relates specifically to the specified locations to be searched, and scattered throughout are deliberate misrepresentations, intentionally misleading comments, as well as gratuitous, ad hominem comments.

At best, viewed in its totality, the affidavit effectively singularly advanced by the government in this case hints at, but does not identify, tentative criminal violations that might be connected with the seven specified items here searched. What is seriously lacking is the constitutionally mandated specific evidence necessary to undergird and substantiate a showing of probable cause. Indeed, as a review of the affidavits submitted by the government in this case in triplicate render clear, the statements contained therein are replete with half-truths, omissions, and outright falsehoods, rendering the warrants to search and seize the seven items ultimately obtained and the evidence collected by the government – upon ultimately baseless assertions – constitutionally infirm. A Frank's hearing is therefore, at a minimum, necessary to determine what the affiant knew, and a further hearing to determine the taint should follow. Accordingly, if the Court is satisfied in this case that any part of the constitutionally impressible and defectively general warrants may be permitted, it is most respectfully submitted that an evidentiary hearing is necessary.

## CONCLUSION

Law enforcement agencies have a duty to make every effort to respect the Constitution. When they choose instead to push the envelope of what might be constitutional, they must

shoulder the consequences of their miscalculation.  Cases acknowledging the "good faith" exception to the otherwise mandatory exclusion of evidence, including United States v. Leon, 468 U.S. 897 (1984), and Illinois v. Krull, 480 U.S. 343 (1987), are not to the contrary.  Those cases hold that exclusion of evidence is not appropriate only when the police sincerely and reasonably believe their actions are in fact constitutional.  Those cases do not apply, however, in cases such as this one where the police take chances with people's rights.

Where police take chances with people's rights, the law is clear that the exclusionary remedy applies.  Indeed, good faith means just that – a sincere belief that the action being undertaken is respectful of people's rights.  The deterrence rationale for the exclusion of evidence, in other words, does not apply when police gamble on the extent of individual rights. We should expect no less from government agents than that they make a sincere effort to honor their oaths to uphold the Constitution of the United States of America.

Accordingly, and for all of the foregoing reasons and authorities cited, defendants respectfully renew their request that the Court grant the pretrial applications here made in their entirety and any and all other relief deemed just and appropriate by this Court.

Respectfully submitted,

PASQUALE F. GIANNETTA, ESQ.
DAWN M. FLORIO, ESQ.
*Attorneys for Defendants*


/s/ Pasquale F. Giannetta
PASQUALE F. GIANNETTA

/s/ Dawn M. Florio
DAWN M. FLORIO, ESQ.


Dated: March 24, 2015

64

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | MAG. NO. 13-6616 (JAD) |
| | : | |
| v. | : | |
| | : | |
| LUKE ATWELL | : | AFFIDAVIT OF DEFENDANT |
| | : | LUKE ATWELL |
| | : | |

I, Luke Atwell, am the Defendant in the above captioned matter.

1.    On April 16, 2013, I voluntarily consented to the search of my cell phone and of my office which is LA Couriers, and I executed consent forms to same.

2.    At no time did I consent to access of my emails nor was I presented a consent form.

3.    While being processed by the Homeland Security, I was ordered to access my emails and I was immediately pushed aside at which time the Homeland Security rifled through my email account, without my consent or authority.

4.    At no time was I presented a consent form by the officers with regard to my email account, nor did I execute a consent form because I emphatically denied consent to my email account.

5.    With regard to the shipment of weapons to LA Couriers from my girlfriend Krystal Lopez, these were weapons that were lawfully purchases and owned by Ms. Lopez in Colorado, and were shipped to herself c/o LA Couriers in New Jersey, since she was relocating to New Jersey.

6.    In fact, upon discovering the weapons, the US Attorney's Office, District of New Jersey, charged Ms. Lopez with illegally transferring weapons, upon which she was arrested, processed and brought before a Magistrate in Colorado, and at a preliminary hearing the charges against Ms. Lopez were dismissed.

Dated:  3/25/15

LUKE ATWELL