UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Freda L. Wolfson |
| | : | |
| v. | : | |
| | : | Criminal No. 13-560 (S-1) |
| CHRISTOPHER CASTELLUZZO | : | |
| and | : | |
| LUKE ATWELL | : | |
| | : | |

**SUR-REPLY BRIEF OF THE UNITED STATES
IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**

PAUL J. FISHMAN
UNITED STATES ATTORNEY
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:

THOMAS S. KEARNEY
Special Assistant United States Attorney

COURTNEY A. HOWARD
Assistant United States Attorney

# **<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT...................................................................   2

SUPPLEMENTAL STATEMENT OF FACTS...........................................   3

LEGAL ARGUMENT............................................................................   12

   I.   The Defense Motions to Suppress the Evidence are Without
       Merit and Should be Denied in Their Entirety............................   12

       A. Agents Properly Conducted a Consent Search of the
          Residence in Bayonne ..............................................................   13

       B. Atwell Consented to Access of his Email Account ..................   16

       C. The Independent Source Doctrine Applies, in the Alternative,
          to the Evidence Obtained From Atwell's Email Account..............   21

   II.  The Defense Motion for a *Franks* Hearing has No Support in
        Fact or Law and Should be Denied ...........................................   25

CONCLUSION....................................................................................   30

## PRELIMINARY STATEMENT

The United States respectfully submits this sur-reply brief in further opposition to the defense motion to suppress evidence and in opposition to the defense motion for a *Franks* hearing.

The Government's initial opposition brief argued that a suppression hearing was not warranted because neither defendant presented any competent evidence, by way of affidavit or otherwise, that raised a single disputed issue of material fact. (*See* Gov't Opp. Br. at Point IV.C.4.) In response, the defendants provided signed statements from Luke Atwell and Naivene Mahgoud. Based on these submissions, the Government believes that a hearing is warranted and will be prepared to present testimony regarding the searches. For the reasons articulated *infra*, the motions to suppress should be denied in their entirety.

The defendants' reply brief also added a request for a *Franks* hearing, alleging that the affidavits "in support of the search warrants included material falsehoods and omitted material evidence." (*See* Defense Reply Br. at page 60). This allegation has no support in the law or the facts, and the request for a *Franks* hearing should be denied.

The Government will rely on the arguments previously set forth in its initial opposition brief with respect to the points re-argued by the defendants.

## SUPLEMENTAL STATEMENT OF FACTS

The Government incorporates by reference the statement of facts previously submitted in its opposition brief dated February 3, 2015.  By way of supplement—and to address the new arguments and statements submitted by the defense—the Government submits the following supplemental statement of facts.[1]

### The Search of 28 Evergreen Street in Bayonne

On March 7, 2013, agents and task force officers from the DEA seized multiple kilograms of methylone from a packaging mill located in Apartment L of 68 Elmwood Avenue in East Orange (the "East Orange Drug Mill").  One of the persons arrested at the East Orange Drug Mill, Rafael Santiago-Soto, arrived at the East Orange Drug Mill driving a black Nissan registered to Christopher Castelluzzo of 28 Evergreen Street in Bayonne, New Jersey. During a search of the East Orange Drug Mill, agents recovered documents connecting Castelluzzo to the Mill including, but not limited to, cardboard shipping boxes and a New Jersey Department of Corrections photo identification.  Following completion of the search of the East Orange Drug Mill, Soto and two packers, later identified as Rossy Gil-Espinosa and Jose Careno-Benigno, were placed under arrest and transported to DEA headquarters for processing.

---

[1] The factual narrative is drawn from anticipated testimony, as well as documents and other evidence related to this case, including official reports of the Drug Enforcement Administration ("DEA") and Homeland Security Investigations ("HSI").

Later that night, several agents and officers drove out to 28 Evergreen Street in Bayonne in an attempt to locate Castelluzzo.  After they arrived at the Bayonne location, Special Agents Jeremy Latchman and Brian Iandoli approached the residence.   The agents displayed their badges which clearly identified them as law enforcement officers.  Naivene Mahgoub, who identified herself as the mother of Castelluzzo's children and a resident of 28 Evergreen Street, answered the door.  The agents expressed their interest in locating Castelluzzo, and Ms. Mahgoub advised the agents that he was not home.

As the conversation continued, the agents asked Ms. Mahgoub if she would consent to a search of the residence, and she gave her consent.  She was presented with a standard consent to search form used by the DEA, which contains an acknowledgment that she was not "threatened, nor forced" and "freely consent[ed]" to the search.  (Exhibit B, Gov't Opp. Br.)  She voluntarily signed the form inside the residence, and the agents and officers thereafter commenced the search.  While the search was in progress, Ms. Mahgoub gave her consent to search the vehicles located at the residence as well.

During the Bayonne search, agents recovered numerous items indicative of drug trafficking, including several phones, various documents, rubber bands, money wrappers, liquid incense, notebooks with ledgers, and plastic cylindrical tubes, similar to the ones being used at the East Orange Drug Mill.

**The Email Searches**

On April 10, 2013, Customs and Border Protection Officers seized an incoming parcel from China which contained just under three (3) kilograms of

methylone, a Schedule I controlled substance (the "Drug Parcel"). The Drug Parcel, addressed to LA Courier Services in Manville, New Jersey, was turned over to agents from Homeland Security Investigations ("HSI"). On April 15, 2013, agents attempted a "controlled delivery" of the Drug Parcel. Similar to a white collar investigation where agents are trained to follow the money, agents participating in a controlled delivery of illegal drugs are trained to follow the parcel. The agents will often follow the parcel up the chain to identify as many of the participants in the drug conspiracy as possible. The Drug Parcel in question was not delivered on April 15th because nobody was present at LA Courier Services to accept the Drug Parcel on that date, but a re-delivery slip with contact information was left with the building manager of the building complex.

The next day, April 16, 2013, the Hillsborough Post Office, which also services Manville, received a call from a male regarding the re-delivery slip. At approximately 1:10 p.m., Luke Atwell drove his Jeep, with Castelluzzo occupying the front passenger seat, to the Manville Post Office and pulled into the parking lot. Atwell then entered the post office, and shortly thereafter, he exited carrying the Drug Parcel. He placed the Drug Parcel in the front seat area of the Jeep between himself and Castelluzzo. As Atwell attempted to back out of his parking space, both he and Castelluzzo were stopped and placed under arrest.

After being transported a short distance to the Manville Police Department, Atwell was advised of his *Miranda* warnings at approximately 1:35

5

p.m.    Atwell was cooperative throughout the investigation that day as he attempted to portray himself as an unwitting dupe who just transported parcels as part of his courier business.    After waiving his *Miranda* rights, Atwell told the agents an elaborate story about how he responded to an advertisement on Craig's List to pick up packages for an Indian male named "Pito."    Atwell acknowledged that he owned LA Courier Services and operated the business out of 64 N. Weiss Street in Manville, New Jersey.    He further acknowledged that he previously received approximately 5-7 packages for Pito, all of which had come from China.    According to Atwell, Pito generally sent him the tracking numbers for the packages to his phone or to his email account.    Atwell would then track the packages from his phone or the computer in his office.    The agents, who at the time had no idea that Pito was actually just an alter-ego created by Atwell, were interested in maintaining Atwell's cooperation to see if they could further the investigation by making another controlled delivery to Pito.

As the agents probed further about Pito to determine the reasonableness and safety of another controlled delivery, Atwell spoke about the pattern he previously followed with Pito when the packages arrived.    Atwell stated that on other occasions when he received parcels destined for Pito, he drove them to "Johnny USA" on West 27th Street in Manhattan, which he claimed was Pito's business address.    He further claimed that he would leave these packages with one of Pito's employees and would thereafter receive a deposit in his bank account from Pito.    When asked about his plans for the Drug Parcel if he had

6

not been arrested, Atwell stated that he intended to drive it over to Pito's business in Manhattan later that day.

During the interview, Atwell offered that he maintained various business records at his office in Manville.  Hoping to perpetuate this ruse about Pito, Atwell told the agents that he had a copy of the Craig's List advertisement at his office and that he could access a series of emails he allegedly exchanged with Pito from his office computer.  When asked whether he would allow the agents to search his office and cellular phone, Atwell consented.  He signed consent to search forms related to the LA Courier Services office and his iPhone. (Exhibits D and E, Gov't Opp. Br.; *see also* paragraph 1 of Atwell Statement dated March 25, 2015.)

HSI agents then drove Atwell to the LA Courier Services office.  To ameliorate Atwell's expressed concern about making a scene at his place of business, the agents uncuffed Atwell outside of LA Courier Services. Approximately four law enforcement officers, rather than the entire investigative team, then followed him into his office.  At the time, the investigative objective continued to be gathering information about Pito to determine if a controlled delivery with him would be safe and possible.  Once inside the office, Atwell handed the agents a previously printed hard copy of the Craig's List advertisement.  (Exhibit S.)  Atwell then, in the presence of the agents, logged on to his computer and pulled up the emails between his admitted account, atwell.luke@gmail.com, and the account he alleged Pito operated, nychookah@gmail.com.  Atwell printed those emails.  (Exhibit T.)

Agents then asked him to shut down the computer, and Atwell complied. Thereafter, the agents, pursuant to the consent search, seized the computer along with various other documents located at LA Courier Services. Atwell was escorted out of the building and discretely re-cuffed prior to being transported to HSI's headquarters.

At HSI, Atwell was brought into the processing area. Again seeking to gather more details about Pito and determine if they could further the investigation, Atwell was brought into the computer lab at HSI by Special Agents James McDermott and Michael Riccitelli. Atwell sat next to Agent Riccitelli at one of the undercover computer terminals where they logged onto Atwell's email account. They looked for emails regarding Pito before Agent Riccitelli initiated a keyword search for "methylone" in Atwell's email account. At that point, a recent email thread between atwell.luke@gmail.com and andrewdaydc@hotmail.com appeared on the screen, and the email included an attachment related to pricing for methylone. (Exhibit U.)

When confronted by the agents about this email, Atwell, now in a less cooperative posture with the agents, claimed that the email thread in question related to a solicitation he had received from an Andrew Becker in Colorado about selling "Molly," a form of Ecstasy. Atwell claimed that he informed Becker that he was not interested in participating in this venture. He was then returned to the holding cell. When Agent McDermott later asked Atwell

whether he would consent to allowing HSI to assume his online presence, Atwell declined.[2]

### The Firearms Mailed by Krystel Lopez

Two paragraphs of Atwell's six paragraph statement are devoted to the shipment of "weapons" by his girlfriend, Krystel Lopez, from Colorado, to his business in New Jersey.  Although the shipment of these firearms is not part of this indictment, some of the facts regarding the Lopez case require clarification.

On April 17, 2013, U.S. Postal Inspectors learned that a second parcel destined for LA Courier Services contained what appeared to be the barrel of a firearm protruding through a hole punctured in the side of the packaging during shipment.  The intended recipient of that package was Lopez, care of LA Courier Services.   Agents had previously learned during the interview with Atwell that Lopez was his girlfriend and that she had shipped packages to his place of business. On April 18, 2013, Magistrate Judge Joseph Dickson signed a warrant authorizing the search of this parcel which was found to contain the upper receiver of an M4 assault rifle.  Later that day, Postal Inspectors learned of an additional six parcels that Lopez had sent from Colorado and addressed to herself at LA Courier Services.  Following the execution of warrants for those parcels, agents recovered the additional component parts of a Colt M4 assault rifle as well as the component parts of a .40 caliber Glock handgun.  At the

---

[2] Notably, the assumption of Atwell's online presence would have afforded HSI agents the opportunity to prevent Atwell or any other person from accessing and deleting the information contained on his email account.

time of their shipment, Atwell was a convicted felon and therefore prohibited from possessing firearms.

On May 17, 2013, then-Magistrate Judge Madeline Cox Arleo signed a criminal complaint and an arrest warrant for Lopez on charges of conspiracy to transfer firearms, contrary to Title 18 United States Code, section 922(a)(5) and in violation of Title 18 United States Code, section 371.  On May 20, 2013, Agent deArmas, assisted by HSI agents in Colorado and the Greeley Police Department, arrested Lopez in Colorado.  On May 23, 2013, Magistrate Boyd Boland in Colorado dismissed the complaint.  Thereafter, on November 1, 2013, a Federal Grand Jury sitting in Newark indicted Lopez for conspiracy and transfer of firearms to a prohibited person.

**Search Warrants**

On June 4, 2013, Special Agent deArmas of HSI presented three affidavits to the Honorable Steven C. Mannion.  All three search warrants were signed by Judge Mannion that day.  The first affidavit sought authorization to search the computer tower recovered from LA Courier Services and the flash drive recovered from Atwell at the time of his arrest.  (Exhibit F, Gov't Opp. Br.)  The second affidavit sought authorization to search the "atwell.luke@gmail.com" and the "nychookah@gmail.com" email accounts.  (Exhibit G, Gov't Opp. Br.)   The third affidavit sought authorization to search the three cellular telephones recovered from Atwell and Castelluzzo at the time of their arrests.  (Exhibit H, Gov't Opp. Br.)

The statements of probable cause in all three affidavits contained factual information gathered during the investigation.  As set forth in the affidavits, on April 10, 2013, Customs and Border Protection ("CBP") intercepted a package containing approximately three (3) kilograms of methylone, a schedule I controlled substance. (Exhibits F, G, H at ¶ 6).  On April 16, 2013, Atwell and Castelluzzo arrived together at the Manville Post Office.  (Exhibits F, G, H at ¶ 9).   Atwell picked up the package and returned to the vehicle still occupied by Castelluzzo, and both men were placed under arrest as they attempted to exit the parking lot.  (Exhibits F, G, H at ¶ 9).  A review of text messages from Castelluzzo's phone showed that he had received messages from "Ghost" indicating: "I got 2 grab the package 2 morrow at the po [Post Office]." (Exhibits F, G, H at ¶ 10).  The affidavits listed the items recovered from each of the defendants. (Exhibits F, G, H at ¶¶ 10-13).

The affidavits also included detail from Atwell's post-arrest statements. Specifically, the affidavits included Atwell's statements that he was the owner of LA Courier Services located at 64 N. Weiss Street in Manville, and that he had responded to an advertisement on Craig's List and used his email account to communicate with the person he identified as Pito whom he alleged was the intended recipient of the target parcel.  (Exhibits F, G, H at ¶ 12).  The affidavits also included portions of Atwell's statement where he acknowledged previously receiving 5-7 packages for Pito at LA Courier Services; had money deposited directly into his accounts following the deliveries; and his belief that the target parcel intended for Pito might contain a gun or explosives.

11

(Exhibits F, G, H at ¶ 13).  The affidavits included information that Atwell had received packages from Lopez at his business and that he maintained records at the Manville office.   (Exhibits F, G, H at ¶ 13).

One paragraph of the affidavits mentioned that a consent review of Atwell's email account also suggested his involvement with an individual involved in the powdered form of MDMA.  (Exhibits F, G, H at ¶ 14).  Detail was also provided with respect to seven other intercepted packages destined for LA Courier Services which contained the component parts of a M4 assault rifle and a Glock handgun.  (Exhibits F, G, H at ¶¶ 16-17).

Following the statements of probable cause, each of the three affidavits provided background, and in some instances, technical information about the items sought.  (Exhibit F at ¶¶ 19-29, Exhibit G at ¶¶ 19-27, and Exhibit H at ¶¶ 19-26, 32-40).  Agent deArmas further articulated that through her training and experience, she was aware that flash drives, computers, email accounts and cellular phones were commonly used by individuals involved in narcotics and firearm trafficking to further their illegal activities.   (Exhibit F at ¶¶ 19, 23; Exhibit G at ¶¶ 27, 30, 32-33; Exhibit H at ¶ 32).

**LEGAL ARGUMENT**

I.   **THE DEFENSE MOTIONS TO SUPPRESS THE EVIDENCE ARE WITHOUT MERIT AND SHOULD BE DENIED IN THEIR ENTIRETY.**

Approximately two years after the arrests in East Orange and Manville, and following the submission of the Government's opposition brief asserting the absence of factually contested issues, Atwell and Naivene Mahgoud, the mother of Castelluzzo's children, submitted statements challenging the

voluntariness of their consent related to the search of Atwell's email account and Castelluzzo's apartment and vehicles.

In March of 2013, the DEA, while investigating the East Orange Drug Mill, went to Castelluzzo's apartment in Bayonne, and according to Mahgoud's recent submission, allegedly "pushed [Mahgoud] aside and rushed into [her] apartment" without her consent.   (Mahgoud statement dated April 3, 2015 at ¶ 5.)   Similarly, Atwell now alleges that during processing, agents from HSI, a completely different federal law enforcement agency which had no involvement with the investigation of the East Orange Drug Mill, "immediately pushed [him] aside" while agents "rifled through [his] email account."   (Atwell statement dated March 25, 2014 at ¶ 3.)   Both of these claims are false and represent self-serving, revisionist history.

### A. Agents Properly Conducted a Consent Search of the Residence in Bayonne.

As previously articulated in the Government's opposition brief, law enforcement officers may conduct a consent search without a warrant if it is given voluntarily by a person authorized to give it.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Wilson*, 413 F.3d 382, 388 (3d Cir. 2005).   To determine whether consent was given voluntarily, courts examine the totality of the circumstances.  *United States v. Stabile*, 633 F.3d 219, 231 (3d Cir. 2011).

On March 7, 2013, agents and task force officers from the DEA seized multiple kilograms of methylone from the East Orange Drug Mill.   One of the persons arrested at the apartment, Rafael Santiago-Soto, arrived at the

13

apartment driving a black Nissan registered to Castelluzzo.  During a search of the East Orange Drug Mill, agents recovered various documents connecting Castelluzzo to the Mill.  Following completion of the search of the East Orange Drug Mill, Soto and two packers were placed under arrest and transported to DEA headquarters for processing.

Absent from that list of arrestees was Atwell, who coincidently had shown up at the East Orange Drug Mill to deliver a pair of gloves to Soto without knowing that federal agents were inside the apartment collecting several kilograms of methylone and other evidence.  After a brief detention, Atwell was released; yet, the defense, through its recent submissions, proffered that the team of agents who released Atwell without further questioning or prolonged detention, were the same agents also rushed the door when they arrived in Bayonne later that evening.

The reality of what occurred at 28 Evergreen Street in Bayonne was however, quite different.  After they arrived at the Bayonne location, Special Agents Latchman and Iandoli approached the residence wearing badges which clearly identified them as law enforcement officers.  Mahgoub, who identified herself as the mother of Castelluzzo's children and a resident of 28 Evergreen Street, answered the door.  The agents expressed their interest in locating Castelluzzo, and Mahgoub advised the agents that he was not home.

As the conversation continued, the agents asked Ms. Mahgoub if she would consent to a search of the residence, and she gave her consent.  She was presented with a standard consent to search form used by the DEA, which

14

contains an acknowledgment that she was not "threatened, nor forced" and "freely consent[ed]" to the search.  (Exhibit B, Gov't Opp. Br.)  She voluntarily signed the form inside the residence, and the agents and officers thereafter commenced the search.  While the search was in progress, Ms. Mahgoub gave her consent to search the vehicles located at the residence as well. The agents recovered several phones, documents related to the drug investigation, rubber bands, money wrappers, notebooks, and plastic cylindrical tubes similar to the ones being used at the East Orange Drug Mill.

To justify a search based on consent, the Government has the burden of proving that the consent was freely and voluntarily given.  *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).  Factors to consider include the age, education and intelligence of the subject and whether there were verbal threats or physical punishment.  *Price*, 558 F.3d at 278 (3d Cir. 2009); *United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994).  Here, the Government anticipates testimony that Mahgoub was an adult of at least average intelligence who was in no way coerced or threatened into giving her consent.  In addition to providing verbal consent to search the premises, agents presented Mahgoub with a consent to search form which she signed in their presence.  The form contained an acknowledgment that she had not been threatened, nor forced in any way and that she freely consented to the search.  (Exhibit B, Gov't Opp. Br.)  Simply stated, Mahgoub provided verbal and written consent for the search of the

residence she shared with Castelluzzo, and the evidence recovered during the search should be deemed admissible in the Government's case-in-chief.

### B. Atwell Consented to Access to His Email Account.

Shortly after his arrest on April 16, 2013, Luke Atwell went into self-preservation mode. He attempted to pull a con on the agents by directing them toward the fictional alter-ego that he had created—an Indian man named "Pito"—to deflect their attention and the investigation away from himself and Castelluzzo. To effectuate his false defense, Atwell was cooperative with the agents following his arrest. He admitted that LA Courier Services was his business and told agents that he accepted packages for Pito after responding to a Craig's List advertisement seeking a courier service. He then told agents that he communicated with Pito at nychookah@gmail.com, using his email atwell.luke@gmail.com. He even agreed to show agents these emails and the Craig's List ad, and so he consented to a search of his business, LA Courier Services.

Following this initial interview with Atwell, his Gmail account was accessed at two different times: once during the consent search of LA Courier Services, and once a few hours later while being processed at HSI. Atwell now states that he did not give consent to access his email account and argues that the emails obtained on the date of his arrest (Exhibits T and U) and "all evidence derived therefrom" should be suppressed. (*See* Defense Reply Br. at page 35). As discussed *infra*, Atwell clearly consented to access to his email account on both occasions. First, at LA Courier Services, Atwell sat at his

16

computer in his office, logged on and pulled up his email, and showed agents two email strings between him and Pito that were then printed. (Exhibit T.) Second, after transporting Atwell to HSI for processing, agents sat with Atwell at a computer and he logged into his Gmail account a second time—again, acting in full cooperation with the agents in order to continue pointing at Pito. It was only after the agents found the email with the methylone/MDMA attachment (Exhibit U) that Atwell realized the jig was up. When his cooperation ceased, the agents no longer relied on his consent and instead sought, and received, a search warrant to further review his email account.

It bears repeating that "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). It is well established that consent is an exception to both a search warrant and probable cause requirements. *Schneckloth*, 412 U.S. at 219. Consent must be given voluntarily, but it may be gleaned from considering a range of factors. *Bumper*, 391 U.S. at 548; *Stabile*, 633 F.3d at 230; *Price*, 558 F.3d at 279; *Kim*, 27 F.3d at 955. While the age, education, and intelligence of the subject are always factors to be considered in determining voluntariness, "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions" have also been deemed relevant when evaluating voluntariness. *Price*, 558 F.3d at 278 (quoting *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003)); *Stabile*, 633 F.3d at 231; *see also United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010) (noting that subjects may implicitly consent to searches); *United*

17

States v. Hinojosa, 606 F.3d 875, 882 (6th Cir. 2010) (holding that there is no requirement that consent be given verbally and that a subject's non-verbal actions may constitute valid consent).  The Government need not inform the subject of his right to refuse consent.  *Schneckloth*, 412 U.S. at 249.

Moreover, the Third Circuit has held that consent may be inferred from the assistance that an individual provides to law enforcement officers.  In *Stabile*, defendant Salvatore Stabile challenged the District Court's denial of his motion to suppress various evidence including images of child pornography on a hard drive from his home computer.  When law enforcement officers arrived at Stabile's home, they were met by Debbie Deetz, who mistakenly believed that she was married to Stabile.  *Id.* at 231.  Deetz invited the officers inside the home and signed a consent form to search the home.  *Id.* at 225.  During the search, Deetz showed the officers the locations of several computers and when members of a computer crime unit arrived to disconnect the hard drives, Deetz watched the officers remove them.  *Id.*  When one officer had difficulty removing a hard drive, she even asked the officer if he needed a screwdriver.  *Id.* In upholding the ruling that Deetz voluntarily consented to the seizure of the hard drives, the court noted that "Deetz's consent may also be inferred from the assistance she provided to the officers."  *Id.* at 233.

Here, a range of factors, including Atwell's verbal and non-verbal actions while in police custody, as well as the assistance he provided the agents, demonstrate that his decision to provide access to his email account was completely voluntary.  Atwell's age, intelligence, and education were at least

18

average, and he had previous experience with the criminal justice system. *See Price*, 558 F.3d at 279.   Shortly after his arrest on April 16, 2013, he was cooperative with the agents as they continued their investigation into the parcel containing the methylone.   He waived his *Miranda* warnings at approximately 1:35 p.m. and proceeded to portray himself as an unwitting dupe innocently involved in the courier business.   Atwell gave lengthy explanations about the Craig's List advertisement, his prior work for Pito, and the use of his office computer, Gmail account, and phone to communicate with Pito and to track these packages from China.

During the interview, Atwell told the agents that he maintained various business records at his office in Manville, including a copy of the Craig's List advertisement.   He further stated that he could access a series of emails he allegedly exchanged with Pito from his office computer.   As evidenced by his own recent statement, Atwell "voluntarily consented to the search of [his] cell phone and [his] office" and "executed consent forms to same."   (*See* paragraph 1 of Atwell's statement.)

HSI agents then drove Atwell to the LA Courier Services office and accommodated his wishes to avoid public scrutiny at his office by allowing him to enter the building without handcuffs.   While at LA Courier Services, Atwell handed the agents a previously printed hard copy of the Craig's List advertisement.   Then, in the presence of the agents, Atwell sat at his computer—the same one that was then seized and for which a search warrant was subsequently obtained—pulled up his Gmail account and showed agents

two email strings between his admitted account, atwell.luke@gmail.com, and the account he alleged was operated by Pito at nychookah@gmail.com. (Exhibit T.)  Although she had previously obtained his written consent to search LA Courier Services, Agent deArmas did not request that Atwell sign an additional consent to search form when he pulled up these email strings on his computer. A totality of the circumstances review does not, however, require that the consent be in written form.  *Schneckloth*, 412 U.S. at 226; *Price*, 558 F.3d at 279.

After his arrival at HSI, Atwell was brought into the processing area.  At that point, the agents remained cautiously optimistic that they might be able to attempt another controlled delivery to Pito.  Atwell's statement, which defies all logic and common sense, suggests that at this stage of the investigation he was "ordered to access [his] emails" and the same group of HSI agents who had allowed him to enter his office without handcuffs on "immediately pushed [him] aside" and "rifled through [his] email account."  (*See* paragraph 3 of Atwell's statement.)  Aside from being incredible, this belated assertion is patently false.

 The Government anticipates testimony that the HSI agents, again seeking to gather more details about Pito in order to determine if they could safely further the investigation, brought Atwell into the computer lab.  Atwell sat next to Agent Riccitelli in front of the computer, and they logged onto Atwell's email account which he did freely and voluntarily.  It was only after Agent Riccitelli initiated a keyword search for "methylone," recovered an email with an attachment related to methylone (Exhibit U), and confronted Atwell

about the email, that Atwell's cooperative attitude changed. At that point, he was returned to the holding cell and the agents ceased any review of the email account.

An examination of the totality of the circumstances shows that Atwell voluntarily consented to, and indeed assisted in, the access of his email account. Accordingly, the motion to suppress the emails obtained on April 16, 2013 at LA Courier Services and HSI (Exhibits T and U) should be denied.[3]

### C. The Independent Source Doctrine Applies, in the Alternative, to the Evidence Obtained From Atwell's Email Account.

Even assuming that Atwell did not consent to accessing his emails—which defies logic in light of the facts detailed *supra*—the independent source doctrine applies and removes any taint from this search. Unfortunately, due to Atwell's own obstructionist actions discussed *infra*, the email regarding methylone (Exhibit U) was not in the search warrant returns for Atwell's email account, but the Government respectfully submits that it should be deemed admissible.

The independent source doctrine acts as an exception to the exclusionary rule and allows for the introduction of evidence initially discovered during an impermissible search, but later obtained through independent activities untainted by the initial search. *Stabile*, 633 F.3d at 243; *Price*, 558 F.3d at

---

[3] Likewise, defendants' blanket request that "all evidence derived" from Exhibits T and U be suppressed must be denied. Only one paragraph of the search warrant affidavits references information obtained from Exhibit U—and there is no information in the affidavits that was obtained solely from Exhibit T. Even if paragraph 14 were excised from the affidavits, there was still ample probable cause to grant the search warrants for Atwell's email account, the Pito email account, the flash drive, the computer tower, and the cellular phones.

281.  The proper remedy for police error or misconduct relating to such evidence is to "put[] the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred."  *Price*, 558 F.3d at 281 (quoting from *Murray v. United States*, 487 U.S. 533, 537 (1988)). Under this doctrine, "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rational has so little basis that the evidence should be received."  *Stabile*, 633 F.3d at 245; *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) (quoting *Nix v. Williams*, 467 U.S. 431 (1984)).  Again, it bears repeating that much of the deterrence benefit is lost in this case when the Government secured search warrants at almost every step of the search.  *Stabile*, 633 F.3d at 246; *Vasquez De Reyes*, 149 F.3d at 195.

Judge Mannion issued search warrants on June 4, 2013 for, among other things, Atwell's email account, atwell.luke@gmail.com.    When implementing the independent source doctrine, a reviewing court must first determine whether a neutral judge would have issued the search warrant even if not presented with information that had been obtained during an unlawful search.  *Stabile*, 633 F.3d at 243.  If the answer to the first question is yes, then the reviewing court must ask whether the first search prompted the officers to obtain the subsequent search warrant.   *Id.*

Here, the search warrant affidavit presented to Judge Mannion did not contain any information obtained solely from the emails printed by Atwell at LA

22

Courier Services, and it contained only one paragraph that referenced the methylone email (Exhibit U). (Exhibits F, G, H at ¶ 14). Even if paragraph 14 had been excised from the probable cause statement—and moreover, even if all of the other contested information (see Exhibits F, G, H at ¶¶ 10, 16-17) contained in the probable cause statement—were excised from the affidavit, there was ample probable cause remaining to justify a search of the email account of Atwell.

The unchallenged facts contained in the affidavits included information about the interception of a package containing approximately three (3) kilograms of methylone. (Exhibits F, G, H at ¶ 6.) The affidavits set forth that Atwell and Castelluzzo arrived together at the Manville Post Office and that Atwell picked up the target package and returned with it to the vehicle still occupied by Castelluzzo. (Exhibits F, G, H at ¶ 9.) The affidavit listed the cellular phones, flash drives, and computer equipment and that were recovered on the defendants at the time of their arrest or at Atwell's place of business. (Exhibits F, G, H at ¶¶ 10-12, 15.) The affidavits also included detail from Atwell's post-arrest statements wherein he identified Pito as the intended recipient of the target parcel, acknowledged previously receiving 5-7 similar packages for Pito at LA Courier Services, expressed his belief that the target parcel might contain a gun or explosives, and that he had communicated with Pito at nychookah@gmail.com using his email account atwell.luke@gmail.com. (Exhibits F, G, H at ¶¶ 12-13.)

Under the second prong of the independent source doctrine, it is clear that the brief search of Atwell's email account during his processing at HSI and during the search of LA Courier Services had no impact on the decision to apply for the search warrants for his email account.   Atwell, who jointly possessed the target parcel containing methylone, had admitted to using his email address to communicate with a potential target, Pito.   Knowing this information, along with their training and experience, it would have been "impossible" or "inconceivable" that the agents would not have applied for search warrant of Atwell's admitted email account.   *Stabile*, 633 F.3d at 245. Accordingly, even assuming that Atwell did not consent to access his email account on the date of his arrest, the emails with Pito (Exhibit T) inevitably would have been discovered through a search warrant of Atwell's email account.

Unfortunately, due to Atwell's obstruction, the email with Andrew Becker regarding methylone (Exhibit U) was not among the emails in the atwell.luke@gmail.com search warrant return.   On April 18, 2013, Google received a preservation letter from HSI for the email account atwell.luke@gmail.com, but Google did not confirm that the preservation was processed until April 24, 2013.   During this gap of time, Atwell was released from custody on bail, and for the first time since confronted with the methylone email (Exhibit U), he had access to his email account.   Following Atwell's release on bail on April 18, 2013, text messages sent from the cellular phone of

24

his girlfriend, Krystel Lopez, to a person named Hilda, contained the following statements:

- "Hey Hilda, it's Luke.  I'm going thru my email to sanitize it.  Well [sic] call you tomorrow."

- "Sure, btw they don't got shit on me and my bail was only 100k.  Shit going to be ok, just going to take a little money.  Teflon don out" (Exhibit V.)

While the methylone email (Exhibit U) was not included in the search warrant return, the email should still be admissible, regardless of consent, because but for Atwell's obstructionist activity, it inevitably would have been discovered through the valid search warrant.

## II.   THE DEFENSE MOTION FOR A *FRANKS* HEARING HAS NO SUPPORT IN FACT OR LAW AND SHOULD BE DENIED.

The Government's initial opposition brief argued that a suppression hearing was not warranted because neither defendant presented any competent evidence, by way of affidavit or otherwise, that raised a single disputed issue.  (*See* Gov't Opp. Br. at Point IV.C.4.)   In response, the defendants provided signed statements from Atwell and Mahgoud and added a request for a *Franks* hearing alleging that the affidavits "in support of the search warrants included material falsehoods and omitted material evidence." Based on the submissions of Atwell and Mahgoud, the Government will be prepared to present testimony regarding the searches.   The Government, however, takes issue with the suggestion that the affidavits contained both

25

material falsehoods and omissions.    Accordingly, the request for a *Franks* hearing should be denied.

There is a presumption of validity that attaches to affidavits submitted in support of search warrants. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). In order to obtain an evidentiary hearing, "the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Id.* The defense must support its allegations of deliberate falsehood or of reckless disregard for the truth with an offer of proof. *Id.* Even if there is such a showing, when a court reviews the balance of the affidavit after the material that is the subject of the alleged falsity or reckless disregard is set aside and still finds there is probable cause, then no hearing is required. *Id.* at 171-172.

The defense states that in obtaining the seven search warrants authorized in this case, the Government relied "upon a single affidavit – replicated in triplicate." This assertion is inaccurate. A plain language reading of the three affidavits clearly demonstrates that the probable cause statements in each of the affidavits was repeated. The balance of the affidavits, however, including the explanation of terms, the articulation of the affiants experience, and the explanation of how the particular items sought to be searched could be used to further criminal activity were very much different.    Specifically, following the statements of probable cause, each of the three affidavits provided background information about the items sought. (Exhibit F at ¶¶ 19-29, Exhibit G at ¶¶ 19-27, and Exhibit H at ¶¶ 19-26, 32-40). Thereafter, each of

the three affidavits specified the property to be searched. (Exhibit F at ¶¶ 31-35, Exhibit G at ¶¶ 28-34, and Exhibit H at ¶¶ 27-30, 41-44). The search warrants all contained attachments which provided more specific detail about the items to be searched as well as a description of the items to be searched and their related federal offenses. (Exhibit I through Exhibit O, attachments A and B). Thus, the defense repeated suggestion in its reply papers that the Government relied on "a singular, identical affidavit, in triplicate" is disingenuous.

Although not clearly articulated in its reply brief, the defense appears to take issue with the inclusion in the affidavits of the last two sentences in paragraph 10 related to the text messages reviewed by HSI at the time of Castelluzzo's arrest, the entirety of paragraph 14 related to the review of Atwell's email account, and paragraphs 16 and 17 related to the packages containing the component parts of the Glock handgun and the Colt M4 assault rifle. The information in each of these paragraphs is factually accurate and in no way contain material falsehoods or material omissions.

In the last two sentences of paragraph 10, the affiant noted that a review of the text messages from Castelluzzo's phone showed that he had received a message on April 15, 2013, the day of the attempted controlled delivery, that indicated: "OK eagles landed and slip was left I got 2 call the PO." (Exhibit C; Exhibits F, G, H at ¶ 10). The last sentence of paragraph 10 noted that Castelluzzo's phone received another text message on that date stating: "I got 2 grab the package 2 morrow at the PO." (Exhibit C; Exhibits F, G, H at ¶ 10).

The defense has challenged the admissibility of these text messages, and the Government reiterates that the agents acted in good faith when they reasonably relied on then-existing case law when they reviewed Castelluzzo's text messages incident to his arrest.  (*See* Gov't Opp. Br. at Points IV.B.1. and 2.).  It cannot, however, be credibly argued that the inclusion of the last two sentences of paragraph 10 represented materially false information.

In paragraph 14 of the affidavits, the affiant noted that Atwell consented to the review of his email account and that one email exchange related to the sale of MDMA.  (Exhibits F, G, H at ¶ 14.)  Once again, the defense has challenged the admissibility of this email, and the Government reiterates its position that Atwell provided his consent to review his emails while he was cooperating with the agents, or in the alternative, that the independent source doctrine would allow for the admission of this evidence.  (*See supra* Points I.B and I.C.).  Once again it cannot be credibly argued that the inclusion of paragraph 14 represented materially false information.

In paragraph 16 and 17 of the affidavits, the affiant again included purely factual information about seven different parcels sent by Krystel Lopez to LA Courier Services.  (Exhibits F, G, H at ¶¶ 16-17.)  These two paragraphs presented to Judge Mannion provided facts about the arrival of component parts of an assault rifle and a handgun without reference to the fact that Judge Arelo had jurated the complaint or that Judge Boland had dismissed it.  The legal proceedings regarding the guns were not material to the probable cause determination being undertaken by Judge Mannion.   The material facts,

namely who sent the packages, who they were addressed to, when they were shipped and what they contained, were all included for his review. Thus, paragraphs 16 and 17 contained the material facts and the absence of information regarding the procedural posture of the complaint against Lopez did not constitute an omission of material fact.

In sum, the three affidavits submitted to Judge Mannion on June 4, 2013 and the probable cause statements contained therein all contained relevant and material facts for his consideration and are presumptively valid. As noted *supra* (Point I.C), even if one or all three of the challenged paragraphs were set aside by this reviewing Court, there remained sufficient content in the warrant affidavits to support findings of probable cause. Accordingly, no *Franks* hearing is required.

## **Conclusion**

For the foregoing reasons, the Court should deny the supplemental defense motions in their entirety.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

By:    /s/ Thomas S. Kearney
Special Asst. U.S. Attorney

By:    /s/ Courtney A. Howard
Assistant U.S. Attorney

cc:    Dawn Florio, Esq. (by e-mail)
Pasquale Giannetta, Esq. (by e-mail)

29